WEINBERG ZAREH MALKIN PRICE LLP
45 Rockefeller Plaza, 20th Floor
New York, New York 10111
Phone: 212-899-5470
Adrienne Woods, Esq.
Omid Zareh, Esq.
Terrence K. McLaughlin, Esq., *of Counsel*
Donna Fiorelli, Esq., *of Counsel*
Email: awoods@wzmplaw.com
Email: ozareh@wzmplaw.com
Email: tmclaughlin@wzmplaw.com
Email: dfiorelli@wzmplaw.com

PILLSBURY WINTHROP SHAW PITTMAN LLP
31 West 52nd Street
New York, New York 10019
Phone: 212-858-1170
Email: hugh.mcdonald@pillsburylaw.com

*Counsel to Nicholas John Farley*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>NICHOLAS JOHN FARLEY,<br><br>Debtor. | Chapter 11<br><br>Case No. 25-11017 (MEW) |

# FOURTH AMENDED COMBINED CHAPTER 11 PLAN OF REORGANIZATION AND DISCLOSURE STATEMENT

Nicholas John Farley (the "**Debtor**"), by and through his counsel, Weinberg Zareh Malkin Price LLP, hereby proposes the following Fourth Amended Combined Chapter 11 Plan of Reorganization and Disclosure Statement (the "**Combined Plan and Disclosure Statement**" or "**Plan**") pursuant to sections 1121(a), 1123, 1125, and 1129 of title 11 of the United States Code (the "**Bankruptcy Code**").

This Combined Plan and Disclosure Statement is being submitted pursuant to section 1125(f) of the Bankruptcy Code, which permits the Court to determine that a separate disclosure statement is not necessary in a case involving an individual debtor whose debts are primarily consumer debts. The Debtor submits that this Combined Plan and Disclosure Statement contains adequate information within the meaning of section 1125(a) of the Bankruptcy Code to enable creditors and parties in interest to make an informed judgment about the Plan.

**IMPORTANT: THIS COMBINED PLAN AND DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BY THE BANKRUPTCY COURT AND HAS NOT YET BEEN APPROVED. THE INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTOR RESERVES THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE, OR WITHDRAW THIS COMBINED PLAN AND DISCLOSURE STATEMENT AT ANY TIME PRIOR TO THE CONFIRMATION HEARING.**

## ARTICLE I — INTRODUCTION AND BACKGROUND

### 1.1 Purpose of This Document.

This Combined Plan and Disclosure Statement serves the dual purpose of (a) providing creditors and parties in interest with adequate information to make an informed decision about whether to accept or reject the Plan, and (b) setting forth the terms and provisions of the Debtor's proposed Chapter 11 Plan of Reorganization. Creditors should read this entire document carefully before voting on the Plan.

**THE DEBTOR BELIEVES THAT THE PLAN IS IN THE BEST INTERESTS OF ALL CREDITORS AND URGES ALL CREDITORS ENTITLED TO VOTE TO ACCEPT THE PLAN.**

### 1.2 Overview of the Debtor.

The Debtor is an individual residing at 301 East 52nd Street, Unit 5C, New York, New York 10022. The Debtor is the owner of 2,800 shares of common stock in 301-52 Townhouse Corp., allocated to Unit 5C, together with a proprietary lease for the cooperative apartment (the "**Property**"). The Debtor purchased the Property in 2013.

The Debtor has extensive professional experience as a senior technology executive and software engineer, with a career spanning financial services, media, and enterprise technology. From October 2011 to February 2017, the Debtor served as the Head of Equities Technology and was responsible for the deployment of Murex in Fixed Income at UBS, earning a total compensation ranging from $1.2m to $1.6m. The Debtor left UBS in February 2017 to care for his wife following a rare cancer diagnosis, and returned to work in 2018 at Bank of New York Mellon in a less senior role that allowed him to continue to support her. From 2018 to January 2024, the Debtor served as a Technical Solutions Architect and Lead Software Engineer at Bank of New York Mellon, earning an annual salary ranging from approximately $600,000 to $950,000. Following emergency heart surgery in November 2023, the Debtor returned from medical leave but was terminated in March 2024, with his compensation reduced to $487,000. A wrongful termination settlement reached in December 2024 included a non-compete clause effective until March 2025, which further prevented the Debtor from meeting his financial obligations. The Debtor is now employed at Mizuho Americas, where he was recently promoted. The Debtor now runs his existing group (Murex – Derivatives Processing Platform) and has been appointed Head

of the Equity & Futures Technology group, effectively doubling his responsibilities. The Debtor's 2025 total compensation was $985,000. The Debtor anticipates a raise in connection with his recent promotion. His current position at Mizuho closely matches the role he previously held at UBS where he earned between $1.2m and $1.6m.

**1.3 Events Leading to the Filing.**

Since late 2021, the Debtor has faced a series of medical crises, beginning with a near-fatal COVID-19 case that triggered ongoing health issues requiring emergency surgeries: nerve surgery (May 2023), emergency heart intervention (November 2023), left leg surgery (December 2024), and left-hand tendon surgery (March 2025). These health issues severely limited the Debtor's ability to work.

In addition to the Debtor's medical challenges, the Debtor became involved in disputes with the cooperative board of 301-52 Townhouse Corp. regarding Department of Buildings violations, maintenance charges, and other matters. The Debtor first listed the Property for sale in May 2024 at an asking price of $6,950,000. During the summer of 2024, while the Debtor was in the United Kingdom for approximately three months caring for his father, who was critically ill in intensive care, the Co-op's board did not permit a scheduled broker open house to proceed on the appointed date. The open house was allowed to take place the following evening, but most of the brokers and prospective purchasers who had registered did not attend, which created a negative impression of the Property in the brokerage community, and the Debtor withdrew the listing in July 2024. The Property was re-listed in February 2025 at an asking price of $6,400,000 and remained on the market through the Petition Date. Following the Petition Date, the Debtor's formal retention of the existing listing broker was approved by the Court on the Debtor's application filed September 3, 2025 [ECF Doc. No. 51], as described in Section 1.4. No offers were received. The Debtor initiated a loan modification process with HSBC Bank USA, N.A. in August 2023, but HSBC scheduled a public auction of the Debtor's shares and proprietary lease for May 21, 2025, to address an alleged debt of $2,981,548.85, plus interest and fees.

These pressures, combined with the Debtor's inability to generate income due to the non-compete clause and health issues, necessitated the filing to prevent the imminent loss of the Debtor's apartment and stabilize his financial situation.

**1.4 The Chapter 11 Case.**

On May 17, 2025 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. The case is assigned to the Honorable Michael E. Wiles and bears Case No. 25-11017 (MEW). The Debtor has remained in possession of his property and has continued to manage his affairs as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

The Property was already listed for sale with a real estate broker on the Petition Date. On September 3, 2025, the Debtor filed an application to formally retain that broker under section 327 of the Bankruptcy Code [ECF Doc. No. 51], which the Court approved, and on October 17, 2025, the Debtor filed proposed marketing and bidding procedures. The order approving the sale and bidding procedures were entered on November 4, 2025. Debtor's former counsel was replaced, and on December 30, 2025, Weinberg Zareh Malkin Price LLP was retained as counsel for the Debtor, with the Court's approval entered *nunc pro tunc* to that date. The Debtor subsequently retained Vernon Consulting, Inc. as financial advisor. On March 4, 2026, the Court entered an Amended Order Approving Bidding Procedures and Granting Related Relief (the "**Amended Bidding Procedures Order**") [ECF Doc. No. 88], which, among other things, approved amended bidding procedures, established a 90-day broker marketing period commencing February 19, 2026, scheduled a Sale Hearing for August 4, 2026, and required the Debtor to make certain payments to 301-52 Townhouse Corp. pending the closing of the sale, including monthly maintenance payments and two lump-sum payments of $66,500 each on March 6, 2026 and May 7, 2026, which payments were made timely. In addition, in September, the Debtor made a payment to 301-52 Townhouse Corp. in the amount of $29,216.26 to bring all maintenance payments current.

Following entry of the Amended Bidding Procedures Order, the Debtor pursued the sale process. However, the Property received no offers after extended marketing. In or about July 2026, HSBC Bank USA, N.A. offered the Debtor a loan modification with a 2% interest rate for the first 60 months, which the Debtor accepted. The Debtor made the trial period mortgage payments for July through September 2026, the mortgage payment for October 2026 and will continue making monthly mortgage payments going forward. Accordingly, the Debtor now proposes to retain the Property and fund the Plan through employment income, asset sales, and other sources rather than through a sale of the Property.

**1.5 Summary of the Plan.**

The Plan provides for the Debtor to retain the Property pursuant to a loan modification with HSBC Bank USA, N.A., and to fund all distributions to creditors from the Debtor's employment income, an advance bonus payment, asset sales, deferred compensation, and Social Security retirement benefits, over a 43-month period (October 2026 through April 2030; the Plan Budget extends through June 2030 to show two months of post-payment administration). The Debtor's primary asset is the Property, which was valued at approximately $5,999,999 on the Debtor's petition and schedules. The Property had been listed at $6,950,000 in May 2024 and at $6,400,000 from February 2025, as described in Section 1.3. The Property is carried at $4,500,000 in the Debtor's most recent Monthly Operating Report. The Property was marketed from May 2024 to July 2026 by two court-approved brokers, with the asking price reduced six times from $6,950,000 to $4,500,000, and no offer was received. The Plan assumes a forced-sale value of $4,100,000 for the reasons set out in Section 12.1. The Debtor believes that the combination of his employment income, bonuses, deferred compensation, Social Security retirement benefits, and proceeds from the sale of personal property discussed herein will generate sufficient funds to satisfy all Allowed

Administrative Claims, all Priority Tax Claims, all Allowed Secured Claims, and all Allowed General Unsecured Claims in full, with interest, over the life of the Plan. The Debtor continues to pursue a settlement with BNY and will utilize any proceeds to reduce Plan payments.

The principal means of funding the Plan are as follows: (a) the Debtor's net monthly employment income of approximately $18,226 from Mizuho Americas; (b) an advance from Mizuho against the 2026 bonus in the amount of $200,000; (c) annual bonuses of approximately $256,270 (net of taxes) and deferred bonuses (net of taxes) totaling approximately $237,965; (d) sale of HiFi equipment (estimated net proceeds of $174,250); (e) sale of a Steinway piano (estimated net proceeds of $36,000); (f) sale of artwork ($37,000); (g) sale of clothing ($18,000); (h) net Social Security income of $1,918/month (net of taxes) commencing January 2028; and (i) BNY deferred compensation of approximately $62,150, together with dividend equivalents on the deferred shares of approximately $2,584 (net of taxes) payable in March 2027 and March 2028.

Total projected net income over the Plan Budget period (October 2026 through June 2030) is approximately $2,270,240. When the starting bank balance of $162,724 is added to this amount there is a total of $2,432,964 available to fund expenses and plan payments. Total projected expenses (including mortgage, Co-Op fees, utilities, and living expenses) are approximately $1,225,835. Remaining projected disposable income available for creditor distributions, together with the starting bank balance is approximately $1,207,129, which is sufficient to fund all required distributions under the Plan (totaling approximately $1,134,041 in Administrative Claims, Priority Claims, and General Unsecured Claims combined).

## ARTICLE II — SUMMARY OF ASSETS AND LIABILITIES

### 2.1 Assets of the Estate.

As reflected in the Debtor's most recent Monthly Operating Report filed with the Court, the Debtor's assets consist of the following:

Primary Residence (Co-op Shares and Proprietary Lease): $4,500,000

Bank Accounts: $162,724

Clothing: $41,400

Jewelry: $13,500

Piano: $36,000

Artwork: $37,000

Electronics: $174,250

Retirement & Profit Sharing (held at Fidelity): $180,087, comprising (i) BNY deferred compensation in the form of restricted stock units (approximately $123,533 before tax, distributed in February 2027 and February 2028 and included in the Plan Budget net of tax at $62,150), (ii) the deferred portion of the Debtor's 2026 Mizuho bonus ($35,000 before tax, vesting in April

2027, 2028 and 2029 and included in the Plan Budget net of tax at $18,305), and (iii) the Debtor's Mizuho 401(k) account and a brokerage account (approximately $21,539), which are not included in the Plan Budget

Sports Equipment: $450

Household Furnishings (nominal forced-sale value; not assigned a value): $0

Total Estimated Assets: $5,145,411

**2.2 Liabilities of the Estate.**

The Debtor's liabilities, as reflected in the proofs of claim filed and the Debtor's schedules, consist of the following:

**Pre-Petition Secured Debt:**

301-52 Townhouse Corp. (Amended Proof of Claim No. 9): $89,824.27 (maintenance component paid in full as of September 16, 2026; approximately $73,065 of attorneys' fees remains outstanding)

HSBC Bank USA, N.A. (Proof of Claim No. 11): $3,325,415.13

WineCredit LLC (Proof of Claim No. 10): $303,602.13; Allowed Secured Claim fixed at $437,978.78 as of June 30, 2026 (including post-petition interest, fees and storage) by stipulation approved August 5, 2026 [ECF Doc. No. 133]

Total Pre-Petition Secured Debt: $3,718,841.53

**Priority Tax Claims:**

Internal Revenue Service (Proof of Claim No. 5): $484,183.07, of which $438,612 is priority

New York State Dept. of Taxation & Finance (Proof of Claim No. 1): $35,206.65, of which $31,044 is asserted as priority

Total Tax Claims as filed: $519,389.72, of which $469,656 is priority (the non-priority balance of $49,733.72 is included in General Unsecured Claims below)

**Other Priority Claims:**

Domestic Support Obligation (pre-petition arrears owed to the Debtor's former spouse): $33,831

**General Unsecured Claims:**

Consolidated Edison Company of New York Inc. (Claim No. 2): $6,983.52

American Express National Bank (Claim No. 4): $31,329.57

HSBC Bank USA NA (Claim No. 7): $26,085.57

Quantum3 Group LLC / Velocity Investments LLC (Claim No. 6): $88,852.58

Midland Credit Management, Inc. (Claim No. 8): $38,299.67

Non-priority portion of IRS and NYS tax claims: $49,733.72

Total Filed General Unsecured Claims: $241,284.63

Potential WineCredit LLC deficiency claim (not yet asserted or substantiated; reserved in the Plan Budget, inclusive of attorneys' fees): up to $107,000

**Post-Petition Liabilities:**

As of January 2026, the Debtor had accrued post-petition liabilities totaling approximately $282,439, consisting of post-petition maintenance owed to the Co-op 301-52 Townhouse Corp. ($89,000), post-petition mortgage arrears owed to HSBC ($192,511), and post-petition amounts owed to WineCredit ($23,736). Pursuant to the Amended Bidding Procedures Order, the Debtor made certain payments to the Co-op, including current monthly maintenance and two lump-sum payments of $66,500 each (the first on March 6, 2026, and the second on May 7, 2026), totaling $133,000 in lump-sum payments. An additional payment of $29,216.26 was made on September 16, 2026 which cleared the outstanding balance owed to the Co-op ($22,451) and met the September maintenance payment ($6,768.26, being the monthly maintenance of $6,533 together with late fees levied by the Co-op on the then-outstanding balance). The post-petition mortgage arrears, together with accrued interest, have been capitalized into the modified principal balance under the Loan Modification with HSBC, and the remaining post-petition amounts owed to WineCredit will be addressed as described in Section 6.3.

**2.3 Income and Expenses.**

The Debtor is currently employed at Mizuho Americas, earning net monthly base income from salary and wages of approximately $18,226. The Debtor's 2025 total compensation was $985,000 (which averages to $82,083 per month). Monthly living expenses are approximately $26,776 (including mortgage payment of $15,066, Co-Op fees of $6,533, average utilities of $1,854, food of $2,000, personal care of $300, medical of $200, transportation of $150, entertainment of $250, and property insurance of $423). Living expenses other than the HSBC mortgage payment (which is fixed under the Loan Modification), including Co-Op maintenance, are assumed to increase by 3% each year from October 2027. The Debtor also receives an annual bonus (net of approximately $256,270, paid in April each year, with $200,000 of the 2026 bonus advanced), along with deferred bonuses from prior years totaling approximately $237,965. Additionally, the Debtor will receive Social Security income of $1,918/month commencing January 2028 and BNY deferred compensation distributions (from Fidelity) totaling approximately $62,150 ($48,164 in February 2027 and $13,986 in February 2028, together with dividend equivalents on the deferred shares of approximately $2,090 in March 2027 and $494 in March 2028, net of taxes).

## ARTICLE III — DEFINITIONS AND INTERPRETATION

Unless otherwise defined herein, capitalized terms used in this Plan shall have the meanings ascribed to them in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure.

**3.1** "Amended Bidding Procedures Order" means the Amended Order Approving Bidding Procedures and Granting Related Relief entered by the Bankruptcy Court on March 4, 2026 [ECF Doc. No. 88], as amended, modified, or supplemented from time to time.

**3.2** "Administrative Claim" means a Claim for costs and expenses of administration of the Chapter 11 Case entitled to priority under sections 503(b) and 507(a)(2) of the Bankruptcy Code, including, without limitation, any actual and necessary costs and expenses of preserving the estate, any actual and necessary costs and expenses of operating the Debtor's affairs, all compensation and reimbursement of expenses to the extent allowed by the Court under sections 327, 330, and 331 of the Bankruptcy Code, and any fees or charges assessed against the estate under section 1930 of title 28 of the United States Code.

**3.3** "Allowed Claim" means a Claim or any portion thereof (a) that has been allowed by a Final Order of the Court; (b) as to which no objection to its allowance has been timely interposed in accordance with the Plan; or (c) as to which any objection has been settled or withdrawn.

**3.4** "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended from time to time.

**3.5** "Bankruptcy Court" or "Court" means the United States Bankruptcy Court for the Southern District of New York or such other court having jurisdiction over the Chapter 11 Case.

**3.6** "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under 28 U.S.C. § 2075.

**3.7** "BNY Settlement" means the settlement being negotiated between the Debtor and Bank of New York to compensate the estate for expenses resulting from cessation of the Debtor's COBRA benefits between the approximate dates of September 5, 2025 and September 17, 2025 in the anticipated amount of $25,000. For the avoidance of doubt, the settlement is not yet finalized and not included in the Plan budget.

**3.8** "Business Day" means any day other than a Saturday, Sunday, or legal holiday as defined in Bankruptcy Rule 9006(a).

**3.9** "Chapter 11 Case" means the case under Chapter 11 of the Bankruptcy Code commenced by the Debtor on May 17, 2025, styled *In re Nicholas John Farley*, Case No. 25-11017 (MEW), pending before the Bankruptcy Court.

**3.10** "Claim" means a claim against the Debtor as defined in section 101(5) of the Bankruptcy Code.

**3.11** "Co-op" means 301-52 Townhouse Corp., the cooperative corporation in which the Debtor holds shares of common stock.

**3.12** "Confirmation Date" means the date on which the Confirmation Order is entered by the Bankruptcy Court.

**3.13** "Confirmation Order" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

**3.14** "Debtor" means Nicholas John Farley, an individual residing at 301 East 52nd Street, Unit 5C, New York, New York 10022.

**3.15** "Disputed Claim Reserve" means a reserve of funds from the Debtor's Plan funds established and maintained by the Debtor's counsel, in an escrow account to address any Disputed Claim, as more fully set forth in Section 7.8 of this Plan.

**3.16** "Disputed Co-op Claim" means any Claim or portion thereof asserted by the Co-op that is the subject of a pending objection, dispute, or contested matter as of the Effective Date, including, without limitation, any disputed pre-petition or post-petition maintenance charges, assessments, late fees, attorneys' fees, fines, or other charges asserted by the Co-op.

**3.17** "Domestic Support Obligations" means the $33,831 prepetition debt that the Debtor owes to his ex-wife that are entitled to treatment as a domestic support obligation under section 507(a)(1)(A) of the Bankruptcy Code.

**3.18** "Effective Date" means the first Business Day that is at least fourteen (14) days after the Confirmation Date on which all conditions to the effectiveness of this Plan have been satisfied or waived.

**3.19** "Estate" means the estate created in this Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

**3.20** "Estate Causes of Action" means any and all claims, causes of action, rights of action, suits, and proceedings, whether in law or in equity, whether known or unknown, that the Debtor or the Estate may hold against any entity, including, without limitation, claims and causes of action arising under sections 502, 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code, and any other avoidance actions, preference actions, fraudulent transfer or conveyance actions, and any other causes of action of the Debtor or the Estate arising under applicable federal or state law.

**3.21** "Final Order" means an order or judgment of the Bankruptcy Court, or any other court of competent jurisdiction, that has not been reversed, stayed, modified, or amended and as to which the time to appeal or seek certiorari, review, or rehearing has expired and no appeal or petition for certiorari, review, or rehearing is pending.

**3.22** "HSBC" means HSBC Bank USA, N.A., the holder of a secured claim against the Property.

**3.23** "Loan Modification" means the modification of the HSBC mortgage loan approved in or about July 2026, providing for an interest rate of 2% for the first 60 months, with monthly payments of $15,066 after three trial payments of $15,043.

**3.24** "Petition Date" means May 17, 2025, the date on which the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

**3.25** "Plan" means this Fourth Amended Chapter 11 Plan of Reorganization, including all exhibits, supplements, appendices, and schedules hereto, as the same may be amended, modified, or supplemented from time to time in accordance with the terms hereof and the Bankruptcy Code.

**3.26** "Priority Tax Claim" means a Claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

**3.27** "Property" means all of the Debtor's right, title, and interest in and to 2,800 shares of common stock in 301-52 Townhouse Corp., allocated to Unit 5C at 301 East 52nd Street, New York, NY 10022, together with the associated proprietary lease.

**3.28** "U.S. Trustee" means the United States Trustee for Region 2.

## ARTICLE IV — CLASSIFICATION OF CLAIMS AND INTERESTS

Pursuant to section 1123(a)(1) of the Bankruptcy Code, the following designates the Classes of Claims against and Interests in the Debtor. A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date.

**Unclassified Claims**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified and are treated separately as set forth in Article V below.

**Classified Claims and Interests**

**Class 1 — Secured Claim of 301-52 Townhouse Corp. (Co-op Claim).**

Class 1 consists of the Allowed Secured Claim of the Co-op for pre-petition maintenance, assessments, late fees, attorneys' fees, and other charges. The Co-op has filed an Amended Proof of Claim No. 9 in the amount of $89,824.27. Following the two payments of $66,500 on March 6, 2026 and May 7, 2026 and a further payment of $29,216.26 on September 16, 2026, all pre-petition and post-petition maintenance owed to the Co-op has been paid in full. The only remaining amount claimed by the Co-op is its attorneys' fees (Geller & Co.) of approximately $73,065 per the most recent statement, which the proprietary lease entitles the Co-op to recover from the Debtor and which the Debtor will pay on the Effective Date as the cure required under section 365(b)(1) of the Bankruptcy Code in connection with the assumption of the proprietary lease pursuant to Section 8.1 of this Plan. Upon payment of the cure amount, the Allowed Secured Claim of the Co-op shall be deemed satisfied in full, and the Co-op's lien on the Property shall remain in place with the same validity, force and effect. The Co-op's Claim has not yet been amended to reflect the

payments made, and any portion of the attorneys' fees that the Debtor disputes may be treated as a Disputed Co-op Claim.

**Class 2 — Secured Claim of HSBC Bank USA, N.A. (Mortgage Claim).**

Class 2 consists of the Allowed Secured Claim of HSBC Bank USA, N.A. arising under the secured cooperative share loan encumbering the Property. HSBC has filed Proof of Claim No. 11 in the amount of $3,325,415.13.

**Class 3 — Secured Claim of WineCredit LLC.**

Class 3 consists of the Allowed Secured Claim of WineCredit LLC, secured by the Debtor's wine collection. WineCredit LLC filed Proof of Claim No. 10 in the amount of $303,602.13. By stipulation approved by the Court on August 5, 2026 [ECF Doc. No. 133], WineCredit LLC's Allowed Secured Claim was fixed at $437,978.78 as of June 30, 2026, comprising the loan balance of $287,619.54, legal fees and costs of $56,156.76, interest of $79,586.46 and storage fees of $14,616.02, and the automatic stay was modified to permit WineCredit LLC to take possession of and liquidate the wine collection.

**Class 4 — Priority Unsecured Claims.**

Class 4 consists of all Allowed Priority Unsecured Claims against the Debtor other than Priority Tax Claims, including any Allowed Claims entitled to priority under section 507(a) of the Bankruptcy Code that are not otherwise classified herein.

**Class 5 — General Unsecured Claims.**

Class 5 consists of all Allowed General Unsecured Claims against the Debtor, including but not limited to the following filed claims:

- Consolidated Edison Company of New York Inc. — Claim No. 2: $6,983.52
- American Express National Bank — Claim No. 4: $31,329.57
- HSBC Bank USA NA — Claim No. 7: $26,085.57
- Quantum3 Group LLC as agent for Velocity Investments LLC — Claim No. 6: $88,852.58
- Midland Credit Management, Inc. — Claim No. 8: $38,299.67
- Any deficiency claims of secured creditors holding Allowed Secured Claims

**Class 6 — Interests of the Debtor.**

Class 6 consists of the Debtor's interest in property of the Estate. As the Debtor is an individual, the Debtor shall retain all property of the Estate that is not distributed under this Plan, subject to the provisions hereof.

# ARTICLE V — TREATMENT OF UNCLASSIFIED CLAIMS

**5.1 Administrative Claims.**

Each holder of an Allowed Administrative Claim shall be paid the full amount of such Allowed Administrative Claim in Cash on the later of (a) the Effective Date, (b) the date on which such Administrative Claim becomes an Allowed Administrative Claim, or (c) such other date as may be agreed upon by the Debtor and the holder of such Administrative Claim. Administrative Claims include, without limitation, fees and expenses of professionals retained by the Debtor pursuant to sections 327 and 328 of the Bankruptcy Code and approved by the Bankruptcy Court, including Weinberg Zareh Malkin Price LLP as counsel, Vernon Consulting, Inc. as former financial advisor as well as quarterly fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6).

All administrative claims, including professional fee applications, must be filed with the Bankruptcy Court and served on the Debtor within thirty (30) days of the Effective Date.

Estimated Administrative Claims are as follows: Weinberg Zareh Malkin Price LLP: \$53,226; Vernon Consulting, Inc.: \$17,475; U.S. Trustee Fees: \$9,402; post-confirmation professional fees: \$24,000. Total estimated Administrative Claims: \$104,103.

**5.2 Priority Tax Claims.**

Each holder of an Allowed Priority Tax Claim shall be paid in full in Cash on the Effective Date, or, at the Debtor's election, in regular installment payments in Cash over a period not exceeding five (5) years from the Petition Date, with interest at the rate required by section 511 of the Bankruptcy Code (7%, being the rate in effect in the month of confirmation), in accordance with section 1129(a)(9)(C) of the Bankruptcy Code. The Debtor elects to pay the Priority Tax Claims in installments as follows:

• Internal Revenue Service — Claim No. 5: \$484,183.07, of which \$438,612 is priority. Interest at 7% shall be paid monthly on the outstanding balance from month 2 of the Plan (November 2026). Principal shall be paid in installments of 2% in February 2027, 5% in March 2027, 7% in April 2027, 24% in April 2028 and 28% in April 2029, with the remaining balance paid in full in April 2030 (month 43), which is within five years of the Petition Date.

• New York State Department of Taxation & Finance — Claim No. 1: \$35,206.65, of which \$31,044 is asserted as priority. Interest at 7% shall be paid monthly from month 2 of the Plan (November 2026), and the priority amount shall be paid in full in February 2027 (month 5 of the Plan).

# ARTICLE VI — TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

**6.1 Class 1 — Secured Claim of 301-52 Townhouse Corp. Class 1 is Unimpaired.**

Treatment: The maintenance component of the Co-op's Claim has been paid in full prior to confirmation. The remaining component, the Co-op's attorneys' fees of approximately $73,065, shall be paid in full from Plan funds on the Effective Date (month 2 of the Plan, November 2026) as the cure required under section 365(b)(1) of the Bankruptcy Code upon the assumption of the proprietary lease pursuant to Section 8.1. Upon payment of the cure amount, the Allowed Secured Claim of the Co-op shall be deemed satisfied in full, and the Co-op's lien on the Property shall be unaffected. Additionally, the Debtor shall continue to pay ongoing monthly Co-Op maintenance fees of $6,533 as they come due. All amounts paid to the Co-op prior to the Confirmation Date pursuant to the Amended Bidding Procedures Order shall be credited against the Allowed Secured Claim of the Co-op. The Debtor reserves all rights, objections, and defenses with respect to any Disputed Co-op Claim.

**6.2 Class 2 — Secured Claim of HSBC Bank USA, N.A. Class 2 is Unimpaired.**

**Treatment:** The Allowed Secured Claim of HSBC shall be treated pursuant to the Loan Modification. HSBC has agreed to modify the terms of its secured cooperative share loan, providing for an interest rate of 2% for the first 60 months. The Debtor shall make monthly mortgage payments of $15,066 to HSBC. The Debtor made the trial period mortgage payments of $15,043 for July through September 2026, the first monthly payment of $15,066 for October 2026 and will continue making monthly mortgage payments going forward. HSBC's lien on the Property shall remain in place with the same validity, force, and effect, subject to the modified terms.

**6.3 Class 3 — Secured Claim of WineCredit LLC. Class 3 is Unimpaired.**

Treatment: The collateral securing the Allowed Secured Claim of WineCredit LLC (i.e., the wine collection) was surrendered to WineCredit LLC pursuant to the stipulation and order entered August 5, 2026 [ECF Doc. No. 133], under which WineCredit LLC is authorized to liquidate the collection in a commercially reasonable manner and apply the net proceeds to its Allowed Secured Claim, any net proceeds in excess of the Allowed Secured Claim are to be remitted to the Debtor, and any deficiency shall be treated as a Class 5 General Unsecured Claim. The Debtor and WineCredit LLC have each reserved their rights as to the balance due. WineCredit LLC has not yet sold the wine collection and has not asserted or substantiated any deficiency. Although the wine collection was previously scheduled at $365,790, it is in the possession of WineCredit LLC and is no longer carried as an asset of the Debtor; a sale may realize less than the scheduled value, and interest, fees and costs of sale continue to accrue on the claim. The Plan Budget therefore conservatively reserves $107,000 for a potential WineCredit deficiency claim, inclusive of attorneys' fees, which amount will be paid only to the extent such a claim is filed and Allowed.

**6.4 Class 4 — Priority Unsecured Claims. Class 4 is Unimpaired.**

Treatment: Domestic Support Obligations of $33,831 will be paid in month 7 of the Plan (April 2027), in accordance with section 507(a)(1) of the Bankruptcy Code. Priority Tax Claims are unclassified and are treated in Section 5.2 above.

**6.5 Class 5 — General Unsecured Claims. Class 5 is Unimpaired.**

**Treatment:** Each holder of an Allowed General Unsecured Claim shall receive its *pro rata* share of the Debtor's net disposable income, after satisfaction in full of all Administrative Claims, Priority Tax Claims, Allowed Secured Claims (Classes 1 through 3), and Priority Unsecured Claims (Class 4). Total filed General Unsecured Claims are approximately $241,284.63, which shall be paid with 4% interest over the Plan period. In addition, the Plan Budget reserves $107,000 for a potential, as yet unsubstantiated, deficiency claim of WineCredit LLC (inclusive of attorneys' fees), for a total modelled Class 5 pool of $348,285; to the extent no such deficiency claim is filed and Allowed, the reserved amount will revert to the Debtor. Allowed General Unsecured Claims shall receive *pro rata* distributions from available funds totaling 100% of their Allowed Claims.

**6.6 Class 6 — Interests of the Debtor. Class 6 is Unimpaired.**

**Treatment:** The Debtor shall retain all property of the Estate not otherwise distributed under this Plan. As an individual debtor, the Debtor's property shall re-vest in the Debtor upon the Effective Date, subject to the obligations and distributions required under this Plan.

## ARTICLE VII — MEANS FOR IMPLEMENTATION OF THE PLAN

**7.1 Source of Funds.**

The Debtor shall retain the Property pursuant to the Loan Modification with HSBC Bank USA, N.A. The Loan Modification provides for an interest rate of 2% for the first 60 months. The Debtor made the trial period mortgage payments of $15,043 for July through September 2026, the first monthly payment of $15,066 for October 2026 and shall continue making monthly mortgage payments of $15,066, as well as ongoing Co-Op fees of $6,533 per month. The principal means of funding distributions under this Plan shall be: (a) the Debtor's employment income (net monthly wages of approximately $18,226 from Mizuho Americas); (b) a bonus advance of $200,000; (c) the sale of personal property, including HiFi equipment (estimated net proceeds of $174,250), a piano ($36,000), artwork ($37,000) and clothing ($18,000); (d) annual bonuses (net of approximately $256,270) and deferred compensation (approximately $237,965 total); and (e) BNY deferred compensation distributions (approximately $62,150) and dividend equivalents on the deferred shares (approximately $2,584, net of taxes, in March 2027 and March 2028). In the event the BNY settlement is finalized, all proceeds which are estimated to be $25,000 will be used to paydown plan payment obligations. The Plan period runs from October 2026 through April 2030 (43 months).

The Debtor shall sell certain personal property to fund distributions under the Plan, as follows:

(a) HiFi Equipment. During 2026 the Debtor approached three categories of buyer for his high-fidelity audio equipment: The Music Room ("TMR"), a national consignment dealer; StereoBuyers, a New York purchaser of used equipment, which declined on June 12, 2026 following losses in a warehouse fire; and the dealers from whom the equipment was originally purchased. TMR proposed in July 2026 a cash purchase of cables and power supplies for $15,430 and consignment of the principal components at a 35% fee, but would not sign a written consignment contract, carried only limited insurance on consigned goods, and required the Debtor to palletize and transport the equipment at his own expense; TMR confirmed that it could not proceed on the terms that Court approval of a consignment of estate property would require. The Debtor will instead sell the equipment piece by piece through Audiogon, an online marketplace for used high-end audio equipment on which the owner sells directly to the buyer, no consignment or transfer of possession is involved, and the buyer pays before shipment. Listings will begin immediately upon confirmation of the Plan, starting with the components that can be packed and shipped by courier (cables, power supplies and smaller electronics) and ending with the two large loudspeakers (Bowers & Wilkins 800 D2), which will be sold to a buyer who collects. The net proceeds of $174,250 in the Plan Budget are 85% of the Audiogon Bluebook low valuation of approximately $205,000 for the 234 items, after Audiogon fees, payment processing, packing and freight, and negotiation; the equipment was purchased for approximately $659,854. The Plan Budget assumes sales commencing in December 2026 and completing by May 2027.

(b) Piano. The Debtor shall sell his piano with expected proceeds of $36,000 (September 2027). The Debtor has received a consignment valuation from Steinway of $39,300, less pickup and showroom-preparation charges, that should yield net proceeds of $36,000.

(c) Clothing. The Debtor's spouse shall sell luxury ready-to-wear clothing, principally Chanel pieces, through resale channels for such pieces, with expected net proceeds of $18,000 ($4,000 in November 2026, $4,000 in December 2026, $5,000 in January 2027 and $5,000 in February 2027).

(d) Artwork. The Debtor will sell the artwork listed in the Plan Budget with expected net proceeds of $37,000. The Debtor's Schedules valued the artwork at its purchase prices, totaling approximately $121,400, because the Schedules were prepared from the purchase invoices without a market test. During 2026 the Debtor sought to sell the works through an art broker introduced by counsel (74tharts LLC), through Frith Street Gallery in London, from which the principal work (a Callum Innes painting purchased in 2008 for approximately $61,700) was acquired, and through other dealers and galleries; none produced an offer, several citing the current resale market, and an art lender that had offered a $20,000 loan against a single painting withdrew. The $37,000 figure, approximately 30% of cost, is derived work by work from recent auction results for comparable pieces (for example, $18,000 for the Innes against recent auction results for large Innes canvases) and is net of commission and freight. The works will be consigned to auction houses and online art marketplaces at reserves consistent with those estimates, with sales assumed in the Plan Budget between January and April 2027.

(e) BNY Settlement. The Debtor continues to negotiate the BNY settlement. The Plan does not include any proceeds as the settlement has not been finalized. In the event that the BNY Settlement is finalized, all proceeds will be used to pay down amounts due under the Plan.

The Debtor is employed at Mizuho Americas, earning net monthly wages of approximately $18,226. The Debtor's 2025 total compensation was $985,000. The Debtor has recently been appointed Head of the Equity & Futures Technology group, in addition to his current responsibilities, effectively doubling his role. The Debtor's 2025 total compensation was $985,000. The Debtor anticipates a raise in connection with his recent promotion. His current position at Mizuho closely matches the role he previously held at UBS where he earned between $1.2m and $1.6m. The Plan assumes total compensation of $1.1m. The Debtor receives an annual bonus (net of approximately $256,270, paid in April of each year) and deferred bonuses totaling approximately $237,965 (payable in certain months as reflected in the Plan Budget). Any increases in base compensation and bonuses will be applied to reduce Plan payments. Additionally, the Debtor will begin receiving Social Security income of $1,918 per month commencing January 2028 and BNY deferred compensation distributions of approximately $62,150, plus dividend equivalents on the deferred shares of approximately $2,584 (net of taxes) in March 2027 and March 2028, during the Plan period.

Distributions under this Plan shall be funded from the Debtor's projected disposable income and shall be made in accordance with the Plan Budget (attached hereto). The priority of payments shall be as follows: (a) Allowed Administrative Claims (totaling approximately $70,701, excluding fees due to the Office of the United States Trustee, payable in month 2 of the Plan, plus $2,000 per month for post-confirmation professional fees payable in months 3 through 14 of the Plan); (b) the cure payment to the Co-op under section 365(b)(1) of the Bankruptcy Code in respect of the assumed proprietary lease, being the Co-op's attorneys' fees of approximately $73,065 (payable in month 2 of the Plan), which satisfies the Allowed Secured Claim of the Co-op (Class 1); the Co-op maintenance arrears have already been paid in full; (c) ongoing HSBC mortgage payments pursuant to the Loan Modification (Class 2) ($15,066/month); (d) Allowed Priority Tax Claims, including the IRS priority claim of $438,612 (payable with 7% interest from month 2 and principal instalments in months 5 through 43) and the NY State claim of $31,044 (payable in month 5); (e) Domestic Support Obligations of $33,831 (payable in month 7); and (f) Allowed General Unsecured Claims of $241,284.63, plus a reserve of $107,000 for any Allowed WineCredit deficiency claim (payable with 4% interest over the Plan period).

**7.2 Disputed Claim Reserve.**

Notwithstanding anything to the contrary in this Plan, the Debtor shall establish and fund the Disputed Claim Reserve from Plan funds in an amount equal to one hundred percent (100%) of the aggregate amount of all Disputed Co-op Claims as of the Effective Date. In the event that WineCredit has a deficiency claim and files such claim prior to the Effective Date, the Debtor will include such amount in the Disputed Claim Reserve. The Disputed Claim Reserve shall be held

in an escrow account maintained by the Debtor's counsel, Weinberg Zareh Malkin Price LLP, for the benefit of the Estate pending the resolution of all Disputed Claims.

The Debtor shall have the right to object to any Disputed Claim, and any such objection shall be resolved by the Bankruptcy Court. Upon the entry of a Final Order resolving any Disputed Claim, the Debtor shall distribute from the Disputed Claim Reserve an amount equal to the Allowed portion of any such Disputed, together with any interest earned thereon, within fourteen (14) days of entry of such Final Order. Any funds remaining in the Disputed Claim Reserve attributable to the disallowed portion of any Disputed Claim shall be released to the Debtor.

The establishment of the Disputed Claim Reserve shall not constitute an admission by the Debtor of the validity, priority, or amount of any Disputed Claim, and the Debtor expressly reserves all rights, objections, and defenses with respect thereto. The rights to payment from the Disputed Claim Reserve shall be limited to the Allowed amount of any Disputed Claim as determined by the Bankruptcy Court. Pending final resolution of all Disputed Claims, the funds in the Disputed Claim Reserve shall not be available for distribution to any other creditor or party in interest.

**7.3 Claims Objection Deadline.**

Unless otherwise ordered by the Bankruptcy Court, objections to Claims shall be filed and served on the later of ninety (90) days after the Effective Date or ninety (90) days after a claim is filed or amended (the "**Claims Objection Deadline**"). The Debtor may, for cause shown, seek one or more extensions of the Claims Objection Deadline by motion filed prior to its expiration. Any Claim as to which no objection has been timely filed and served on or before the Claims Objection Deadline (as may be extended) shall be deemed an Allowed Claim in the amount set forth in the applicable proof of claim or, if no proof of claim was filed, in the amount scheduled by the Debtor as undisputed and non-contingent. Nothing in this Section shall limit the Debtor's right to object to any Disputed Co-op Claim in accordance with Section 7.8 of this Plan, which objections may be filed at any time prior to the final resolution of the Disputed Claim Reserve.

# ARTICLE VIII — TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**8.1 Assumption and Rejection.**

On the Effective Date, the proprietary lease for Unit 5C at 301 East 52nd Street shall be assumed by the Debtor, who shall retain the Property. The cure amount payable to the Co-op under section 365(b)(1) of the Bankruptcy Code upon such assumption is the Co-op's attorneys' fees of approximately $73,065, as set forth in Section 6.1; all maintenance and other charges under the proprietary lease have been paid in full. To the extent the Debtor and the Co-op do not agree on the cure amount, the disputed portion shall be determined by the Bankruptcy Court at or following the Confirmation Hearing and shall be held in the Disputed Claim Reserve pending such

determination, and the undisputed portion shall be paid on the Effective Date. All other executory contracts and unexpired leases not previously assumed or rejected shall be deemed rejected as of the Effective Date, unless otherwise provided by separate order of the Bankruptcy Court.

**8.2 Claims Arising from Rejection.**

Any Claim arising from the rejection of an executory contract or unexpired lease pursuant to this Plan must be filed with the Bankruptcy Court no later than thirty (30) days after the Effective Date or shall be forever barred.

## ARTICLE IX — CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVENESS

**9.1 Conditions Precedent to Confirmation.**

The following are conditions precedent to confirmation of the Plan: (a) the Confirmation Order shall be in form and substance reasonably acceptable to the Debtor; and (b) the Plan shall comply with the applicable provisions of the Bankruptcy Code.

**9.2 Conditions Precedent to the Effective Date.**

The following are conditions precedent to the occurrence of the Effective Date: (a) the Confirmation Order shall have been entered and shall have become a Final Order; and (b) all documents, instruments, and agreements necessary to implement the Plan shall have been executed and delivered.

**9.3 Waiver of Conditions.**

The Debtor may waive any of the conditions set forth in sections 9.1 and 9.2, other than conditions required by the Bankruptcy Code, without notice, leave, or order of the Bankruptcy Court and without any formal action.

## ARTICLE X — DISCHARGE, RELEASE, AND INJUNCTION

**10.1 Discharge.**

Pursuant to section 1141(d)(5) of the Bankruptcy Code, the Debtor shall receive a discharge upon the completion of all payments under the Plan, as provided by applicable law.

**10.2 Injunction.**

Except as otherwise provided in the Plan or the Confirmation Order, on and after the Confirmation Date, all entities that have held, hold, or may hold Claims against or Interests in the Debtor are permanently enjoined from commencing or continuing any action or proceeding against the Debtor or the Estate on account of any such Claim or Interest.

**10.3 Reservation of Rights to Pursue Estate Causes of Action.**

Notwithstanding any provision of this Plan to the contrary, the Debtor, on behalf of the Estate, hereby expressly reserves and retains all Estate Causes of Action, whether or not such Estate Causes of Action are specifically identified or described herein. Nothing in this Plan, the Confirmation Order, or any order of the Bankruptcy Court shall be deemed a waiver, release, or relinquishment of any Estate Cause of Action. The Debtor shall have the exclusive right, authority, and standing to commence, prosecute, settle, or abandon any Estate Cause of Action, as the representative of the Estate, after the Confirmation Date. The failure to specifically identify or describe any particular Estate Cause of Action in this Plan or the Disclosure Statement shall not constitute, and shall not be deemed to constitute, a waiver, release, or abandonment of any such Estate Cause of Action. All Estate Causes of Action are expressly preserved for the benefit of the Estate and its creditors.

Without limiting the generality of the foregoing, the Debtor specifically reserves the right to pursue causes of action against the Co-op, including claims arising from the Department of Buildings violation disputes, accounting errors, excessive fees, and other matters.

## ARTICLE XI — RETENTION OF JURISDICTION

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall retain exclusive jurisdiction over the following matters: (a) to hear and determine all motions, applications, adversary proceedings, and contested or litigated matters arising out of, under, or related to the Chapter 11 Case; (b) to ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of this Plan; (c) to hear and determine any objections to Claims or to the allowance, classification, or priority of any Claim; (d) to enter and implement such orders as may be necessary to execute, interpret, or enforce the provisions of this Plan or to maintain the integrity of this Plan; (e) to modify this Plan before or after the Confirmation Date; (f) to adjudicate any disputes concerning the Property or the Loan Modification; (g) to consider and approve fee applications of professionals retained in this Chapter 11 Case; (h) to determine all matters relating to compensation and reimbursement of expenses under sections 330 and 331 of the Bankruptcy Code; (i) to hear and determine matters concerning federal, state, and local taxes; (j) to hear and determine all Estate Causes of Action, including, without limitation, actions arising under sections 502, 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code, and any other avoidance actions, preference actions, fraudulent transfer or conveyance actions, and any other causes of action of the Debtor or the Estate, and to enter such orders as may be necessary to effectuate recovery on account of any Estate Cause of Action; (k) to enter a final decree closing this Chapter 11 Case; and (l) to hear any other matter not inconsistent with the Bankruptcy Code. For the avoidance of doubt, the Bankruptcy Court shall not retain exclusive jurisdiction over claims and causes of action against third parties that are not required to be brought before the Bankruptcy Court.

# ARTICLE XII — LIQUIDATION ANALYSIS AND FEASIBILITY

**12.1 Liquidation Analysis.**

Section 1129(a)(7) of the Bankruptcy Code requires that each holder of an Allowed Claim in an impaired Class that has not accepted the Plan will receive or retain under the Plan at least as much as such holder would receive if the Debtor's Estate were liquidated under Chapter 7 of the Bankruptcy Code. The Debtor believes the Plan satisfies this "best interests of creditors" test.

The Property is carried at $4,500,000 in the Debtor's most recent Monthly Operating Report. The marketing process described in Sections 1.3 and 1.4 did not yield any offers. Mandatory Local Law 11 façade work began on the building on May 5, 2025; when it reached the south elevation in late August 2025 the building was enclosed in scaffolding, cranes and equipment were placed on the Property's 1,400 square foot terrace with the terrace furniture stacked in its center, and the terrace has been unusable since. The managing agent has stated that it has no completion date. Both listing brokers reported the same three recurring comments from prospective purchasers: the condition of the building's lobby, hallways and staircases; the Local Law 11 work with no completion date; and the cost of renovating the interior. Following a client viewing, Seth Levin of Keller Williams on April 22, 2026, reported via text "I just touched base with the agent again. She had been waiting for more feedback from her buyers. She just texted me that they really like your property but are unsure about the building". On November 25, 2025, Serhant recommended reducing the asking price to approximately $4,500,000, citing limited buyer interest driven by co-op rules, building conditions and renovation costs of $700 to $1,200 per square foot. On April 6, 2026, Keller Williams issued a broker price opinion putting the as-is value at approximately $4,800,000 with a baseline of approximately $4,500,000. The Property was listed at $4,500,000 from May 7, 2026 and was shown throughout, and no offer was received before the listing was withdrawn on July 15, 2026. The Plan Budget therefore uses $4,100,000 as the forced-sale value, approximately 9% below the last asking price at which no offer was received and 15% below the broker's as-is opinion, to reflect the discount a Chapter 7 trustee's sale would attract while the façade work continues.

In a hypothetical Chapter 7 liquidation, a trustee would be appointed and would be tasked with liquidating the Debtor's assets. The costs associated with a Chapter 7 liquidation — including trustee commissions (up to the statutory maximum under section 326 of the Bankruptcy Code), additional professional fees, wind-down costs, and the potential for fire-sale pricing — would substantially reduce the value available for distribution to creditors. In a Chapter 7 liquidation, the Property would be sold by a trustee while the Local Law 11 work described above continues. Based on the broker price opinion of approximately $4,800,000 as-is, the absence of any offer at the $4,500,000 asking price over ten weeks of showings, and the discount customarily attracted by a trustee's sale, the Plan assumes gross proceeds of approximately $4,100,000. After costs of sale of approximately 8% ($328,000), HSBC's secured claim (approximately $3,517,796, the projected balance under the Loan Modification as of April 2027), the Chapter 7 trustee's commission under

section 326 of the Bankruptcy Code (approximately $146,250) and the Debtor's New York homestead exemption ($180,000), the sale of the Property would yield nothing for other creditors. The Debtor's remaining non-exempt personal property (HiFi equipment, artwork and piano) might realize approximately $148,000 at a trustee's auction, which is less than the approximately $576,552 of Priority Tax Claims, Domestic Support Obligations and the Co-op's cure claim that must be paid first. Even at a sale price of $4,500,000, the funds available after costs, HSBC, the trustee's commission and the homestead exemption (approximately $432,000 including personal property) would not cover the priority and cure claims. Accordingly, holders of General Unsecured Claims would receive no distribution in a Chapter 7 liquidation. Under this Plan, creditors receive payment in full (with interest) from the Debtor's employment income and other sources over time, which is substantially more favorable than what they would receive in a Chapter 7 liquidation. Additionally, the Debtor is contributing substantial post-confirmation income to the Plan which would not be available in a liquidation under Chapter 7.

**12.2 Feasibility.**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor, unless the Plan so provides.

The Plan is feasible because the Debtor has sufficient starting available funds of $162,724 along with projected income and assets to fund all required distributions over the Plan period (October 2026 through April 2030, with the Plan Budget extending through June 2030) while maintaining a minimum bank balance of $15,000 from February 2027 onwards. The Debtor's projected funding sources are as follows:

• Employment Income: Net monthly salary of $18,226 from Mizuho Americas (totaling $820,170 over the Plan period), with 2025 total compensation of $985,000 and the Plan assuming compensation of $1.1m going forward. In the event that the Debtor's income increases, monthly payments under the Plan will be increased commensurately, based on a percentage increase. By way of example, if the Debtor's income were to double, monthly payments under the Plan will likewise increase by 100% such that creditors would be repaid on an accelerated schedule;

• Annual Bonuses: Net annual bonus payable four times during the Plan period (April 2027 ($51,603 after repayment of bonus advance), April 2028 ($256,270), April 2029 ($256,270) and April 2030 ($256,270)), totaling $820,413;

• Deferred Compensation: Vesting of deferred bonuses payable in April 2027 ($6,102), April 2028 ($42,712), April 2029 ($79,322) and April 2030 ($109,830), totaling approximately $237,965;

• BNY Deferred Compensation Distributions: Two (2) distributions totaling $62,150 — consisting of $48,164 in February 2027 and $13,986 in February 2028, plus dividend equivalents



111290458.v1

on the deferred shares of $2,090 in March 2027 and $494 in March 2028 (net of taxes), $2,584 in total;

• Personal Property Sales and Settlements: HiFi equipment ($174,250), piano ($36,000), artwork ($37,000) and clothing ($18,000), totaling $265,250;

• Social Security: $1,918/month (net of taxes) commencing January 2028, totaling $57,528 over the Plan period;

• Reimbursements: refunds and reimbursements of medical, dental, vision and business expenses totaling $4,180 incurred in September 2026.

Of the $180,087 held at Fidelity, the BNY deferred compensation and the deferred portion of the 2026 Mizuho bonus (together approximately $80,455 net of tax) are included in the Plan Budget; the balance, the Debtor's 401(k) and brokerage accounts of approximately $21,539, is not included as a funding source and is available to the Debtor as a contingency should any projected income stream fall short. The 401(k) account receives contributions of 8% of the Debtor's base salary each year (a 4% employee deferral from gross salary, already reflected in the net salary used in the Plan Budget, matched by a 4% employer contribution from Mizuho), approximately $32,000 per year in total, so that, before any investment return, the account is expected to grow to approximately $133,000 by the end of the Plan period.

Total projected net income over the Plan period is approximately $2,270,240. When the starting bank balance of $162,724 is added to this amount there is a total of $2,432,964 available to fund expenses and plan payments. Total projected expenses (including mortgage, Co-Op fees, utilities, and living expenses, with all living expenses other than the fixed HSBC mortgage payment escalated by 3% annually from October 2027) are approximately $1,225,835. Remaining projected disposable income available for creditor distributions, together with the starting bank balance is approximately $1,207,129, which is sufficient to fund all required distributions under the Plan (totaling approximately $1,134,041 in Administrative Claims, Priority Claims, and General Unsecured Claims combined).

## ARTICLE XIII — RISK FACTORS

Holders of Claims should consider the following risk factors in deciding whether to vote to accept or reject the Plan:

### 13.1 Loan Modification Compliance.

The Plan depends on the Debtor's continued compliance with the terms of the Loan Modification with HSBC. Failure to make timely monthly mortgage payments could result in HSBC declaring a default and exercising its remedies, including foreclosure on the Property, which could jeopardize the Plan.

**13.2 Employment Continuity.**

The Plan depends on the Debtor's continued employment at Mizuho Americas or comparable employment. While the Debtor was recently promoted and the Plan assumes a modest compensation increase over the compensation received in 2025, there can be no assurance that the Debtor will remain employed for the full duration of the Plan.

**13.3 Sufficient Income.**

While the Debtor believes that the combination of employment income, bonuses, deferred compensation, asset sales, and Social Security retirement benefits will generate sufficient funds to satisfy all Allowed Claims, there can be no assurance that all projected income streams will materialize as anticipated. In the event that the Debtor's projected income is insufficient, holders of General Unsecured Claims may receive less than the full amount of their Allowed Claims. The Debtor's 401(k) account (approximately $21,524 at October 2026, and growing by employee and employer contributions of approximately $32,000 per year), which is not relied upon in the Plan Budget, would be available to mitigate any such shortfall.

**13.4 Claims Objections.**

The Debtor reserves the right to object to any Claim. The actual amount of Allowed Claims may differ from the amounts currently scheduled or reflected in filed proofs of claim. In particular, any deficiency claim of WineCredit LLC will depend on the proceeds realized from the sale of the wine collection, which has not yet occurred; the deficiency may exceed the $107,000 reserved in the Plan Budget, in which case the Allowed Class 5 Claims, and the distributions required under the Plan, would be correspondingly larger. This may affect the distributions under the Plan.

**13.5 Tax Consequences.**

The Plan may result in tax consequences for the Debtor and the Estate. Creditors are urged to consult their own tax advisors regarding any tax consequences of the Plan.

**13.6 BNY Settlement.**

The Debtor may not ultimately be successful in negotiating the anticipated BNY Settlement.

## ARTICLE XIV — VOTING PROCEDURES AND CONFIRMATION

**14.1 Voting on the Plan.**

Pursuant to section 1126 of the Bankruptcy Code, no Class of Claims is Impaired under the Plan. Accordingly, no Class of Claims is entitled to vote to accept or reject the Plan as all Classes are conclusively presumed to have accepted the Plan.

**14.2 Acceptance of the Plan.**

Pursuant to section 1126(c) of the Bankruptcy Code, a Class of Claims has accepted the Plan if the Plan has been accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the Allowed Claims of such Class that have actually voted.

**14.3 Confirmation Standards.**

At the Confirmation Hearing, the Court will determine whether the requirements of section 1129 of the Bankruptcy Code have been satisfied, including, among others, that: (a) the Plan complies with the applicable provisions of the Bankruptcy Code; (b) the proponent of the Plan has complied with the applicable provisions of the Bankruptcy Code; (c) the Plan has been proposed in good faith; (d) the Plan satisfies the "best interests of creditors" test set forth in section 1129(a)(7); (e) the Plan is feasible pursuant to section 1129(a)(11); and (f) all amounts payable for services or costs and expenses in connection with the case have been approved by the Court.

**14.4 Federal Tax Consequences.**

The following is a summary of certain significant United States federal income tax consequences of the Plan to the Debtor and holders of Claims. This summary is based on the Internal Revenue Code of 1986, as amended, and is for informational purposes only. It does not address all aspects of federal income taxation that may be relevant to particular holders of Claims. Each holder of a Claim is urged to consult its own tax advisor regarding the federal, state, local, and foreign tax consequences of the Plan.

Generally, a creditor who receives cash in satisfaction of a Claim will recognize gain or loss equal to the difference between the amount of cash received and the creditor's adjusted tax basis in the Claim. The character of any gain or loss (as ordinary income or capital gain) will depend on the nature of the Claim and the circumstances of the holder.

## ARTICLE XV — MISCELLANEOUS PROVISIONS

**15.1 Payment of Statutory Fees.**

All fees payable pursuant to 28 U.S.C. § 1930 shall be paid on or before the Effective Date and shall continue to be paid until the Chapter 11 Case is closed, converted, or dismissed.

**15.2 Post-Confirmation Reporting.**

The Debtor shall file all post-confirmation reports required by the Bankruptcy Court, the U.S. Trustee, and applicable law until the Chapter 11 Case is closed.

**15.3 Breach of the Plan.**

In the event the Debtor breaches the Plan payment requirements, the Debtor shall promptly file a notice with the Bankruptcy Court and request a hearing to determine whether the

case should be converted to Chapter 7 and/or a sale process for the Property commenced to pay remaining claims.

**15.4 Amendments and Modifications.**

The Debtor reserves the right, in accordance with the Bankruptcy Code, to amend or modify this Plan at any time before the Confirmation Date and, with the approval of the Bankruptcy Court, after the Confirmation Date and before substantial consummation of the Plan.

**15.5 Revocation or Withdrawal of the Plan.**

The Debtor reserves the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Plan is revoked or withdrawn, it shall be null and void, and nothing contained in the Plan shall constitute a waiver or release of any Claims by or against the Debtor.

**15.6 Governing Law.**

Except to the extent that the Bankruptcy Code or other federal law is applicable, the rights, duties, and obligations arising under this Plan shall be governed by the laws of the State of New York, without giving effect to conflict of laws principles.

**15.7 Notices.**

All notices and requests in connection with this Plan shall be in writing and shall be delivered to: Counsel for the Debtor: (i) Weinberg Zareh Malkin Price LLP, Attn: Adrienne Woods, Esq., 45 Rockefeller Plaza, 20th Floor, New York, New York 10111, Phone: (212) 899-5470, Email: awoods@wzmplaw.com and (ii) Pillsbury Winthrop Shaw Pittman LLP, 31 West 52nd Street, New York, New York 10019, Phone: (212) 858-1170, Email: hugh.mcdonald@pillsburylaw.com.

**15.8 Exculpations.**

Notwithstanding anything herein to the contrary, to the fullest extent permitted by applicable law, no Exculpated Party (as defined below) shall have or incur, and each Exculpated Party shall be released and exculpated from, any claim, obligation, right, cause of action, remedy, or liability whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in connection with or arising out of the administration of the Chapter 11 Case; the negotiation and pursuit of the Disclosure Statement, any settlement or other acts approved by the Bankruptcy Court, and the Plan or confirmation of the Plan; the occurrence of the Effective Date; the administration and implementation of the Plan or the property to be sold or distributed under the Plan; or the transactions in furtherance of any of the foregoing; other than claims or liabilities arising out of or relating to any act or omission of an Exculpated Party that is determined by a Final Order of a court of competent jurisdiction to have constituted willful misconduct, intentional fraud, or gross negligence.

For purposes of this Section 15.8, the term "Exculpated Party" or "Exculpated Parties" shall mean the Debtor, the Debtor's attorneys at Weinberg Zareh Malkin Price LLP and Pillsbury

Winthrop Shaw Pittman LLP, and the Debtor's financial advisor at Vernon Consulting, Inc, and each of their respective current and former members, partners, shareholders, officers, directors, associates, employees, agents, and representatives, in each case acting in their capacity as professionals retained by, or fiduciaries of, the Debtor's estate in the Chapter 11 Case.

No entity may commence or continue any action, employment of process, or act to collect, offset, or recover any claim or cause of action released or exculpated under this Section 15.8, and any such action or proceeding shall be enjoined. Any entity that violates this injunction shall be subject to sanctions, including contempt of court.

**15.9 Successors and Assigns.**

The rights, benefits, and obligations of any entity named or referred to in this Plan shall be binding on, and inure to the benefit of, any successor or assign of such entity.

**15.10 Severability.**

If any term or provision of this Plan is held to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.

**15.11 Final Decree.**

The Debtor shall file a motion requesting entry of a final decree closing this Chapter 11 Case after the Estate has been fully administered and all distributions required under this Plan have been made.

**15.12 Recommendation.**

The Debtor believes that the Plan affords creditors the best opportunity to receive the maximum recovery on their Claims. The Debtor's retention of the Property pursuant to the Loan Modification, combined with the Debtor's employment income, bonuses, deferred compensation, asset sales, and Social Security retirement benefits, will generate sufficient funds to pay all creditors in full with interest. The Debtor recommends that all creditors entitled to vote accept the Plan.

Respectfully submitted,

*<u>/s/ Nicholas John Farley</u>*

Nicholas John Farley

Dated: October 16, 2026
New York, New York



111290458.v1

WEINBERG ZAREH MALKIN PRICE LLP

<u>*/s/ Adrienne Woods*</u>
Adrienne Woods, Esq.
Omid Zareh, Esq.
Terrence K. McLaughlin, Esq., of Counsel
Donna Fiorelli, Esq., of Counsel
45 Rockefeller Plaza, 20th Floor
New York, New York 10111
Phone: 212-899-5470
Email: awoods@wzmplaw.com
Email: ozareh@wzmplaw.com
Email: tmclaughlin@wzmplaw.com
Email: dfiorelli@wzmplaw.com
And

Hugh M. McDonald
PILLSBURY WINTHROP SHAW PITTMAN LLP
31 West 52nd Street
New York, New York 10019
Phone: 212-858-1170
Email: hugh.mcdonald@pillsburylaw.com

*Counsel to Debtor*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| NICHOLAS JOHN FARLEY, | Case No. 25-11017 (MEW) |
| Debtor. | |

# EXHIBIT A

## PLAN BUDGET

Monthly cash flow budget, October 2026 to June 2030

*Exhibit to the Declaration of Nicholas John Farley in Support of the Fourth Amended Combined Chapter 11 Plan of Reorganization and Disclosure Statement*

**Prepared by:** Nicholas John Farley (the Debtor), October 2026 (16 pages, following)

| Item | Figure | Where it appears in the Plan |
|---|---|---|
| Plan period | 43 months, October 2026 to April 2030 | The Budget runs to June 2030 to show two months of post-payment administration (Plan §1.5, §7.1, §12.2) |
| Opening cash | $162,724 | Bank balance at the start of October 2026 (Plan §1.5, §2.1, §12.2) |
| Total net income | $2,270,240 | Salary $820,170; annual bonuses $820,413; deferred bonuses $237,965; BNY deferred compensation and dividend equivalents $64,734; asset sales $265,250; Social Security $57,528; reimbursements $4,180 (Plan §1.5, §12.2) |
| Total living expenses | $1,225,835 | HSBC mortgage fixed at $15,066 a month under the Loan Modification; all other living costs escalated 3% a year from October 2027 (Plan §2.3, §12.2) |
| Available for creditors | $1,207,129 | Net income plus opening cash, less living expenses (Plan §1.5, §12.2) |
| Distributions under the Plan | $1,134,041 | Administrative Claims $104,103; Priority Tax Claims, Domestic Support Obligations and the Co-op cure $648,277; General Unsecured Claims with 4% interest, including the $107,000 WineCredit reserve, $381,662 (Plan §5.1, §5.2, §6.1 to §6.5, §7.1) |
| Bank balance | At least $10,000 every month from February 2027 | Lowest balance after February 2027 is $16,629 (March 2029); closing balance in June 2030 is $73,088 (Plan §12.2) |
| Tax basis | Net of tax throughout | Bonuses, deferred compensation and BNY distributions at 52.3% of gross; salary at actual net pay; Social Security at 68% of the gross benefit |

*The Budget is a projection prepared by the Debtor on the assumptions stated in the Plan; the pages that follow show each month of the Plan period, six months to a page, with the totals on the final pages.*

**Exhibit A - Plan Budget**
**Nicholas John Farley**
**SDNY Case 25-11017-MEW**
**Plan of Reorganization Budget**
*Plan term Oct-26 – Apr-30 (43 months); May/Jun-30 show post-payment administration.*

| | 1<br>Oct-26 | 2<br>Nov-26 | 3<br>Dec-26 | 4<br>Jan-27 | 5<br>Feb-27 | 6<br>Mar-27 |
|---|---|---|---|---|---|---|
| **Income** | | | | | | |
| Salary – Mizuho Americas, net of tax | $18,226 | $18,226 | $18,226 | $18,226 | $18,226 | $18,226 |
| Social Security, net of tax (from Jan-28) | - | - | - | - | - | - |
| Piano sale (Steinway consignment, net of transportation costs and consignment fee) | - | - | - | - | - | - |
| HiFi sale (85% of gross - net of Audiogon 6% fees, payment processor fees, packing/freight costs, seller negotiation) | - | - | $8,500 | $8,500 | $25,500 | $37,400 |
| Artwork – sales net of commission and freight | - | - | - | $2,000 | $5,000 | $9,000 |
| Clothing – net of fees | - | $4,000 | $4,000 | $5,000 | $5,000 | - |
| Refunds and reimbursement of medical, dental, vision, and business expenses incurred in prior month | $4,180 | | | | | |
| Deferred BNY comp (Fidelity): 644 shares vest Feb-27, 187 shares vest Feb-28, net of tax; plus dividend equivalents on the deferred shares, $3,997.11 gross Mar-27 and $944.35 gross Mar-28, and shown net of tax | - | - | - | - | $48,164 | $2,090 |
| Annual cash bonus, net of tax (Apr-27: after advance repaid) | - | - | - | - | - | - |
| Deferred bonus 2026 (vests Apr-27/28/29, net of tax) | - | - | - | - | - | - |
| Deferred bonus 2027 (vests Apr-28/29/30, net of tax) | - | - | - | - | - | - |
| Deferred bonus 2028 (vests Apr-29/30, net of tax) | - | - | - | - | - | - |
| Deferred bonus 2029 (vests Apr-30, net of tax) | - | - | - | - | - | - |
| **Total net income** | **$22,406** | **$22,226** | **$30,726** | **$33,726** | **$101,890** | **$66,716** |
| | | | | | | |
| **Expenses – Schedule J** | | | | | | |
| HSBC mortgage – modified payment at 2% | $15,066 | $15,066 | $15,066 | $15,066 | $15,066 | $15,066 |
| Co-op maintenance | $6,533 | $6,533 | $6,533 | $6,533 | $6,533 | $6,533 |
| Utilities & services (ConEd higher May–Sep) | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 |
| Property insurance | $423 | $423 | $423 | $423 | $423 | $423 |
| Food + household essentials | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 |
| Personal care incl. clothing | $300 | $300 | $300 | $300 | $300 | $300 |
| Medical & dental | $200 | $200 | $200 | $200 | $200 | $200 |
| Transportation | $150 | $150 | $150 | $150 | $150 | $150 |
| Entertainment | $250 | $250 | $250 | $250 | $250 | $250 |
| **Total expenses** | **$26,422** | **$26,422** | **$26,422** | **$26,422** | **$26,422** | **$26,422** |
| | | | | | | |
| **Remaining projected disposable income** | **($4,016)** | **($4,196)** | **$4,304** | **$7,304** | **$75,468** | **$40,295** |
| | | | | | | |
| Period beginning bank balance | $162,724 | $158,708 | $8,007 | $7,571 | $9,214 | $33,045 |
| **Funds available** | **$158,708** | **$154,512** | **$12,311** | **$14,876** | **$84,682** | **$73,339** |
| | | | | | | |
| **Administrative** | | | | | | |
| WZMP | - | $53,226 | - | - | - | - |
| Vernon Consulting, Inc | - | $17,475 | - | - | - | - |
| Post-confirmation professional fees | - | - | $2,000 | $2,000 | $2,000 | $2,000 |
| US Trustee quarterly fees (0.4% of disbursements) | - | - | - | $922 | - | - |
| **Administrative total** | **-** | **$70,701** | **$2,000** | **$2,922** | **$2,000** | **$2,000** |

**Exhibit A - Plan Budget**
**Nicholas John Farley**
**SDNY Case 25-11017-MEW**
**Plan of Reorganization Budget**

*Plan term Oct-26 – Apr-30 (43 months); May/Jun-30 show post-payment administration.*

| | 1<br>Oct-26 | 2<br>Nov-26 | 3<br>Dec-26 | 4<br>Jan-27 | 5<br>Feb-27 | 6<br>Mar-27 |
|---|---|---|---|---|---|---|
| **Priority claims and Co-op cure** | | | | | | |
| Co-op maintenance arrears (paid Sep-26) | - | - | - | - | - | - |
| Co-op attorney fees (Geller) – cure at confirmation | - | $73,065 | - | - | - | - |
| Domestic support obligations | - | - | - | - | - | - |
| NY State priority tax – interest, then paid Feb-27 | - | $181 | $181 | $181 | $31,225 | - |
| | | | | | | |
| **IRS priority tax claim plus 7% interest** | | | | | | |
| Opening balance | $438,612 | $438,612 | $438,612 | $438,612 | $438,612 | $429,840 |
| Interest payment (7% ÷ 12 on opening balance) | - | $2,559 | $2,559 | $2,559 | $2,559 | $2,507 |
| Principal payment | - | - | - | - | $8,772 | $21,931 |
| Closing balance | $438,612 | $438,612 | $438,612 | $438,612 | $429,840 | $407,909 |
| **IRS payment (interest + principal)** | **-** | **$2,559** | **$2,559** | **$2,559** | **$11,331** | **$24,438** |
| | | | | | | |
| **Total priority claims and cure** | **-** | **$75,805** | **$2,740** | **$2,740** | **$42,556** | **$24,438** |
| | | | | | | |
| **General unsecured – 100% plus 4% simple interest** | | | | | | |
| Opening principal | $348,285 | $348,285 | $348,285 | $348,285 | $348,285 | $341,319 |
| Opening accrued interest | - | $1,161 | $2,322 | $3,483 | $4,644 | $5,689 |
| Interest accrued (4% ÷ 12 on opening principal) | $1,161 | $1,161 | $1,161 | $1,161 | $1,161 | $1,138 |
| Principal payment | - | - | - | - | $6,966 | $17,414 |
| Interest paid (pro rata to principal paid) | - | - | - | - | $116 | $348 |
| Closing principal | $348,285 | $348,285 | $348,285 | $348,285 | $341,319 | $323,905 |
| Closing accrued interest | $1,161 | $2,322 | $3,483 | $4,644 | $5,689 | $6,478 |
| **Unsecured payment (principal + interest)** | **-** | **-** | **-** | **-** | **$7,082** | **$17,763** |
| | | | | | | |
| **Ending bank balance** | **$158,708** | **$8,007** | **$7,571** | **$9,214** | **$33,045** | **$29,139** |

**Notes**

*Tax: annual bonus, deferred compensation and Fidelity distributions are net of tax at 52.3% of gross – an effective 47.7% rate (federal, NYS and NYC). Base salary is actual net pay ($18,226 a month on $400k gross); Social Security is net of federal tax at 68% (New York tax not applicable).*

*Inflation: all living costs other than the HSBC mortgage (fixed under the modification) are uplifted by 3% every 12 months from October 2027.*

**Exhibit A - Plan Budget**
**Nicholas John Farley**
**SDNY Case 25-11017-MEW**
**Plan of Reorganization Budget**
*Plan term Oct-26 – Apr-30 (43 months); May/Jun-30 show post-payment administration.*

| | 7<br>Apr-27 | 8<br>May-27 | 9<br>Jun-27 | 10<br>Jul-27 | 11<br>Aug-27 | 12<br>Sep-27 |
|---|---|---|---|---|---|---|
| **Income** | | | | | | |
| Salary – Mizuho Americas, net of tax | $18,226 | $18,226 | $18,226 | $18,226 | $18,226 | $18,226 |
| Social Security, net of tax (from Jan-28) | - | - | - | - | - | - |
| Piano sale (Steinway consignment, net of transportation costs and consignment fee) | - | - | - | - | - | $36,000 |
| HiFi sale (85% of gross - net of Audiogon 6% fees, payment processor fees, packing/freight costs, seller negotiation) | $45,900 | $48,450 | - | - | - | - |
| Artwork – sales net of commission and freight | $21,000 | - | - | - | - | - |
| Clothing – net of fees | - | - | - | - | - | - |
| Refunds and reimbursement of medical, dental, vision, and business expenses incurred in prior month | | | | | | |
| Deferred BNY comp (Fidelity): 644 shares vest Feb-27, 187 shares vest Feb-28, net of tax; plus dividend equivalents on the deferred shares, $3,997.11 gross Mar-27 and $944.35 gross Mar-28, and shown net of tax | - | - | - | - | - | - |
| Annual cash bonus, net of tax (Apr-27: after advance repaid) | $51,603 | - | - | - | - | - |
| Deferred bonus 2026 (vests Apr-27/28/29, net of tax) | $6,102 | - | - | - | - | - |
| Deferred bonus 2027 (vests Apr-28/29/30, net of tax) | - | - | - | - | - | - |
| Deferred bonus 2028 (vests Apr-29/30, net of tax) | - | - | - | - | - | - |
| Deferred bonus 2029 (vests Apr-30, net of tax) | - | - | - | - | - | - |
| **Total net income** | **$142,831** | **$66,676** | **$18,226** | **$18,226** | **$18,226** | **$54,226** |
| | | | | | | |
| **Expenses – Schedule J** | | | | | | |
| HSBC mortgage – modified payment at 2% | $15,066 | $15,066 | $15,066 | $15,066 | $15,066 | $15,066 |
| Co-op maintenance | $6,533 | $6,533 | $6,533 | $6,533 | $6,533 | $6,533 |
| Utilities & services (ConEd higher May–Sep) | $1,500 | $2,350 | $2,350 | $2,350 | $2,350 | $2,350 |
| Property insurance | $423 | $423 | $423 | $423 | $423 | $423 |
| Food + household essentials | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 |
| Personal care incl. clothing | $300 | $300 | $300 | $300 | $300 | $300 |
| Medical & dental | $200 | $200 | $200 | $200 | $200 | $200 |
| Transportation | $150 | $150 | $150 | $150 | $150 | $150 |
| Entertainment | $250 | $250 | $250 | $250 | $250 | $250 |
| **Total expenses** | **$26,422** | **$27,272** | **$27,272** | **$27,272** | **$27,272** | **$27,272** |
| | | | | | | |
| **Remaining projected disposable income** | **$116,409** | **$39,404** | **($9,046)** | **($9,046)** | **($9,046)** | **$26,954** |
| | | | | | | |
| Period beginning bank balance | $29,139 | $50,967 | $86,171 | $72,925 | $58,946 | $45,700 |
| **Funds available** | **$145,548** | **$90,371** | **$77,125** | **$63,879** | **$49,900** | **$72,654** |
| | | | | | | |
| **Administrative** | | | | | | |
| WZMP | - | - | - | - | - | - |
| Vernon Consulting, Inc | - | - | - | - | - | - |
| Post-confirmation professional fees | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 |
| US Trustee quarterly fees (0.4% of disbursements) | $719 | - | - | $733 | - | - |
| **Administrative total** | **$2,719** | **$2,000** | **$2,000** | **$2,733** | **$2,000** | **$2,000** |

**Exhibit A - Plan Budget**
**Nicholas John Farley**
**SDNY Case 25-11017-MEW**
**Plan of Reorganization Budget**

*Plan term Oct-26 – Apr-30 (43 months); May/Jun-30 show post-payment administration.*

| | 7<br>Apr-27 | 8<br>May-27 | 9<br>Jun-27 | 10<br>Jul-27 | 11<br>Aug-27 | 12<br>Sep-27 |
|---|---|---|---|---|---|---|
| **Priority claims and Co-op cure** | | | | | | |
| Co-op maintenance arrears (paid Sep-26) | - | - | - | - | - | - |
| Co-op attorney fees (Geller) – cure at confirmation | - | - | - | - | - | - |
| Domestic support obligations | $33,831 | - | - | - | - | - |
| NY State priority tax – interest, then paid Feb-27 | - | - | - | - | - | - |
| | | | | | | |
| **IRS priority tax claim plus 7% interest** | | | | | | |
| Opening balance | $407,909 | $377,206 | $377,206 | $377,206 | $377,206 | $377,206 |
| Interest payment (7% ÷ 12 on opening balance) | $2,379 | $2,200 | $2,200 | $2,200 | $2,200 | $2,200 |
| Principal payment | $30,703 | - | - | - | - | - |
| Closing balance | $377,206 | $377,206 | $377,206 | $377,206 | $377,206 | $377,206 |
| **IRS payment (interest + principal)** | **$33,082** | **$2,200** | **$2,200** | **$2,200** | **$2,200** | **$2,200** |
| | | | | | | |
| **Total priority claims and cure** | **$66,913** | **$2,200** | **$2,200** | **$2,200** | **$2,200** | **$2,200** |
| | | | | | | |
| **General unsecured – 100% plus 4% simple interest** | | | | | | |
| Opening principal | $323,905 | $299,525 | $299,525 | $299,525 | $299,525 | $299,525 |
| Opening accrued interest | $6,478 | $6,989 | $7,987 | $8,986 | $9,984 | $10,983 |
| Interest accrued (4% ÷ 12 on opening principal) | $1,080 | $998 | $998 | $998 | $998 | $998 |
| Principal payment | $24,380 | - | - | - | - | - |
| Interest paid (pro rata to principal paid) | $569 | - | - | - | - | - |
| Closing principal | $299,525 | $299,525 | $299,525 | $299,525 | $299,525 | $299,525 |
| Closing accrued interest | $6,989 | $7,987 | $8,986 | $9,984 | $10,983 | $11,981 |
| **Unsecured payment (principal + interest)** | **$24,949** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Ending bank balance** | **$50,967** | **$86,171** | **$72,925** | **$58,946** | **$45,700** | **$68,453** |

## Notes

*Tax: annual bonus, deferred compensation and Fidelity distributions are net of tax at 52.3% of gross – an effective 47.7% rate (federal, NYS and NYC). Base salary is actual net pay ($18,226 a month on $400k gross); Social Security is net of federal tax at 68% (New York tax not applicable).*

*Inflation: all living costs other than the HSBC mortgage (fixed under the modification) are uplifted by 3% every 12 months from October 2027.*

**Exhibit A - Plan Budget**
**Nicholas John Farley**
**SDNY Case 25-11017-MEW**
**Plan of Reorganization Budget**
*Plan term Oct-26 – Apr-30 (43 months); May/Jun-30 show post-payment administration.*

| | 13<br>Oct-27 | 14<br>Nov-27 | 15<br>Dec-27 | 16<br>Jan-28 | 17<br>Feb-28 | 18<br>Mar-28 |
|---|---|---|---|---|---|---|
| **Income** | | | | | | |
| Salary – Mizuho Americas, net of tax | $18,226 | $18,226 | $18,226 | $18,226 | $18,226 | $18,226 |
| Social Security, net of tax (from Jan-28) | - | - | - | $1,918 | $1,918 | $1,918 |
| Piano sale (Steinway consignment, net of transportation costs and consignment fee) | - | - | - | - | - | - |
| HiFi sale (85% of gross - net of Audiogon 6% fees, payment processor fees, packing/freight costs, seller negotiation) | - | - | - | - | - | - |
| Artwork – sales net of commission and freight | - | - | - | - | - | - |
| Clothing – net of fees | - | - | - | - | - | - |
| Refunds and reimbursement of medical, dental, vision, and business expenses incurred in prior month | | | | | | |
| Deferred BNY comp (Fidelity): 644 shares vest Feb-27, 187 shares vest Feb-28, net of tax; plus dividend equivalents on the deferred shares, $3,997.11 gross Mar-27 and $944.35 gross Mar-28, and shown net of tax | - | - | - | - | $13,986 | $494 |
| Annual cash bonus, net of tax (Apr-27: after advance repaid) | - | - | - | - | - | - |
| Deferred bonus 2026 (vests Apr-27/28/29, net of tax) | - | - | - | - | - | - |
| Deferred bonus 2027 (vests Apr-28/29/30, net of tax) | - | - | - | - | - | - |
| Deferred bonus 2028 (vests Apr-29/30, net of tax) | - | - | - | - | - | - |
| Deferred bonus 2029 (vests Apr-30, net of tax) | - | - | - | - | - | - |
| **Total net income** | **$18,226** | **$18,226** | **$18,226** | **$20,144** | **$34,129** | **$20,637** |
| | | | | | | |
| **Expenses – Schedule J** | | | | | | |
| HSBC mortgage – modified payment at 2% | $15,066 | $15,066 | $15,066 | $15,066 | $15,066 | $15,066 |
| Co-op maintenance | $6,729 | $6,729 | $6,729 | $6,729 | $6,729 | $6,729 |
| Utilities & services (ConEd higher May–Sep) | $1,545 | $1,545 | $1,545 | $1,545 | $1,545 | $1,545 |
| Property insurance | $436 | $436 | $436 | $436 | $436 | $436 |
| Food + household essentials | $2,060 | $2,060 | $2,060 | $2,060 | $2,060 | $2,060 |
| Personal care incl. clothing | $309 | $309 | $309 | $309 | $309 | $309 |
| Medical & dental | $206 | $206 | $206 | $206 | $206 | $206 |
| Transportation | $155 | $155 | $155 | $155 | $155 | $155 |
| Entertainment | $258 | $258 | $258 | $258 | $258 | $258 |
| **Total expenses** | **$26,762** | **$26,762** | **$26,762** | **$26,762** | **$26,762** | **$26,762** |
| | | | | | | |
| **Remaining projected disposable income** | **($8,536)** | **($8,536)** | **($8,536)** | **($6,619)** | **$7,367** | **($6,125)** |
| | | | | | | |
| Period beginning bank balance | $68,453 | $55,339 | $42,602 | $31,866 | $22,683 | $27,849 |
| **Funds available** | **$59,917** | **$46,803** | **$34,066** | **$25,247** | **$30,050** | **$21,724** |
| | | | | | | |
| **Administrative** | | | | | | |
| WZMP | - | - | - | - | - | - |
| Vernon Consulting, Inc | - | - | - | - | - | - |
| Post-confirmation professional fees | $2,000 | $2,000 | - | - | - | - |
| US Trustee quarterly fees (0.4% of disbursements) | $378 | - | - | $364 | - | - |
| **Administrative total** | **$2,378** | **$2,000** | **-** | **$364** | **-** | **-** |

**Exhibit A - Plan Budget**
**Nicholas John Farley**
**SDNY Case 25-11017-MEW**
**Plan of Reorganization Budget**

*Plan term Oct-26 – Apr-30 (43 months); May/Jun-30 show post-payment administration.*

| | 13<br>Oct-27 | 14<br>Nov-27 | 15<br>Dec-27 | 16<br>Jan-28 | 17<br>Feb-28 | 18<br>Mar-28 |
|---|---|---|---|---|---|---|
| **Priority claims and Co-op cure** | | | | | | |
| Co-op maintenance arrears (paid Sep-26) | - | - | - | - | - | - |
| Co-op attorney fees (Geller) – cure at confirmation | - | - | - | - | - | - |
| Domestic support obligations | - | - | - | - | - | - |
| NY State priority tax – interest, then paid Feb-27 | - | - | - | - | - | - |
| **IRS priority tax claim plus 7% interest** | | | | | | |
| Opening balance | $377,206 | $377,206 | $377,206 | $377,206 | $377,206 | $377,206 |
| Interest payment (7% ÷ 12 on opening balance) | $2,200 | $2,200 | $2,200 | $2,200 | $2,200 | $2,200 |
| Principal payment | - | - | - | - | - | - |
| Closing balance | $377,206 | $377,206 | $377,206 | $377,206 | $377,206 | $377,206 |
| **IRS payment (interest + principal)** | **$2,200** | **$2,200** | **$2,200** | **$2,200** | **$2,200** | **$2,200** |
| **Total priority claims and cure** | **$2,200** | **$2,200** | **$2,200** | **$2,200** | **$2,200** | **$2,200** |
| **General unsecured – 100% plus 4% simple interest** | | | | | | |
| Opening principal | $299,525 | $299,525 | $299,525 | $299,525 | $299,525 | $299,525 |
| Opening accrued interest | $11,981 | $12,979 | $13,978 | $14,976 | $15,975 | $16,973 |
| Interest accrued (4% ÷ 12 on opening principal) | $998 | $998 | $998 | $998 | $998 | $998 |
| Principal payment | - | - | - | - | - | - |
| Interest paid (pro rata to principal paid) | - | - | - | - | - | - |
| Closing principal | $299,525 | $299,525 | $299,525 | $299,525 | $299,525 | $299,525 |
| Closing accrued interest | $12,979 | $13,978 | $14,976 | $15,975 | $16,973 | $17,971 |
| **Unsecured payment (principal + interest)** | **-** | **-** | **-** | **-** | **-** | **-** |
| **Ending bank balance** | **$55,339** | **$42,602** | **$31,866** | **$22,683** | **$27,849** | **$19,524** |

## Notes

*Tax: annual bonus, deferred compensation and Fidelity distributions are net of tax at 52.3% of gross – an effective 47.7% rate (federal, NYS and NYC). Base salary is actual net pay ($18,226 a month on $400k gross); Social Security is net of federal tax at 68% (New York tax not applicable).*

*Inflation: all living costs other than the HSBC mortgage (fixed under the modification) are uplifted by 3% every 12 months from October 2027.*

**Exhibit A - Plan Budget**
**Nicholas John Farley**
**SDNY Case 25-11017-MEW**
**Plan of Reorganization Budget**

*Plan term Oct-26 – Apr-30 (43 months); May/Jun-30 show post-payment administration.*

| | 19<br>Apr-28 | 20<br>May-28 | 21<br>Jun-28 | 22<br>Jul-28 | 23<br>Aug-28 | 24<br>Sep-28 |
|---|---|---|---|---|---|---|
| **Income** | | | | | | |
| Salary – Mizuho Americas, net of tax | $18,226 | $18,226 | $18,226 | $18,226 | $18,226 | $18,226 |
| Social Security, net of tax (from Jan-28) | $1,918 | $1,918 | $1,918 | $1,918 | $1,918 | $1,918 |
| Piano sale (Steinway consignment, net of transportation costs and consignment fee) | - | - | - | - | - | - |
| HiFi sale (85% of gross - net of Audiogon 6% fees, payment processor fees, packing/freight costs, seller negotiation) | - | - | - | - | - | - |
| Artwork – sales net of commission and freight | - | - | - | - | - | - |
| Clothing – net of fees | - | - | - | - | - | - |
| Refunds and reimbursement of medical, dental, vision, and business expenses incurred in prior month | | | | | | |
| Deferred BNY comp (Fidelity): 644 shares vest Feb-27, 187 shares vest Feb-28, net of tax; plus dividend equivalents on the deferred shares, $3,997.11 gross Mar-27 and $944.35 gross Mar-28, and shown net of tax | - | - | - | - | - | - |
| Annual cash bonus, net of tax (Apr-27: after advance repaid) | $256,270 | - | - | - | - | - |
| Deferred bonus 2026 (vests Apr-27/28/29, net of tax) | $6,102 | - | - | - | - | - |
| Deferred bonus 2027 (vests Apr-28/29/30, net of tax) | $36,610 | - | - | - | - | - |
| Deferred bonus 2028 (vests Apr-29/30, net of tax) | - | - | - | - | - | - |
| Deferred bonus 2029 (vests Apr-30, net of tax) | - | - | - | - | - | - |
| **Total net income** | **$319,125** | **$20,144** | **$20,144** | **$20,144** | **$20,144** | **$20,144** |
| | | | | | | |
| **Expenses – Schedule J** | | | | | | |
| HSBC mortgage – modified payment at 2% | $15,066 | $15,066 | $15,066 | $15,066 | $15,066 | $15,066 |
| Co-op maintenance | $6,729 | $6,729 | $6,729 | $6,729 | $6,729 | $6,729 |
| Utilities & services (ConEd higher May–Sep) | $1,545 | $2,421 | $2,421 | $2,421 | $2,421 | $2,421 |
| Property insurance | $436 | $436 | $436 | $436 | $436 | $436 |
| Food + household essentials | $2,060 | $2,060 | $2,060 | $2,060 | $2,060 | $2,060 |
| Personal care incl. clothing | $309 | $309 | $309 | $309 | $309 | $309 |
| Medical & dental | $206 | $206 | $206 | $206 | $206 | $206 |
| Transportation | $155 | $155 | $155 | $155 | $155 | $155 |
| Entertainment | $258 | $258 | $258 | $258 | $258 | $258 |
| **Total expenses** | **$26,762** | **$27,638** | **$27,638** | **$27,638** | **$27,638** | **$27,638** |
| | | | | | | |
| **Remaining projected disposable income** | **$292,363** | **($7,494)** | **($7,494)** | **($7,494)** | **($7,494)** | **($7,494)** |
| | | | | | | |
| Period beginning bank balance | $19,524 | $115,190 | $106,109 | $97,029 | $86,822 | $77,741 |
| **Funds available** | **$311,887** | **$107,695** | **$98,615** | **$89,534** | **$79,327** | **$70,247** |
| | | | | | | |
| **Administrative** | | | | | | |
| WZMP | - | - | - | - | - | - |
| Vernon Consulting, Inc | - | - | - | - | - | - |
| Post-confirmation professional fees | - | - | - | - | - | - |
| US Trustee quarterly fees (0.4% of disbursements) | $348 | - | - | $1,126 | - | - |
| **Administrative total** | **$348** | **-** | **-** | **$1,126** | **-** | **-** |

**Exhibit A - Plan Budget**
**Nicholas John Farley**
**SDNY Case 25-11017-MEW**
**Plan of Reorganization Budget**

*Plan term Oct-26 – Apr-30 (43 months); May/Jun-30 show post-payment administration.*

| | 19<br>Apr-28 | 20<br>May-28 | 21<br>Jun-28 | 22<br>Jul-28 | 23<br>Aug-28 | 24<br>Sep-28 |
|---|---|---|---|---|---|---|
| **Priority claims and Co-op cure** | | | | | | |
| Co-op maintenance arrears (paid Sep-26) | - | - | - | - | - | - |
| Co-op attorney fees (Geller) – cure at confirmation | - | - | - | - | - | - |
| Domestic support obligations | - | - | - | - | - | - |
| NY State priority tax – interest, then paid Feb-27 | - | - | - | - | - | - |
| | | | | | | |
| **IRS priority tax claim plus 7% interest** | | | | | | |
| Opening balance | $377,206 | $271,939 | $271,939 | $271,939 | $271,939 | $271,939 |
| Interest payment (7% ÷ 12 on opening balance) | $2,200 | $1,586 | $1,586 | $1,586 | $1,586 | $1,586 |
| Principal payment | $105,267 | - | - | - | - | - |
| Closing balance | $271,939 | $271,939 | $271,939 | $271,939 | $271,939 | $271,939 |
| **IRS payment (interest + principal)** | **$107,467** | **$1,586** | **$1,586** | **$1,586** | **$1,586** | **$1,586** |
| | | | | | | |
| **Total priority claims and cure** | **$107,467** | **$1,586** | **$1,586** | **$1,586** | **$1,586** | **$1,586** |
| | | | | | | |
| **General unsecured – 100% plus 4% simple interest** | | | | | | |
| Opening principal | $299,525 | $215,936 | $215,936 | $215,936 | $215,936 | $215,936 |
| Opening accrued interest | $17,971 | $13,676 | $14,396 | $15,116 | $15,835 | $16,555 |
| Interest accrued (4% ÷ 12 on opening principal) | $998 | $720 | $720 | $720 | $720 | $720 |
| Principal payment | $83,588 | - | - | - | - | - |
| Interest paid (pro rata to principal paid) | $5,294 | - | - | - | - | - |
| Closing principal | $215,936 | $215,936 | $215,936 | $215,936 | $215,936 | $215,936 |
| Closing accrued interest | $13,676 | $14,396 | $15,116 | $15,835 | $16,555 | $17,275 |
| **Unsecured payment (principal + interest)** | **$88,882** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Ending bank balance** | **$115,190** | **$106,109** | **$97,029** | **$86,822** | **$77,741** | **$68,661** |

## Notes

*Tax: annual bonus, deferred compensation and Fidelity distributions are net of tax at 52.3% of gross – an effective 47.7% rate (federal, NYS and NYC). Base salary is actual net pay ($18,226 a month on $400k gross); Social Security is net of federal tax at 68% (New York tax not applicable).*

*Inflation: all living costs other than the HSBC mortgage (fixed under the modification) are uplifted by 3% every 12 months from October 2027.*

**Exhibit A - Plan Budget**
**Nicholas John Farley**
**SDNY Case 25-11017-MEW**
**Plan of Reorganization Budget**
*Plan term Oct-26 – Apr-30 (43 months); May/Jun-30 show post-payment administration.*

| | 25<br>Oct-28 | 26<br>Nov-28 | 27<br>Dec-28 | 28<br>Jan-29 | 29<br>Feb-29 | 30<br>Mar-29 |
|---|---|---|---|---|---|---|
| **Income** | | | | | | |
| Salary – Mizuho Americas, net of tax | $18,226 | $18,226 | $18,226 | $18,226 | $18,226 | $18,226 |
| Social Security, net of tax (from Jan-28) | $1,918 | $1,918 | $1,918 | $1,918 | $1,918 | $1,918 |
| Piano sale (Steinway consignment, net of transportation costs and consignment fee) | - | - | - | - | - | - |
| HiFi sale (85% of gross - net of Audiogon 6% fees, payment processor fees, packing/freight costs, seller negotiation) | - | - | - | - | - | - |
| Artwork – sales net of commission and freight | - | - | - | - | - | - |
| Clothing – net of fees | - | - | - | - | - | - |
| Refunds and reimbursement of medical, dental, vision, and business expenses incurred in prior month | | | | | | |
| Deferred BNY comp (Fidelity): 644 shares vest Feb-27, 187 shares vest Feb-28, net of tax; plus dividend equivalents on the deferred shares, $3,997.11 gross Mar-27 and $944.35 gross Mar-28, and shown net of tax | - | - | - | - | - | - |
| Annual cash bonus, net of tax (Apr-27: after advance repaid) | - | - | - | - | - | - |
| Deferred bonus 2026 (vests Apr-27/28/29, net of tax) | - | - | - | - | - | - |
| Deferred bonus 2027 (vests Apr-28/29/30, net of tax) | - | - | - | - | - | - |
| Deferred bonus 2028 (vests Apr-29/30, net of tax) | - | - | - | - | - | - |
| Deferred bonus 2029 (vests Apr-30, net of tax) | - | - | - | - | - | - |
| **Total net income** | **$20,144** | **$20,144** | **$20,144** | **$20,144** | **$20,144** | **$20,144** |
| | | | | | | |
| **Expenses – Schedule J** | | | | | | |
| HSBC mortgage – modified payment at 2% | $15,066 | $15,066 | $15,066 | $15,066 | $15,066 | $15,066 |
| Co-op maintenance | $6,931 | $6,931 | $6,931 | $6,931 | $6,931 | $6,931 |
| Utilities & services (ConEd higher May–Sep) | $1,591 | $1,591 | $1,591 | $1,591 | $1,591 | $1,591 |
| Property insurance | $449 | $449 | $449 | $449 | $449 | $449 |
| Food + household essentials | $2,122 | $2,122 | $2,122 | $2,122 | $2,122 | $2,122 |
| Personal care incl. clothing | $318 | $318 | $318 | $318 | $318 | $318 |
| Medical & dental | $212 | $212 | $212 | $212 | $212 | $212 |
| Transportation | $159 | $159 | $159 | $159 | $159 | $159 |
| Entertainment | $265 | $265 | $265 | $265 | $265 | $265 |
| **Total expenses** | **$27,113** | **$27,113** | **$27,113** | **$27,113** | **$27,113** | **$27,113** |
| | | | | | | |
| **Remaining projected disposable income** | **($6,970)** | **($6,970)** | **($6,970)** | **($6,970)** | **($6,970)** | **($6,970)** |
| | | | | | | |
| Period beginning bank balance | $68,661 | $59,754 | $51,198 | $42,642 | $33,741 | $25,185 |
| **Funds available** | **$61,691** | **$52,784** | **$44,228** | **$35,672** | **$26,772** | **$18,216** |
| | | | | | | |
| **Administrative** | | | | | | |
| WZMP | - | - | - | - | - | - |
| Vernon Consulting, Inc | - | - | - | - | - | - |
| Post-confirmation professional fees | - | - | - | - | - | - |
| US Trustee quarterly fees (0.4% of disbursements) | $351 | - | - | $344 | - | - |
| **Administrative total** | **$351** | **-** | **-** | **$344** | **-** | **-** |

**Exhibit A - Plan Budget**
**Nicholas John Farley**
**SDNY Case 25-11017-MEW**
**Plan of Reorganization Budget**

*Plan term Oct-26 – Apr-30 (43 months); May/Jun-30 show post-payment administration.*

| | 25<br>Oct-28 | 26<br>Nov-28 | 27<br>Dec-28 | 28<br>Jan-29 | 29<br>Feb-29 | 30<br>Mar-29 |
|---|---|---|---|---|---|---|
| **Priority claims and Co-op cure** | | | | | | |
| Co-op maintenance arrears (paid Sep-26) | - | - | - | - | - | - |
| Co-op attorney fees (Geller) – cure at confirmation | - | - | - | - | - | - |
| Domestic support obligations | - | - | - | - | - | - |
| NY State priority tax – interest, then paid Feb-27 | - | - | - | - | - | - |
| **IRS priority tax claim plus 7% interest** | | | | | | |
| Opening balance | $271,939 | $271,939 | $271,939 | $271,939 | $271,939 | $271,939 |
| Interest payment (7% ÷ 12 on opening balance) | $1,586 | $1,586 | $1,586 | $1,586 | $1,586 | $1,586 |
| Principal payment | - | - | - | - | - | - |
| Closing balance | $271,939 | $271,939 | $271,939 | $271,939 | $271,939 | $271,939 |
| **IRS payment (interest + principal)** | **$1,586** | **$1,586** | **$1,586** | **$1,586** | **$1,586** | **$1,586** |
| **Total priority claims and cure** | **$1,586** | **$1,586** | **$1,586** | **$1,586** | **$1,586** | **$1,586** |
| **General unsecured – 100% plus 4% simple interest** | | | | | | |
| Opening principal | $215,936 | $215,936 | $215,936 | $215,936 | $215,936 | $215,936 |
| Opening accrued interest | $17,275 | $17,995 | $18,714 | $19,434 | $20,154 | $20,874 |
| Interest accrued (4% ÷ 12 on opening principal) | $720 | $720 | $720 | $720 | $720 | $720 |
| Principal payment | - | - | - | - | - | - |
| Interest paid (pro rata to principal paid) | - | - | - | - | - | - |
| Closing principal | $215,936 | $215,936 | $215,936 | $215,936 | $215,936 | $215,936 |
| Closing accrued interest | $17,995 | $18,714 | $19,434 | $20,154 | $20,874 | $21,594 |
| **Unsecured payment (principal + interest)** | **-** | **-** | **-** | **-** | **-** | **-** |
| **Ending bank balance** | **$59,754** | **$51,198** | **$42,642** | **$33,741** | **$25,185** | **$16,629** |

## Notes

*Tax: annual bonus, deferred compensation and Fidelity distributions are net of tax at 52.3% of gross – an effective 47.7% rate (federal, NYS and NYC). Base salary is actual net pay ($18,226 a month on $400k gross); Social Security is net of federal tax at 68% (New York tax not applicable).*

*Inflation: all living costs other than the HSBC mortgage (fixed under the modification) are uplifted by 3% every 12 months from October 2027.*

**Exhibit A - Plan Budget**
**Nicholas John Farley**
**SDNY Case 25-11017-MEW**
**Plan of Reorganization Budget**
*Plan term Oct-26 – Apr-30 (43 months); May/Jun-30 show post-payment administration.*

| | 31<br>Apr-29 | 32<br>May-29 | 33<br>Jun-29 | 34<br>Jul-29 | 35<br>Aug-29 | 36<br>Sep-29 |
|---|---|---|---|---|---|---|
| **Income** | | | | | | |
| Salary – Mizuho Americas, net of tax | $18,226 | $18,226 | $18,226 | $18,226 | $18,226 | $18,226 |
| Social Security, net of tax (from Jan-28) | $1,918 | $1,918 | $1,918 | $1,918 | $1,918 | $1,918 |
| Piano sale (Steinway consignment, net of transportation costs and consignment fee) | - | - | - | - | - | - |
| HiFi sale (85% of gross - net of Audiogon 6% fees, payment processor fees, packing/freight costs, seller negotiation) | - | - | - | - | - | - |
| Artwork – sales net of commission and freight | - | - | - | - | - | - |
| Clothing – net of fees | - | - | - | - | - | - |
| Refunds and reimbursement of medical, dental, vision, and business expenses incurred in prior month | | | | | | |
| Deferred BNY comp (Fidelity): 644 shares vest Feb-27, 187 shares vest Feb-28, net of tax; plus dividend equivalents on the deferred shares, $3,997.11 gross Mar-27 and $944.35 gross Mar-28, and shown net of tax | - | - | - | - | - | - |
| Annual cash bonus, net of tax (Apr-27: after advance repaid) | $256,270 | - | - | - | - | - |
| Deferred bonus 2026 (vests Apr-27/28/29, net of tax) | $6,102 | - | - | - | - | - |
| Deferred bonus 2027 (vests Apr-28/29/30, net of tax) | $36,610 | - | - | - | - | - |
| Deferred bonus 2028 (vests Apr-29/30, net of tax) | $36,610 | - | - | - | - | - |
| Deferred bonus 2029 (vests Apr-30, net of tax) | - | - | - | - | - | - |
| **Total net income** | **$355,735** | **$20,144** | **$20,144** | **$20,144** | **$20,144** | **$20,144** |
| | | | | | | |
| **Expenses – Schedule J** | | | | | | |
| HSBC mortgage – modified payment at 2% | $15,066 | $15,066 | $15,066 | $15,066 | $15,066 | $15,066 |
| Co-op maintenance | $6,931 | $6,931 | $6,931 | $6,931 | $6,931 | $6,931 |
| Utilities & services (ConEd higher May–Sep) | $1,591 | $2,493 | $2,493 | $2,493 | $2,493 | $2,493 |
| Property insurance | $449 | $449 | $449 | $449 | $449 | $449 |
| Food + household essentials | $2,122 | $2,122 | $2,122 | $2,122 | $2,122 | $2,122 |
| Personal care incl. clothing | $318 | $318 | $318 | $318 | $318 | $318 |
| Medical & dental | $212 | $212 | $212 | $212 | $212 | $212 |
| Transportation | $159 | $159 | $159 | $159 | $159 | $159 |
| Entertainment | $265 | $265 | $265 | $265 | $265 | $265 |
| **Total expenses** | **$27,113** | **$28,015** | **$28,015** | **$28,015** | **$28,015** | **$28,015** |
| | | | | | | |
| **Remaining projected disposable income** | **$328,622** | **($7,871)** | **($7,871)** | **($7,871)** | **($7,871)** | **($7,871)** |
| | | | | | | |
| Period beginning bank balance | $16,629 | $112,913 | $104,171 | $95,430 | $85,421 | $76,680 |
| **Funds available** | **$345,251** | **$105,041** | **$96,300** | **$87,558** | **$77,549** | **$68,808** |
| | | | | | | |
| **Administrative** | | | | | | |
| WZMP | - | - | - | - | - | - |
| Vernon Consulting, Inc | - | - | - | - | - | - |
| Post-confirmation professional fees | - | - | - | - | - | - |
| US Trustee quarterly fees (0.4% of disbursements) | $344 | - | - | $1,268 | - | - |
| **Administrative total** | **$344** | **-** | **-** | **$1,268** | **-** | **-** |

**Exhibit A - Plan Budget**
**Nicholas John Farley**
**SDNY Case 25-11017-MEW**
**Plan of Reorganization Budget**

*Plan term Oct-26 – Apr-30 (43 months); May/Jun-30 show post-payment administration.*

| | 31<br>Apr-29 | 32<br>May-29 | 33<br>Jun-29 | 34<br>Jul-29 | 35<br>Aug-29 | 36<br>Sep-29 |
|---|---|---|---|---|---|---|
| **Priority claims and Co-op cure** | | | | | | |
| Co-op maintenance arrears (paid Sep-26) | - | - | - | - | - | - |
| Co-op attorney fees (Geller) – cure at confirmation | - | - | - | - | - | - |
| Domestic support obligations | - | - | - | - | - | - |
| NY State priority tax – interest, then paid Feb-27 | - | - | - | - | - | - |
| **IRS priority tax claim plus 7% interest** | | | | | | |
| Opening balance | $271,939 | $149,128 | $149,128 | $149,128 | $149,128 | $149,128 |
| Interest payment (7% ÷ 12 on opening balance) | $1,586 | $870 | $870 | $870 | $870 | $870 |
| Principal payment | $122,811 | - | - | - | - | - |
| Closing balance | $149,128 | $149,128 | $149,128 | $149,128 | $149,128 | $149,128 |
| **IRS payment (interest + principal)** | **$124,398** | **$870** | **$870** | **$870** | **$870** | **$870** |
| **Total priority claims and cure** | **$124,398** | **$870** | **$870** | **$870** | **$870** | **$870** |
| **General unsecured – 100% plus 4% simple interest** | | | | | | |
| Opening principal | $215,936 | $118,417 | $118,417 | $118,417 | $118,417 | $118,417 |
| Opening accrued interest | $21,594 | $12,236 | $12,631 | $13,026 | $13,421 | $13,815 |
| Interest accrued (4% ÷ 12 on opening principal) | $720 | $395 | $395 | $395 | $395 | $395 |
| Principal payment | $97,520 | - | - | - | - | - |
| Interest paid (pro rata to principal paid) | $10,077 | - | - | - | - | - |
| Closing principal | $118,417 | $118,417 | $118,417 | $118,417 | $118,417 | $118,417 |
| Closing accrued interest | $12,236 | $12,631 | $13,026 | $13,421 | $13,815 | $14,210 |
| **Unsecured payment (principal + interest)** | **$107,597** | **-** | **-** | **-** | **-** | **-** |
| **Ending bank balance** | **$112,913** | **$104,171** | **$95,430** | **$85,421** | **$76,680** | **$67,938** |

**Notes**

*Tax: annual bonus, deferred compensation and Fidelity distributions are net of tax at 52.3% of gross – an effective 47.7% rate (federal, NYS and NYC). Base salary is actual net pay ($18,226 a month on $400k gross); Social Security is net of federal tax at 68% (New York tax not applicable).*

*Inflation: all living costs other than the HSBC mortgage (fixed under the modification) are uplifted by 3% every 12 months from October 2027.*

**Exhibit A - Plan Budget**
**Nicholas John Farley**
**SDNY Case 25-11017-MEW**
**Plan of Reorganization Budget**
*Plan term Oct-26 – Apr-30 (43 months); May/Jun-30 show post-payment administration.*

| | 37<br>Oct-29 | 38<br>Nov-29 | 39<br>Dec-29 | 40<br>Jan-30 | 41<br>Feb-30 | 42<br>Mar-30 |
|---|---|---|---|---|---|---|
| **Income** | | | | | | |
| Salary – Mizuho Americas, net of tax | $18,226 | $18,226 | $18,226 | $18,226 | $18,226 | $18,226 |
| Social Security, net of tax (from Jan-28) | $1,918 | $1,918 | $1,918 | $1,918 | $1,918 | $1,918 |
| Piano sale (Steinway consignment, net of transportation costs and consignment fee) | - | - | - | - | - | - |
| HiFi sale (85% of gross - net of Audiogon 6% fees, payment processor fees, packing/freight costs, seller negotiation) | - | - | - | - | - | - |
| Artwork – sales net of commission and freight | - | - | - | - | - | - |
| Clothing – net of fees | - | - | - | - | - | - |
| Refunds and reimbursement of medical, dental, vision, and business expenses incurred in prior month | | | | | | |
| Deferred BNY comp (Fidelity): 644 shares vest Feb-27, 187 shares vest Feb-28, net of tax; plus dividend equivalents on the deferred shares, $3,997.11 gross Mar-27 and $944.35 gross Mar-28, and shown net of tax | - | - | - | - | - | - |
| Annual cash bonus, net of tax (Apr-27: after advance repaid) | - | - | - | - | - | - |
| Deferred bonus 2026 (vests Apr-27/28/29, net of tax) | - | - | - | - | - | - |
| Deferred bonus 2027 (vests Apr-28/29/30, net of tax) | - | - | - | - | - | - |
| Deferred bonus 2028 (vests Apr-29/30, net of tax) | - | - | - | - | - | - |
| Deferred bonus 2029 (vests Apr-30, net of tax) | - | - | - | - | - | - |
| **Total net income** | **$20,144** | **$20,144** | **$20,144** | **$20,144** | **$20,144** | **$20,144** |
| | | | | | | |
| **Expenses – Schedule J** | | | | | | |
| HSBC mortgage – modified payment at 2% | $15,066 | $15,066 | $15,066 | $15,066 | $15,066 | $15,066 |
| Co-op maintenance | $7,139 | $7,139 | $7,139 | $7,139 | $7,139 | $7,139 |
| Utilities & services (ConEd higher May–Sep) | $1,639 | $1,639 | $1,639 | $1,639 | $1,639 | $1,639 |
| Property insurance | $462 | $462 | $462 | $462 | $462 | $462 |
| Food + household essentials | $2,185 | $2,185 | $2,185 | $2,185 | $2,185 | $2,185 |
| Personal care incl. clothing | $328 | $328 | $328 | $328 | $328 | $328 |
| Medical & dental | $219 | $219 | $219 | $219 | $219 | $219 |
| Transportation | $164 | $164 | $164 | $164 | $164 | $164 |
| Entertainment | $273 | $273 | $273 | $273 | $273 | $273 |
| **Total expenses** | **$27,475** | **$27,475** | **$27,475** | **$27,475** | **$27,475** | **$27,475** |
| | | | | | | |
| **Remaining projected disposable income** | **($7,331)** | **($7,331)** | **($7,331)** | **($7,331)** | **($7,331)** | **($7,331)** |
| | | | | | | |
| Period beginning bank balance | $67,938 | $59,391 | $51,190 | $42,988 | $34,447 | $26,246 |
| **Funds available** | **$60,607** | **$52,059** | **$43,858** | **$35,657** | **$27,116** | **$18,915** |
| | | | | | | |
| **Administrative** | | | | | | |
| WZMP | - | - | - | - | - | - |
| Vernon Consulting, Inc | - | - | - | - | - | - |
| Post-confirmation professional fees | - | - | - | - | - | - |
| US Trustee quarterly fees (0.4% of disbursements) | $347 | - | - | $340 | - | - |
| **Administrative total** | **$347** | **-** | **-** | **$340** | **-** | **-** |

EXHIBIT A – Plan Budget – Nicholas John Farley, Case No. 25-11017 (MEW) Exhibit A – page 15 of 17

**Exhibit A - Plan Budget**
**Nicholas John Farley**
**SDNY Case 25-11017-MEW**
**Plan of Reorganization Budget**

*Plan term Oct-26 – Apr-30 (43 months); May/Jun-30 show post-payment administration.*

| | 37<br>Oct-29 | 38<br>Nov-29 | 39<br>Dec-29 | 40<br>Jan-30 | 41<br>Feb-30 | 42<br>Mar-30 |
|---|---|---|---|---|---|---|
| **Priority claims and Co-op cure** | | | | | | |
| Co-op maintenance arrears (paid Sep-26) | - | - | - | - | - | - |
| Co-op attorney fees (Geller) – cure at confirmation | - | - | - | - | - | - |
| Domestic support obligations | - | - | - | - | - | - |
| NY State priority tax – interest, then paid Feb-27 | - | - | - | - | - | - |
| | | | | | | |
| **IRS priority tax claim plus 7% interest** | | | | | | |
| Opening balance | $149,128 | $149,128 | $149,128 | $149,128 | $149,128 | $149,128 |
| Interest payment (7% ÷ 12 on opening balance) | $870 | $870 | $870 | $870 | $870 | $870 |
| Principal payment | - | - | - | - | - | - |
| Closing balance | $149,128 | $149,128 | $149,128 | $149,128 | $149,128 | $149,128 |
| **IRS payment (interest + principal)** | **$870** | **$870** | **$870** | **$870** | **$870** | **$870** |
| | | | | | | |
| **Total priority claims and cure** | **$870** | **$870** | **$870** | **$870** | **$870** | **$870** |
| | | | | | | |
| **General unsecured – 100% plus 4% simple interest** | | | | | | |
| Opening principal | $118,417 | $118,417 | $118,417 | $118,417 | $118,417 | $118,417 |
| Opening accrued interest | $14,210 | $14,605 | $14,999 | $15,394 | $15,789 | $16,184 |
| Interest accrued (4% ÷ 12 on opening principal) | $395 | $395 | $395 | $395 | $395 | $395 |
| Principal payment | - | - | - | - | - | - |
| Interest paid (pro rata to principal paid) | - | - | - | - | - | - |
| Closing principal | $118,417 | $118,417 | $118,417 | $118,417 | $118,417 | $118,417 |
| Closing accrued interest | $14,605 | $14,999 | $15,394 | $15,789 | $16,184 | $16,578 |
| **Unsecured payment (principal + interest)** | **-** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Ending bank balance** | **$59,391** | **$51,190** | **$42,988** | **$34,447** | **$26,246** | **$18,045** |

## Notes

*Tax: annual bonus, deferred compensation and Fidelity distributions are net of tax at 52.3% of gross – an effective 47.7% rate (federal, NYS and NYC). Base salary is actual net pay ($18,226 a month on $400k gross); Social Security is net of federal tax at 68% (New York tax not applicable).*

*Inflation: all living costs other than the HSBC mortgage (fixed under the modification) are uplifted by 3% every 12 months from October 2027.*

**Exhibit A - Plan Budget**
**Nicholas John Farley**
**SDNY Case 25-11017-MEW**
**Plan of Reorganization Budget**

*Plan term Oct-26 – Apr-30 (43 months); May/Jun-30 show post-payment administration.*

| | 43<br>Apr-30 | 44<br>May-30 | 45<br>Jun-30 | Total |
|---|---|---|---|---|
| **Income** | | | | |
| Salary – Mizuho Americas, net of tax | $18,226 | $18,226 | $18,226 | $820,170 |
| Social Security, net of tax (from Jan-28) | $1,918 | $1,918 | $1,918 | $57,528 |
| Piano sale (Steinway consignment, net of transportation costs and consignment fee) | - | - | - | $36,000 |
| HiFi sale (85% of gross - net of Audiogon 6% fees, payment processor fees, packing/freight costs, seller negotiation) | - | - | - | $174,250 |
| Artwork – sales net of commission and freight | - | - | - | $37,000 |
| Clothing – net of fees | - | - | - | $18,000 |
| Refunds and reimbursement of medical, dental, vision, and business expenses incurred in prior month | | | | $4,180 |
| Deferred BNY comp (Fidelity): 644 shares vest Feb-27, 187 shares vest Feb-28, net of tax; plus dividend equivalents on the deferred shares, $3,997.11 gross Mar-27 and $944.35 gross Mar-28, and shown net of tax | - | - | - | $64,734 |
| Annual cash bonus, net of tax (Apr-27: after advance repaid) | $256,270 | - | - | $820,413 |
| Deferred bonus 2026 (vests Apr-27/28/29, net of tax) | - | - | - | $18,305 |
| Deferred bonus 2027 (vests Apr-28/29/30, net of tax) | $36,610 | - | - | $109,830 |
| Deferred bonus 2028 (vests Apr-29/30, net of tax) | $36,610 | - | - | $73,220 |
| Deferred bonus 2029 (vests Apr-30, net of tax) | $36,610 | - | - | $36,610 |
| **Total net income** | **$386,244** | **$20,144** | **$20,144** | **$2,270,240** |
| | | | | |
| **Expenses – Schedule J** | | | | |
| HSBC mortgage – modified payment at 2% | $15,066 | $15,066 | $15,066 | $677,957 |
| Co-op maintenance | $7,139 | $7,139 | $7,139 | $306,563 |
| Utilities & services (ConEd higher May–Sep) | $1,639 | $2,568 | $2,568 | $85,382 |
| Property insurance | $462 | $462 | $462 | $19,849 |
| Food + household essentials | $2,185 | $2,185 | $2,185 | $93,851 |
| Personal care incl. clothing | $328 | $328 | $328 | $14,078 |
| Medical & dental | $219 | $219 | $219 | $9,385 |
| Transportation | $164 | $164 | $164 | $7,039 |
| Entertainment | $273 | $273 | $273 | $11,731 |
| **Total expenses** | **$27,475** | **$28,404** | **$28,404** | **$1,225,835** |
| | | | | |
| **Remaining projected disposable income** | **$358,769** | **($8,260)** | **($8,260)** | **$1,044,405** |
| | | | | |
| Period beginning bank balance | $18,045 | $91,086 | $82,826 | |
| **Funds available** | **$376,814** | **$82,826** | **$74,566** | |
| | | | | |
| **Administrative** | | | | |
| WZMP | - | - | - | $53,226 |
| Vernon Consulting, Inc | - | - | - | $17,475 |
| Post-confirmation professional fees | - | - | - | $24,000 |
| US Trustee quarterly fees (0.4% of disbursements) | $340 | - | $1,479 | $9,402 |
| **Administrative total** | **$340** | **-** | **$1,479** | **$104,103** |

## Exhibit A - Plan Budget
## Nicholas John Farley
## SDNY Case 25-11017-MEW
## Plan of Reorganization Budget

*Plan term Oct-26 – Apr-30 (43 months); May/Jun-30 show post-payment administration.*

| | 43<br>Apr-30 | 44<br>May-30 | 45<br>Jun-30 | Total |
|---|---|---|---|---|
| **Priority claims and Co-op cure** | | | | |
| Co-op maintenance arrears (paid Sep-26) | - | - | - | - |
| Co-op attorney fees (Geller) – cure at confirmation | - | - | - | $73,065 |
| Domestic support obligations | - | - | - | $33,831 |
| NY State priority tax – interest, then paid Feb-27 | - | - | - | $31,768 |
| | | | | |
| **IRS priority tax claim plus 7% interest** | | | | |
| Opening balance | $149,128 | - | - | |
| Interest payment (7% ÷ 12 on opening balance) | $870 | - | - | $71,000 |
| Principal payment | $149,128 | - | - | $438,612 |
| Closing balance | - | - | - | |
| **IRS payment (interest + principal)** | **$149,998** | **-** | **-** | **$509,612** |
| | | | | |
| **Total priority claims and cure** | **$149,998** | **-** | **-** | **$648,277** |
| | | | | |
| **General unsecured – 100% plus 4% simple interest** | | | | |
| Opening principal | $118,417 | - | - | |
| Opening accrued interest | $16,578 | - | - | |
| Interest accrued (4% ÷ 12 on opening principal) | $395 | - | - | $33,377 |
| Principal payment | $118,417 | - | - | $348,285 |
| Interest paid (pro rata to principal paid) | $16,973 | - | - | $33,377 |
| Closing principal | - | - | - | |
| Closing accrued interest | - | - | - | |
| **Unsecured payment (principal + interest)** | **$135,390** | **-** | **-** | **$381,662** |
| | | | | |
| **Ending bank balance** | **$91,086** | **$82,826** | **$73,088** | **$73,088** |

### Notes

*Tax: annual bonus, deferred compensation and Fidelity distributions are net of tax at 52.3% of gross – an effective 47.7% rate (federal, NYS and NYC). Base salary is actual net pay ($18,226 a month on $400k gross); Social Security is net of federal tax at 68% (New York tax not applicable).*

*Inflation: all living costs other than the HSBC mortgage (fixed under the modification) are uplifted by 3% every 12 months from October 2027.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re: Chapter 11

NICHOLAS JOHN FARLEY, Case No. 25-11017 (MEW)

Debtor.

# EXHIBIT B

## HIFI EQUIPMENT VALUATION AND SALE LIST

Equipment to be sold through Audiogon

*Exhibit to the Declaration of Nicholas John Farley in Support of the Fourth Amended Combined Chapter 11 Plan of Reorganization and Disclosure Statement*

**Prepared by:** Nicholas John Farley (the Debtor), October 2026 (3 pages, following)

| Item | Figure | Basis / use in the Plan |
|---|---|---|
| Equipment listed | 86 line items; 234 individual items | Every component, speaker, cable, rack and power product, by manufacturer and model, with quantity |
| Original purchase cost | $659,854 | Purchase invoices (Plan §7.1(a); Declaration, HiFi Equipment) |
| Audiogon Bluebook low value | $204,972 (approximately $205,000; 31% of cost) | Low end of the price range published by Audiogon's Bluebook from completed sales of the same model, accessed October 2026, rounded to the nearest $50; Estimated Market Value = quantity × Bluebook low value |
| Net proceeds assumed in the Plan | $174,250 (85% of the Bluebook total) | After Audiogon fees, payment processing, packing and freight, and negotiation below asking (Plan §1.5(d), §2.1, §7.1(a), §12.2; Plan Budget, Exhibit A, line "HiFi sale") |
| Method and timing of sale | Piece by piece through Audiogon, listed on confirmation | Smaller items shipped by courier first, the two loudspeakers last to a buyer who collects; the Plan Budget assumes sales from December 2026 to May 2027 (Plan §7.1(a)) |
| Retail reference columns | For information only | Current US list price where the model is still sold; otherwise the last US list price or the current equivalent; blank where no reliable same-model US figure exists |

*Values are the Debtor's estimates from the sources stated and are not appraisals; actual proceeds will depend on the prices realized on Audiogon.*

**Exhibit B - HiFi Valuation & Sale List**

| Manufacturer | Description | Model | Qty | Unit Cost | Total Purchase Price | Audiogon Bluebook Low Value | Estimated Market Value | Status (Oct 2026) | Retail reference ($/unit) | Basis | Notes / Successor | Retail reference × qty |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Arcam | Surround processor | AV950 | 2 | $8,500 | $17,000 | $1,000 | $2,000 | Discontinued 2017 | | not found | *No US list found; UK list £6,000. Line successor: Arcam AVP45 processor $5,999.95 (ships Q3 2026).* | - |
| Arcam | Multi-channel amplifier | P777 | 2 | $4,250 | $8,500 | $1,000 | $2,000 | Discontinued | | not found | *No US list found; UK list £3,575. Current 7-ch Arcam: PA720 $3,300.* | - |
| Arcam | Receiver | AVR380 | 1 | $2,000 | $2,000 | $500 | $500 | Discontinued | | not found | *No US list found; UK £1,499. Current entry Arcam receiver AVA15 $4,499.95.* | - |
| Arcam | Multi-channel amplifier | P7 | 1 | $1,500 | $1,500 | $500 | $500 | Discontinued c.2009 | $4,499 | last US list 2004 | *Replaced by P777; current PA720 $3,300.* | $4,499 |
| Arcam | Surround processor | AV888 | 1 | $8,500 | $8,500 | $300 | $300 | Discontinued c.2014 | $7,900 | last US list 2012 | *Stereophile Recommended Components 2012–13 at $7,900; replaced by AV950.* | $7,900 |
| Audience | Adept Response Power Conditioner | aR6 | 6 | $1,600 | $9,600 | $500 | $3,000 | Superseded (name continues) | $4,360 | current equivalent | *Current-generation aR6 $4,360; original aR6 (c.2006–10) last list $2,800 (2008).* | $26,160 |
| Audioquest | Ethernet cable | Vodka, 8m | 3 | $1,159 | $3,477 | $200 | $600 | Current | $2,300 | current list | *Vodka RJ/E Ethernet 8m.* | $6,900 |
| Audioquest | Ethernet cable | Vodka, 3m | 2 | $529 | $1,058 | $100 | $200 | Current | $1,150 | current list | *Vodka RJ/E Ethernet 3m.* | $2,300 |
| Audioquest | Speaker cable | Rocket 33, 2 x 65ft | 1 | $1,050 | $1,050 | $150 | $150 | Current | | not found | *Pre-terminated pairs $50/ft-pair (15 ft pair $1,119.95); 65 ft would be custom; bulk $25/ft.* | - |
| Bowers & Wilkins | L&R speakers | 800 D2 | 1 | $24,000 | $24,000 | $10,000 | $10,000 | Discontinued 2015 | $24,000 | last US list 2011 | *800 Diamond (D2) $24,000/pair. Current flagship 801 D5 $65,000/pair (Sept 2026).* | $24,000 |
| Bowers & Wilkins | Surround speakers | 805 D2 | 1 | $5,000 | $5,000 | $2,500 | $2,500 | Discontinued 2015 | $5,000 | last US list 2011 | *805 Diamond $5,000/pair. Current 805 D5 $15,000/pair.* | $5,000 |
| Bowers & Wilkins | Center channel | HTMD3 | 1 | $5,500 | $5,500 | $2,000 | $2,000 | Discontinued 2021 | $6,000 | last US list 2015 | *HTM1 D3 $6,000 (HTM2 D3 was $4,000). Current HTM81 D5 $15,000.* | $6,000 |
| Bowers & Wilkins | Subwoofer | PV1D | 1 | $1,750 | $1,750 | $600 | $600 | Discontinued c.2021 | $1,750 | last US list 2013 | *Successor DB4S $2,199.* | $1,750 |
| Bowers & Wilkins | Speakers | M1 | 5 | $250 | $1,250 | $100 | $500 | Current | $325 | current list | *M-1 satellite, each.* | $1,625 |
| Bowers & Wilkins | Sound bar | Panorama 2 | 1 | $1,800 | $1,800 | $350 | $350 | Discontinued | $2,200 | last US list 2013 | *Panorama 3 ($999) also discontinued; no current B&W soundbar.* | $2,200 |
| Bowers & Wilkins | Outdoor speakers | AM-1 | 1 | $600 | $600 | $100 | $100 | Current | $500 | current list | *AM-1 $1,000/pair ($500 each). Owner row ($600) may be a pair.* | $500 |
| Chief | Network cabinet, 14 shelves, cooling fans, plexiglass door | NE1F4423 | 1 | $3,298 | $3,298 | $750 | $750 | Discontinued | | not found | *NE1F4423 no longer sold; nearest current E1 36U NE1F3623 $706–$953.* | - |
| Chord | Din to RCA | Sarum Tuned Array | 3 | $2,635 | $7,905 | $750 | $2,250 | Discontinued 2015 | | not found | *UK £1,600/1m (2013). Successor Sarum T DIN/RCA from $2,780 (Basil Audio).* | - |
| Chord | RCA interconnects | Sarum Super ARAY, 1m | 4 | $1,730 | $6,920 | $250 | $1,000 | Superseded 2017 (still sold) | $3,055 | current list | *Sarum Super ARAY RCA pair from $3,055 (Basil Audio); successor Sarum T from $2,780.* | $12,220 |
| Chord | DIN to RCA | Cobra Vee 3, 3m | 1 | $375 | $375 | $40 | $40 | Discontinued c.2015 | | not found | *UK £95/m (2013); replaced by Clearway (UK £180/1m DIN).* | - |
| Custom | Glass and lacquer AV cabinet | | 1 | $17,500 | $17,500 | $1,500 | $1,500 | n/a (custom) | | not found | *Custom cabinet – no retail reference.* | - |
| Kimber | Digital Coax | D60, 2m | 2 | $722 | $1,444 | $150 | $300 | Current | $890 | current list | *Kimber D-60 2m RCA.* | $1,780 |
| Kimber | Digital Coax | D60, 1m | 1 | $390 | $390 | $80 | $80 | Current | $490 | current list | *Kimber D-60 1m RCA.* | $490 |
| Linn | Sondek LP12 turntable, Keel sub-chassis/armboard, Ekos SE tonearm, Kandid MC cartridge, Radikal power supply | Klimax LP12 | 1 | $22,007 | $22,007 | $12,000 | $12,000 | Current (spec updated 2025) | $45,970 | current list | *Current Klimax LP12 (Klimax Radikal + Keel SE spec) $45,970; owner-era config (Keel/Ekos SE/Kandid/Radikal) ~$30–35k MSRP in 2022.* | $45,970 |
| Madison Fielding | Outdoor speakers | Piermont | 8 | $3,000 | $23,996 | $850 | $6,800 | Unverified (brand became Intelligent Audio Products 2019) | $2,900 | last US list 2016 | *Launch list $5,795–$6,495/pair (c.$2,900–3,250 each); manufacturer site unreachable Oct 2026.* | $23,200 |
| Madison Fielding | Outdoor planters | Piermont | 6 | $1,900 | $11,400 | $250 | $1,500 | Unverified | | not found | *No planter-only price found.* | - |
| Middle Atlantic | Wall mounted equipment rack | DWR-21-17 | 1 | $928 | $928 | $200 | $200 | Current | $1,251 | current list | *DWR-21-17 (list $1,390).* | $1,251 |
| Middle Atlantic | Wall mounted equipment rack | DWR-16-17 | 2 | $744 | $1,488 | $150 | $300 | Current | $1,003 | current list | *DWR-16-17 (list $1,114).* | $2,005 |
| Middle Atlantic | Wall mounted equipment rack | SWR 12-12 | 1 | $519 | $519 | $100 | $100 | Current | $806 | current list | *SWR-12-12 (list $896).* | $806 |
| Middle Atlantic | Wall mounted equipment rack | HRF-1214 | 1 | $330 | $330 | $75 | $75 | Current | $505 | current list | *HRF-1214 (list $561).* | $505 |
| Middle Atlantic | Rack shelves | U1V | 12 | $57 | $684 | $10 | $120 | Current | $75 | current list | *U1V shelf (list $83).* | $896 |
| Middle Atlantic | Rack shelves | U2V | 5 | $75 | $375 | $10 | $50 | Current | $96 | current list | *U2V shelf (list $107).* | $482 |
| Middle Atlantic | Rack shelves | U3V | 1 | $84 | $84 | $10 | $10 | Current | $112 | current list | *U3V shelf (list $124).* | $112 |
| Middle Atlantic | Rack shelves | HR-UMS1-3.5 | 3 | $51 | $153 | $10 | $30 | Current | $81 | current list | *HR-UMS1-3.5 (list $90).* | $243 |
| Naim | Power amp, power supply, two Burndy interconnects & Powerline | NAP500 & 500PS | 3 | $33,995 | $101,985 | $9,500 | $28,500 | Discontinued 2015 (non-DR) | | not found | *Last non-DR US list not found. Successor NAP 500 DR incl. 500 PS DR $34,999 (US list Mar 2025).* | - |

**Exhibit B - HiFi Valuation & Sale List**

| Manufacturer | Description | Model | Qty | Unit Cost | Total Purchase Price | Audiogon Bluebook Low Value | Estimated Market Value | Status (Oct 2026) | Retail reference ($/unit) | Basis | Notes / Successor | Retail reference × qty |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Naim | Pre-amp, power supply & Powerline | NAC552DR & 552PS DR | 1 | $34,995 | $34,995 | $15,000 | $15,000 | Current | $34,999 | current list | *NAC 552 with 552 PS DR: $34,999 on the Naim Audio USA retail price list (Mar 2025); Overture AV and Upscale Audio list the same. Model corrected to the DR* | $34,999 |
| Naim | Power supply (includes Powerline) | NAPS555-DR | 4 | $11,495 | $45,980 | $4,750 | $19,000 | Current | $13,499 | current list | *NAPS 555 DR $13,499 (US list Mar 2025).* | $53,996 |
| Naim | CD player, two Burndy interconnects & Hi-Line | CD555 | 1 | $25,995 | $25,995 | $9,000 | $9,000 | Discontinued c.2017 | $25,995 | last US list | *CD555 last US list $25,995 (Basil Audio legacy listing; 2007 launch $28,150). No CD successor; ND 555 $22,999.* | $25,995 |
| Naim | Power amp & power supply | NAP 300-DR | 2 | $13,995 | $27,990 | $7,000 | $14,000 | Discontinued 2024 | $15,999 | last US list 2024 | *NAP 300 DR last list $15,999; remaining stock $10,999–12,700. Successor NAP 350 $8,499 each.* | $31,998 |
| Naim | Super Lumina speaker cable | #NAIMSLS7B-B | 2 | $7,895 | $15,790 | $3,000 | $6,000 | Current | $10,299 | current list | *Super Lumina speaker cable 7m pair $10,299 (Basil Audio).* | $20,598 |
| Naim | Pair of L/R speakers | Ovator S-400 in white | 1 | $7,995 | $7,995 | $3,000 | $3,000 | Discontinued c.2017 | $7,995 | last US list | *Ovator S-400 last list $7,995 (Basil legacy listing). Naim no longer makes speakers.* | $7,995 |
| Naim | Pair of Super Lumina DIN4-XLR interconnect | #NAIMSLIDI-XLRR+L | 1 | $5,500 | $5,500 | $2,000 | $2,000 | Current | $6,899 | current list | *Super Lumina DIN4-XLR L+R pair $6,899 (Basil Audio).* | $6,899 |
| Naim | Equipment support stand | Fraim Base | 9 | $1,399 | $12,591 | $350 | $3,150 | Current | $1,939 | current list | *Fraim base $1,939 (Basil Audio).* | $17,451 |
| Naim | Equipment support stand | Fraim Shelf Standard | 14 | $1,099 | $15,386 | $350 | $4,900 | Current | $1,149 | current list | *Fraim level (any height) $1,149 (Basil Audio).* | $16,086 |
| Naim | Equipment support stand | Fraim Shelf Medium | 6 | $1,099 | $6,594 | $350 | $2,100 | Current | $1,149 | current list | *Fraim level (any height) $1,149 (Basil Audio).* | $6,894 |
| Naim | Equipment support stand | Fraim Shelf Tall | 1 | $1,099 | $1,099 | $350 | $350 | Current | $1,149 | current list | *Fraim level (any height) $1,149 (Basil Audio).* | $1,149 |
| Naim | Network player & two Burndy interconnects | NDS | 1 | $12,995 | $12,995 | $1,500 | $1,500 | Discontinued 2018 | $12,995 | last US list | *NDS last list $12,995 (Basil legacy; TMR MSRP $11,000). Successor ND 555 $22,999 (+555 PS DR).* | $12,995 |
| Naim | Phono Stage | Superline | 1 | $4,195 | $4,195 | $1,500 | $1,500 | Discontinued early 2026 | $4,599 | last US list 2025 | *Superline $4,599 (US list Mar 2025); remaining dealer stock. No direct successor (NVC TT $3,699).* | $4,599 |
| Naim | Power supply for Phono Stage | SuperCap-DR | 1 | $7,695 | $7,695 | $1,500 | $1,500 | Discontinued 2024 | $8,599 | last US list 2024 | *SuperCap DR last list $8,599. New Classic NPX 300 $8,999 (not a drop-in).* | $8,599 |
| Naim | Preamplifier with integrated Streamer | NAC-N272 | 2 | $5,995 | $11,990 | $1,500 | $3,000 | Discontinued 2020 | $6,690 | last US list 2020 | *NAC-N 272 last list $6,690 ($6,995 with tuner). Successor NSC 222 $8,999.* | $13,380 |
| Naim | Power amp | NAP200 | 2 | $3,995 | $7,990 | $750 | $1,500 | Discontinued (DR suspended 2021) | $3,999 | last US list 2021 | *NAP 200 DR last list $3,999. Successor NAP 250 $8,999.* | $7,998 |
| Naim | 3m pair of Super Lumina speaker cable | #NAIMSLS3B-B | 1 | $3,295 | $3,295 | $1,250 | $1,250 | Current | $4,239 | current list | *Super Lumina speaker cable 3m pair $4,239 (Basil Audio).* | $4,239 |
| Naim | Network player | ND5 XS | 1 | $4,195 | $4,195 | $1,350 | $1,350 | Discontinued 2018 | $4,495 | last US list | *ND5 XS last list $4,495; ND5 XS 2 ($3,999) also discontinued 2025–26.* | $4,495 |
| Naim | Super Lumina DIN5-DIN5 interconnect | #NAIMSLIDI-DI | 2 | $3,295 | $6,590 | $1,200 | $2,400 | Current | $3,490 | current list | *Super Lumina DIN5-DIN5 $3,490 (Basil Audio).* | $6,980 |
| Naim | Network player | UnitiQute 2 | 1 | $2,595 | $2,595 | $750 | $750 | Discontinued 2017 | $2,595 | last US list | *UnitiQute 2 last list $2,595. Successor Uniti Atom $3,799.* | $2,595 |
| Naim | Speaker cable | 170.3ft of NAC A5 | 1 | $25 | $4,258 | $8 | $1,362 | Current | $18 | current equivalent | *NAC A5 per foot, converted from EU list €55/m (Sept 2026); US per-foot price not found.* | $18 |
| Naim | Power cords | Powerline | 31 | $995 | $30,845 | $450 | $13,950 | Current | $1,139 | current list | *Power-Line $1,139 (Upscale Audio; Basil Audio).* | $35,309 |
| Naim | Hi-Line (DIN to DIN) | Hi-Line | 3 | $1,395 | $4,185 | $100 | $300 | Current | $1,590 | current list | *Hi-Line (any termination) $1,590 (Basil Audio).* | $4,770 |
| Naim | DIN/RCA HiLine | HiLine | 1 | $1,395 | $1,395 | $200 | $200 | Current | $1,590 | current list | *Hi-Line (any termination) $1,590 (Basil Audio).* | $1,590 |
| Naim | RCA/DIN HiLine | HiLine | 2 | $1,395 | $2,790 | $200 | $400 | Current | $1,590 | current list | *Hi-Line (any termination) $1,590 (Basil Audio).* | $3,180 |
| Naim | Burndy set for NDS | NDS Burndy | 1 | $1,850 | $1,850 | $150 | $150 | Current | $1,850 | current list | *NDS Burndy pair $1,850 (Basil Audio) – only suits the discontinued NDS.* | $1,850 |
| Naim | Burndy cable | S-XPS BURNDY | 1 | $995 | $995 | $150 | $150 | Current | $995 | current list | *Burndy $995 (Basil Audio).* | $995 |
| Naim | Burndy cable | SNAXO Burndy | 1 | $995 | $995 | $150 | $150 | Current | $995 | current list | *Burndy $995 (Basil Audio).* | $995 |
| Naim | Network player | UnitiQute 2 b | 1 | $2,595 | $2,595 | $750 | $750 | Discontinued 2017 | $2,595 | last US list | *UnitiQute 2 last list $2,595. Successor Uniti Atom $3,799.* | $2,595 |
| REL | Subwoofer | Stentor III | 1 | $5,500 | $5,500 | $1,000 | $1,000 | Discontinued c.2010 | $5,000 | last US list 2002 | *Stentor III $5,000 (2002). Closest current REL: Carbon Special Black Label $4,999.* | $5,000 |
| Salamander | AV cabinet with base stand | Miami 247 | 1 | $4,800 | $4,800 | $750 | $750 | Current (special order) | $3,999 | current list | *Chameleon Miami 247 $3,999 (wall-mount kit extra).* | $3,999 |
| Spectral | AV cabinet | CL1552 | 1 | $3,840 | $3,840 | $1,500 | $1,500 | Discontinued | | not found | *UK £1,800 (2007); no US list found.* | - |
| Stax | Headphone amp | SRM-007t | 1 | $2,400 | $2,400 | $500 | $500 | Discontinued | $1,820 | last US list | *SRM-007tII last US price $1,819.99 (Elusive Disc). Current: SRM-700T $3,739.99 / SRM-500T $1,499.* | $1,820 |
| Stax | Headphones | SR-007Mk2 | 1 | $2,350 | $2,350 | $500 | $500 | Discontinued 2025 | $2,205 | last US list 2025 | *SR-007MK2 last US price $2,205. Successor SR-007S $2,390.* | $2,205 |
| Teddy Pardo | Power supply | Teddy 12/4 | 4 | $414 | $1,656 | $150 | $600 | Discontinued | | not found | *Current equivalent High Current PS 12V/5A $685.* | - |
| Teddy Pardo | Power supply | Dual 12 | 2 | $519 | $1,038 | $150 | $300 | Discontinued | | not found | *Current equivalent Dual Outlet PS $895.* | - |
| Teddy Pardo | Power supply | Teddy 12/2 | 3 | $369 | $1,107 | $100 | $300 | Discontinued | | not found | *Current equivalent MiniTeddy SE 12V/2A $529–$569.* | - |
| Totem | Pair of Tribe V speakers in satin white | Tribe | 2 | $3,200 | $6,400 | $1,000 | $2,000 | Current | $4,600 | current (dealer est | *Tribe V est. $4,600 each (The Music Room; Totem publishes no US price; Canada C$4,800–5,400).* | $9,200 |

**Exhibit B - HiFi Valuation & Sale List**

| Manufacturer | Description | Model | Qty | Unit Cost | Total Purchase Price | Audiogon Bluebook Low Value | Estimated Market Value | Status (Oct 2026) | Retail reference ($/unit) | Basis | Notes / Successor | Retail reference × qty |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Totem | Tribe V speaker in satin black | Tribe | 1 | $3,200 | $3,200 | $1,000 | $1,000 | Current | $4,600 | current (dealer est | *Tribe V est. $4,600 each (The Music Room; Totem publishes no US price; Canada C$4,800–5,400).* | $4,600 |
| Totem | Tribe 12" in-wall sub & amp | Tribe | 1 | $2,685 | $2,685 | $750 | $750 | Current | $1,995 | last US list 2009 | *Tribe In-Wall Sub 12 incl. amp $1,995 (2009); current US price not published.* | $1,995 |
| Totem | Sub-woofer amp | | 1 | $1,000 | $1,000 | $250 | $250 | Supplied with sub | | not found | *Not sold separately.* | - |
| Transparent | Power conditioner | Powerwave 10 | 4 | $1,600 | $6,400 | $300 | $1,200 | Discontinued 2023 | $1,695 | last US list 2007 | *PowerWave 10 $1,695 (2007). Successor PowerWave $2,300.* | $6,780 |
| Transparent | Balanced XLR interconnect pair | MusicLink Plus, 15ft | 1 | $1,415 | $1,415 | $300 | $300 | Renamed (PLUS Gen 6) | $1,655 | current equivalent | *PLUS balanced 15 ft $1,655.* | $1,655 |
| Transparent | Active HDMI High Performance cable | HP Active HDMI, 50ft | 1 | $1,160 | $1,160 | $250 | $250 | Discontinued | | not found | *2011 launch "from $800 for 30 ft"; no 50 ft HDMI in current catalogue.* | - |
| Transparent | Subwoofer cable | MusicLink Plus, 35ft | 1 | $925 | $925 | $250 | $250 | Discontinued | | not found | *No subwoofer cable in current Transparent catalogue.* | - |
| Transparent | Balanced XLR interconnect | MusicLink Plus, 1m | 2 | $400 | $800 | $100 | $200 | Renamed (PLUS Gen 6) | $950 | current equivalent | *PLUS balanced 1m $950.* | $1,900 |
| Transparent | RCA interconnect | MusicLink Plus, 1m | 13 | $200 | $2,600 | $60 | $780 | Renamed (PLUS Gen 6) | $475 | current equivalent | *PLUS RCA 1m $475.* | $6,175 |
| Transparent | RCA interconnect | MusicLink Plus, 2m | 3 | $265 | $795 | $75 | $225 | Renamed (PLUS Gen 6) | $625 | current equivalent | *PLUS RCA 2m $625.* | $1,875 |
| Transparent | Subwoofer cable | MusicLink Plus, 15ft | 1 | $485 | $485 | $150 | $150 | Discontinued | | not found | *No subwoofer cable in current Transparent catalogue.* | - |
| Transparent | Power Conditioner | Powerbank 6 | 4 | $695 | $2,780 | $100 | $400 | Current | $995 | current list | *PowerBank 6 $995.* | $3,980 |
| Transparent | In-Wall power conditioner | Powerbank 2 | 2 | $395 | $790 | $100 | $200 | Discontinued | $395 | last US list | *PowerBank 2 In-Wall last list $395; plug-in PowerBank 2 $440.* | $790 |
| | | | 234 | items | $659,854 | | $204,972 | | | | | **$572,010** |

*Retail reference = current US list price for the same model where it is still sold; otherwise the last US list price (year shown in Basis) or, for cable lines renamed by the maker, the current equivalent.*
*Blank = no reliable same-model US figure (foreign price or successor – see Notes).*
*Prices from US retailers/manufacturers as of 3 Oct 2026.*
*Audiogon Bluebook Low Value = the low end of the price range published by Audiogon's Bluebook, which is compiled from completed sales of the same model on Audiogon, the online marketplace through which the equipment will be sold; values accessed in October 2026 and rounded to the nearest $50. Estimated Market Value = Qty × Audiogon Bluebook Low Value. The Plan assumes net proceeds of 85% of the total after Audiogon fees, payment processing, packing, freight and negotiation.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re: Chapter 11

NICHOLAS JOHN FARLEY, Case No. 25-11017 (MEW)

Debtor.

# EXHIBIT C

## ARTWORK VALUATION AND SALE LIST

Ten works to be sold at auction and online – purchase cost and estimated net proceeds, work by work

*Exhibit to the Declaration of Nicholas John Farley in Support of the*
*Fourth Amended Combined Chapter 11 Plan of Reorganization and Disclosure Statement*

**Prepared by:** Nicholas John Farley (the Debtor), October 2026 (1 page, following)

| Item | Figure | Basis / use in the Plan |
|---|---|---|
| Works listed | 10 works (13 pieces) | Each work with its purchase cost, estimated net sale proceeds and provenance notes |
| Purchase cost | $121,400 | Purchase invoices; the Schedules carried the artwork at these purchase prices without a market test (Plan §7.1(d); Declaration, Artwork) |
| Estimated net sale proceeds | $37,000 (approximately 30% of cost) | Derived work by work from recent auction results for comparable pieces, net of commission and freight (Plan §1.5(f), §2.1, §7.1(d), §12.2; Plan Budget, Exhibit A, line "Artwork") |
| Principal work | Callum Innes, Monologue Black 11 (2007) | Purchased March 2008 from Frith Street Gallery, London, for approximately $61,700 (£31,020); estimated proceeds $18,000 against recent auction results for large Innes canvases |
| Marketing to date | No offer received | Offered during 2026 through 74tharts LLC, Frith Street Gallery and other dealers and galleries; an art lender's $20,000 loan offer against a single painting was withdrawn (Plan §7.1(d)) |
| Method and timing of sale | Consignment to auction houses and online art marketplaces | At reserves consistent with the estimates; the Plan Budget assumes sales from January to April 2027 ($2,000, $5,000, $9,000 and $21,000) |

*Values are the Debtor's estimates from the sources stated and are not appraisals; actual proceeds will depend on the prices realized at sale.*

**Exhibit C - Artwork Valuation & Sale List**

| Description | Purchase Cost | Estimated Sale Proceeds | Notes |
|---|---|---|---|
| Callum Innes "Monologue Black 11" painting | $61,700 | $18,000 | Bought from Frith Street Gallery, London (the artist's gallery), invoice 1383CI dated 3 March 2008: Callum Innes, Monologue Black 11, 2007, oil on canvas, 222.5 × 222.5 cm, gallery ref. CI 89 07. Price £30,000 less 12% discount, plus UK VAT at 17.5% = £31,020 paid, approximately $61,700 at the March 2008 rate of about $1.99/£; VAT not reclaimed. Invoice held and available as provenance. Estimated proceeds of $18,000 net reflect recent auction results for large Innes canvases |
| William Perez  Siempre Hay un Hogar | $10,000 | $3,000 | Purchased directly from artist in Cuba |
| Bradley Theodore Karl and Frida - 2 paintings | $10,000 | $3,000 | Purchased directly from artist |
| Domingo Zapata Elephante I LOVE YOU- 2016 | $5,000 | $2,000 | |
| Harold Lopez Dame La C and Dame La R - 2 paintinç | $10,000 | $3,500 | Purchased from Galeria Cubana in Cuba |
| Thomas Zanon-Larcher Photographs (2) - "Turning | $7,200 | $1,500 | Purchased from the Wapping Project gallery |
| Allan Forsyth "Brooklyn" | $2,500 | $1,000 | |
| William Perez El Artista Installation | $5,000 | $2,000 | Purchased at Artz Cure Sarcoma charity auction |
| Allan Forsyth " Stage Fright" | $2,500 | $1,000 | |
| Mr Brainwash - Kate Moss | $7,500 | $2,000 | |
| **Totals** | **$121,400** | **$37,000** | 30% of purchase cost |

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re: Chapter 11

NICHOLAS JOHN FARLEY, Case No. 25-11017 (MEW)

Debtor.

# EXHIBIT D

## FIDELITY ACCOUNT STATEMENT

Fidelity Investments – Portfolio Positions as of October 10, 2026, 10:34 a.m. ET

*Exhibit to the Declaration of Nicholas John Farley in Support of the*
*Fourth Amended Combined Chapter 11 Plan of Reorganization and Disclosure Statement*

**Account holder:** Nicholas John Farley
**Custodian:** Fidelity Investments (Fidelity Brokerage Services LLC / Fidelity NetBenefits)
**Statement:** Portfolio Positions, all accounts, printed October 10, 2026 (6 pages, following)

| Account / plan | Holding | Distribution / vesting | Value at Oct. 10, 2026 | Plan reference |
|---|---|---|---|---|
| BNY Mellon Deferred Compensation – restricted stock units (2 grants: Deferral G and Deferral H) | 2,578 units granted; 831 shares outstanding (BNY at $142.71) | 644 shares (457 + 187) distribute Feb. 15, 2027; 187 shares distribute Feb. 15, 2028. Dividend equivalents of $3,997.11 and $944.35 pay with those distributions. | $123,533.47 (before tax) | Plan §2.1(i), §2.3, §12.2 |
| Mizuho Americas – deferred cash bonus (grant 2025DBACUS) | $35,000 cash award, unvested | $11,666 vests Apr. 1, 2027; $11,667 vests Apr. 1, 2028; $11,667 vests Apr. 1, 2029 | $35,000.00 (before tax) | Plan §2.1(ii) |
| Mizuho Americas 401(k) Plan (plan no. 91930) | 710.836 units of fund 31565A851 | Retirement account; not a Plan funding source | $21,524.12 | Plan §2.1(iii), §13.3 |
| Individual brokerage account ending 4143 | SPAXX money market | Not a Plan funding source | $14.92 | Plan §2.1(iii) |
| **Total held at Fidelity** | | | **$180,072.51** | |

*Account numbers are redacted to the last four digits in accordance with Fed. R. Bankr. P. 9037. All values are as reported by Fidelity on the attached pages; stock-plan values are before taxes.*

Fidelity

Open an Account Fidelity Assistant Log Out

Accounts & Trade Planning News & Research Products & Services How can we help?

Fidelity

## Positions

# All accounts

Overview

As of Oct-10-2026 at 10:34 a.m. ET

| Symbol | Last price | Last price change | Today's gain/loss $ | Today's gain/loss % | Total gain/loss $ | Total gain/loss % | Current value | % of account | Quantity | Average cost basis | Cost basis total | 52-week range |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Individual** [redacted] | | | | | | | | | | | | |
| **SPAXX** HELD IN MONEY M... | | | | | | | $14.92 | 100.00% | | | | |
| **Account total** | | | **$0.00** | **0.00%** | **$0.00** | **0.00%** | **$14.92** | | | | | |

Securities priced today **$0.00**
Securities not priced today **$0.00**
Some securities, such as mutual funds, are not priced until after the market closes.

**MIZUHO AMERICAS 401(K) PLAN** 91930

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **31565A851** FID FRDM INX 2025 T | $30.28 | +$0.12 | +$85.30 | +0.40% | +$480.29 | +2.28% | $21,524.12 | 100.00% | 710.836 | $29.60 | $21,043.83 | -- |
| **Account total** | | | **+$85.30** | **+0.40%** | **+$480.29** | **+2.28%** | **$21,524.12** | | | | | |

Securities priced today **$0.00**
Securities not priced today **+$85.30**
Some securities, such as mutual funds, are not priced until after the market closes.

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Grand total** | | | **+$85.30** | **+0.40%** | **+$480.29** | **+2.28%** | **$21,539.04** | | | | | |

Securities priced today **$0.00**
Securities not priced today **+$85.30**
Some securities, such as mutual funds, are not priced until after the market closes.

# Stock Plans

**BNY ESPP**

You can view plan details on Netbenefits.com

**BNY RSU (2 GRANTS)** *All values are before taxes*

BANK OF NEW YORK MELLON (BNY): **$142.71** -$0.90

| Grant ID | Total granted | Vesting date | Distribution date | Status | Tax withholding | Original quantity | Dividends | Outstanding value | Actions |
|---|---|---|---|---|---|---|---|---|---|
| **DEFERRAL H** Granted: **Feb-01-2024** | 748.000 | Feb-15-2028 | Feb-15-2028 | Unvested | Net shares | 187.000 | $944.35 | $27,631.12 | ••• |
| | | Feb-15-2027 | Feb-15-2027 | Unvested | Net shares | 187.000 | $944.35 | $27,631.12 | |
| | | Feb-15-2026 | Feb-15-2026 | Distributed | Net shares | 187.000 | -- | -- | |
| | | Feb-15-2025 | Feb-15-2025 | Distributed | Net shares | 187.000 | -- | -- | |
| **DEFERRAL G** Granted: **Feb-13-2023** | 1,830.000 | Dec-31-2023 | Feb-15-2024 | Distributed | Net shares | 458.000 | -- | -- | ••• |
| | | Dec-31-2023 | Feb-15-2025 | Distributed | Net shares | 458.000 | -- | -- | |
| | | Dec-31-2023 | Feb-15-2026 | Distributed | Net shares | 457.000 | -- | -- | |
| | | Dec-31-2023 | Feb-15-2027 | Vested | Net shares | 457.000 | $3,052.76 | $68,271.23 | |
| **Total** | **2,578.000** | | | | | **2,578.000** | **--** | **$123,533.47** | |

Awards are distributed in accordance with plan guidelines.

**MIZUHO CASH (1 GRANT)** *All values are before taxes*

| Grant ID | Total granted | Vesting date | Distribution date | Status | Outstanding value | Actions |
|---|---|---|---|---|---|---|
| **2025DBACUS** Granted: **Apr-01-2026** | $35,000.00 | Apr-01-2029 | Apr-02-2029 | Unvested | $11,667.00 | ••• |
| | | Apr-01-2028 | Apr-03-2028 | Unvested | $11,667.00 | |
| | | Apr-01-2027 | Apr-01-2027 | Unvested | $11,666.00 | |
| **Total** | **$35,000.00** | | | | **$35,000.00** | |

Awards are distributed in accordance with plan guidelines.

## Important information

- The price of one or more positions has not been updated today and is currently displaying the price from the prior market day. Today's gain/loss data resets daily before the market opens. Some securities, such as mutual funds, are priced once a day, after the market closes.

s If securities held in your account are restricted for sale under your company's stock plan rules, Fidelity will use the FIFO method for lots available for sale.

The price of one or more positions has not been updated today and is currently displaying the price from the prior market day. Today's gain/loss data resets daily before the market opens. Some securities, such as mutual funds, are priced once a day, after the market closes.

Content and data provided by various third parties and Fidelity. Terms of Use

**Performance data shown represents past performance and is no guarantee of future results. Investment return and principal value will fluctuate, so investors may have a gain or loss when shares are sold. Current performance may be higher or lower than what is quoted, and investors should visit the performance page for most recent month-end performance.**

**You could lose money by investing in a money market fund. Although the fund seeks to preserve the value of your investment at $1.00 per share, it cannot guarantee it will do so. An investment in the fund is not a bank account and is not insured or guaranteed by the Federal Deposit Insurance Corporation or any other government agency. Fidelity Investments and its affiliates, the fund's sponsor, is not required to reimburse the fund for losses, and you should not expect that the sponsor will provide financial support to the fund at any time, including during periods of market stress.**

Fidelity's government and U.S. Treasury money market funds will not impose a fee upon the sale of your shares.

*Options trading entails significant risk and is not appropriate for all investors. Certain complex options strategies carry additional risk. Before trading options, please read Characteristics and Risks of Standardized Options. Supporting documentation for any claims, if applicable, will be furnished upon request.*

Fidelity does not provide legal or tax advice. The information herein is general and educational in nature and should not be considered legal or tax advice. Tax laws and regulations are complex and subject to change, which can materially impact investment results. Fidelity cannot guarantee that the information herein is accurate, complete, or timely. Fidelity makes no

warranties with regard to such information or results obtained by its use, and disclaims any liability arising out of your use of, or any tax position taken in reliance on, such information. Consult an attorney or tax professional regarding your specific situation.

Fidelity Stock Plan Services, LLC, provides recordkeeping and/or administrative services to your company's equity compensation plan, in addition to any services provided directly to the plan by your company or its service providers.

See your plan documents for details regarding the terms and conditions of your plan.

Advisory services are provided for a fee through Strategic Advisers LLC (Strategic Advisers), a registered investment adviser. Discretionary portfolio management is provided by its affiliate, Fidelity Management & Research Company LLC (FMR), a registered investment adviser. Brokerage services are provided by Fidelity Brokerage Services LLC (FBS), and custodial and related services are provided by National Financial Services LLC (NFS), each a member of NYSE and SIPC. Strategic Advisers, FMR, FBS, and NFS are Fidelity Investments companies.

Investment advisor representatives are licensed with Strategic Advisers LLC (Strategic Advisers), a registered investment adviser, and registered with Fidelity Brokerage Services LLC (FBS), a registered broker-dealer. Whether a Fidelity representative provides advisory services through Strategic Advisers for a fee or brokerage services through FBS will depend on the products and services you choose.

**IMPORTANT: The projections or other information generated by the Planning & Guidance Center's Retirement Analysis regarding the likelihood of various investment outcomes are hypothetical in nature, do not reflect actual investment results, and are not guarantees of future results. Your results may vary with each use and over time.**

Fidelity Crypto® is offered by Fidelity Digital Assets®.

Investing involves risk, including risk of total loss.

Crypto as an asset class is highly volatile, can become illiquid at any time, and is for investors with a high-risk tolerance. Crypto may also be more susceptible to market manipulation than securities. Crypto is not insured by the Federal Deposit Insurance Corporation, the Securities Investor Protection Corporation, or any other government agency, and is not an obligation of any bank. Investors in crypto do not benefit from the same regulatory protections applicable to registered securities.

Fidelity Crypto® accounts and custody and trading of crypto in such accounts are provided by Fidelity Digital Assets, National Association, which is a national trust bank.

Brokerage services in support of securities trading are provided by Fidelity Brokerage Services LLC (“FBS”), and related custody services are provided by National Financial Services LLC (“NFS”), each a registered broker-dealer and member NYSE and SIPC.

Neither FBS nor NFS offer crypto as a direct investment nor provide trading or custody services for such assets.

The Fidelity Digital Dollar℠ (FIDD) is a stablecoin valued at the redemption price ($1/unit). FIDD℠ is issued by Fidelity Digital Assets, National Association ("FDA, NA"). Customers of FDA, NA can purchase and redeem FIDD℠ for $1/unit from FDA, NA. Access to FIDD is subject to availability based on account eligibility. Learn more in FIDD’s Terms. Custody and trading of crypto is provided by Fidelity Digital Assets, National Association, which is a national trust bank. Brokerage services in support of securities trading are provided by Fidelity Brokerage Services LLC ("FBS"), and related custody services are provided by National Financial Services LLC ("NFS"), each a registered broker-dealer and member NYSE and SIPC. Neither FBS nor NFS offer crypto as a direct investment nor provide trading or custody services for such assets.

Fidelity Crypto and Fidelity Digital Assets are registered service marks of FMR LLC.
Fidelity Crypto® risk disclosure | Fidelity Crypto® complaints & disclosures

**Before investing in any mutual fund or exchange-traded fund, you should consider its investment objectives, risks, charges, and expenses. Contact Fidelity for a prospectus, an offering circular, or, if available, a summary prospectus containing this information. Read it carefully.**

Feedback

984557.16.0

> Additional important information

Copyright 1998- 2026 FMR LLC. All rights reserved.
Terms of Use | Privacy | Security | Site Map | Accessibility | Contact Us | Share Your Screen
This is for persons in the U.S. only.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re: Chapter 11

NICHOLAS JOHN FARLEY, Case No. 25-11017 (MEW)

Debtor.

---

# EXHIBIT E

## SOCIAL SECURITY STATEMENT

Social Security Administration – my Social Security Retirement Calculator estimate, prepared October 3, 2026

*Exhibit to the Declaration of Nicholas John Farley in Support of the*
*Fourth Amended Combined Chapter 11 Plan of Reorganization and Disclosure Statement*

**Prepared for:** Nicholas J. Farley (the Debtor)

**Source:** ssa.gov Retirement Calculator, based on the Debtor's actual earnings record (2 pages, following)

| Retirement age | Benefits begin | Estimated monthly benefit (gross) | Use in the Plan |
|---|---|---|---|
| 65 years 10 months (current age) | October 2026 | $2,454 | Not assumed |
| 67 (full retirement age) | December 2027 | $2,820 | Assumed. First monthly payment January 2028; the Plan Budget uses $1,918 per month net of taxes (Plan §1.5(h), §2.3, §7.1, §12.2) |
| 70 (delayed, maximum) | December 2030 | $3,915 | Not assumed (after the Plan period) |

*Estimates are as stated by the Social Security Administration; actual benefits are determined on application. The statement contains no Social Security number, date of birth or account number.*

# *my* Social Security

Prepared for Nicholas J. Farley on 10/03/2026.

The Retirement Calculator gives estimates based on your actual Social Security earnings record. Please keep in mind that these are just estimates.

**Benefit Estimates Graph**




**Benefit Estimates Table**

| Retirement Age | Date | Benefit | Amount |
|---|---|---|---|
| Age 65 and 10 months (Current) | Oct. 2026 | Current Retirement Age | $2,454 / month |
| Age 67 (Full) | Dec. 2027 | Full Retirement Age (Full Benefit) | $2,820 / month |
| Age 70 (Delayed) | Dec. 2030 | Delayed Retirement Age (Maximum Benefit) | $3,915 / month |

**Disclaimer:**

We estimated your benefit amounts using your average earnings over your working lifetime. Your estimated benefits are based on current law, and could be affected if the law changes in the future. We cannot provide

your actual benefit amount until you apply for benefits.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re: Chapter 11

NICHOLAS JOHN FARLEY, Case No. 25-11017 (MEW)

Debtor.

---

# EXHIBIT F

## STEINWAY & SONS CONSIGNMENT OFFER

Consignment Inquiry – Steinway Model A / Ebony Satin, Serial No. 597987 – September 30, 2026

*Exhibit to the Declaration of Nicholas John Farley in Support of the Fourth Amended Combined Chapter 11 Plan of Reorganization and Disclosure Statement*

**From:** Chad Frye, Restoration Sales, Steinway & Sons, One Steinway Place, Astoria, NY 11105
**To:** Nicholas Farley (the Debtor)
**Date:** Wednesday, September 30, 2026
**Subject:** Consignment Inquiry – Steinway A / Ebony, 597987 (email, 1 page, following)

| Item | Steinway offer (Exhibit F) | Use in the Plan |
|---|---|---|
| Instrument | Steinway & Sons Model A grand piano, Ebony Satin finish, 2014, serial no. 597987 | Plan §2.1 (Piano: $36,000); Declaration (Steinway piano) |
| Consignment amount | $39,300, less the pickup/delivery charge and any pre-established service to put the piano into showroom condition (both determined after Steinway's technical evaluation) | Net proceeds of $36,000 assumed, i.e., $39,300 less an allowance of $3,300 for the pickup/delivery charge and showroom preparation (Plan §1.5(e), §7.1(b), §12.2; Plan Budget, Exhibit A, line "Piano sale") |
| Terms | One-year consignment agreement, renewable if the piano remains unsold. Steinway pays the pickup cost up front and deducts it from the consignment amount. Steinway & Sons does not purchase pianos; payment is by check after the piano is sold and delivered to its new owner. | Net proceeds shown in the Plan Budget in September 2027 (Plan §7.1(b)) |

*The consignment amount is Steinway's offer and remains subject to its technical evaluation of the piano. The email contains no Social Security number, date of birth or financial account number.*

**From:** Frye, Chad
**To:** [redacted]
**Cc:**
**Subject:** Consignment Inquiry - Steinway A / Ebony, 597987
**Date:** Wednesday, September 30, 2026 6:04:06 PM

Dear Nicholas:

Thank you for your inquiry. While Steinway & Sons does not purchase pianos, we do on occasion consider accepting newer instruments of certain models and finishes to sell on consignment depending on market conditions and availability.

The Model A is a model that we are currently considering for consignment. Although the decision to consign the piano will depend on a technical evaluation, the amount we offer for a Model A / Ebony Satin from 2014 is $39,300—less the delivery charge and any pre-established service to put the piano into showroom condition (determined after the technical evaluation). If you are agreeable to the consignment amount, we will then arrange for a technical evaluation upon which we will make a final decision regarding consignment.

While the cost to pick up your piano and deliver it to our location is your responsibility, we agree to facilitate and pay for this service up front and later deduct it from the consignment amount once your piano is sold and delivered. The pickup amount will be clearly stated in the consignment agreement.

The consignment agreement will remain in effect for one year and can be renewed should your instrument remain unsold. Once Steinway & Sons sells your piano and receives a signed delivery receipt from the piano mover delivering the instrument to its new owner, we will acknowledge the sale, cut a check, and mail it to you for the agreed amount in the contract, less the stated initial pickup charge.

Please let me know if consignment is of interest to you. Thanks.

Best,
Chad

**CHAD FRYE**
*Restoration Sales*

718-204-3122
cfrye@steinway.com

STEINWAY & SONS
One Steinway Place
Astoria, NY 11105
www.steinway.com/restoration

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

NICHOLAS JOHN FARLEY,

Debtor.

Chapter 11

Case No. 25-11017 (MEW)

# EXHIBIT G

## REDLINE AGAINST THIRD AMENDED PLAN

Fourth Amended Combined Chapter 11 Plan of Reorganization and Disclosure Statement, marked against the Third Amended Combined Chapter 11 Plan of Reorganization and Disclosure Statement

*Exhibit to the Declaration of Nicholas John Farley in Support of the Fourth Amended Combined Chapter 11 Plan of Reorganization and Disclosure Statement*

## ~~THIRD~~FOURTH AMENDED COMBINED CHAPTER 11 PLAN OF REORGANIZATION AND DISCLOSURE STATEMENT ~~DATED AUGUST 4, 2026~~

Nicholas John Farley (the "**Debtor**"), by and through his counsel, Weinberg Zareh Malkin Price LLP, hereby proposes the following ~~Second~~Fourth Amended Combined Chapter 11 Plan of Reorganization and Disclosure Statement (the "**Combined Plan and Disclosure Statement**" or "**Plan**") pursuant to sections 1121(a), 1123, 1125, and 1129 of title 11 of the United States Code (the "**Bankruptcy Code**").

This Combined Plan and Disclosure Statement is being submitted pursuant to section 1125(f) of the Bankruptcy Code, which permits the Court to determine that a separate disclosure statement is not necessary in a case involving an individual debtor whose debts are primarily consumer debts. The Debtor submits that this Combined Plan and Disclosure Statement contains adequate information within the meaning of section 1125(a) of the Bankruptcy Code to enable creditors and parties in interest to make an informed judgment about the Plan.

**IMPORTANT: THIS COMBINED PLAN AND DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BY THE BANKRUPTCY COURT AND HAS NOT YET BEEN APPROVED. THE INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTOR RESERVES THE**

**RIGHT TO ALTER, AMEND, MODIFY, REVOKE, OR WITHDRAW THIS COMBINED PLAN AND DISCLOSURE STATEMENT AT ANY TIME PRIOR TO THE CONFIRMATION HEARING.**

## ARTICLE I — INTRODUCTION AND BACKGROUND

### 1.1 Purpose of This Document.

This Combined Plan and Disclosure Statement serves the dual purpose of (a) providing creditors and parties in interest with adequate information to make an informed decision about whether to accept or reject the Plan, and (b) setting forth the terms and provisions of the Debtor's proposed Chapter 11 Plan of Reorganization. Creditors should read this entire document carefully before voting on the Plan.

**THE DEBTOR BELIEVES THAT THE PLAN IS IN THE BEST INTERESTS OF ALL CREDITORS AND URGES ALL CREDITORS ENTITLED TO VOTE TO ACCEPT THE PLAN.**

### 1.2 Overview of the Debtor.

The Debtor is an individual residing at 301 East 52nd Street, Unit 5C, New York, New York 10022. The Debtor is the owner of 2,800 shares of common stock in 301-52 Townhouse Corp., allocated to Unit 5C, together with a proprietary lease for the cooperative apartment (the "**Property**"). The Debtor purchased the Property in 2013.

The Debtor has extensive professional experience as a ~~full-stack software engineer and~~ senior technology executive and software engineer, with a career spanning financial services, media, and enterprise technology. From October 2011 to February 2017, the Debtor served as the Head of Equities Technology and was responsible for the deployment of Murex in Fixed Income at UBS, earning a total compensation ranging from $1.2m to $1.6m. The Debtor left UBS in February 2017 to care for his wife following a rare cancer diagnosis, and returned to work in 2018 at Bank of New York Mellon in a less senior role that allowed him to continue to support her. From 2018 to January 2024, the Debtor served as a ~~lead software engineer~~Technical Solutions Architect and Lead Software Engineer at Bank of New York Mellon, earning an annual salary ranging from approximately $600,000 to $950,000. Following emergency heart surgery in November 2023, the Debtor returned from medical leave but was terminated in March 2024, with his compensation reduced to $487,000. ~~A~~A wrongful termination settlement reached in December 2024 included a non-compete clause effective until March 2025, which further prevented the Debtor from meeting his financial obligations. The Debtor is now employed at Mizuho Americas, where he was recently promoted. The Debtor now runs his existing group (Murex – Derivatives Processing Platform) and has been appointed Head of the Equity & Futures Technology group, effectively doubling his responsibilities. The Debtor's 2025 total compensation was $985,000. ~~While the~~The Debtor anticipates a raise in connection with his recent promotion~~, the Plan~~

~~conservatively assumes total compensation remains flat~~. His current position at Mizuho closely matches the role he previously held at UBS where he earned between $1.2m and $1.6m.

**1.3 Events Leading to the Filing.**

Since late 2021, the Debtor has faced a series of medical crises, beginning with a near-fatal COVID-19 case that triggered ongoing health issues requiring emergency surgeries: nerve surgery (May 2023), emergency heart intervention (November 2023), left leg surgery (December 2024), and left-hand tendon surgery (March 2025). These health issues severely limited the Debtor's ability to work.

In addition to the Debtor's medical challenges, the Debtor became involved in disputes with the cooperative board of 301-52 Townhouse Corp. regarding Department of Buildings violations, maintenance charges, and other matters. The Debtor first listed the Property for sale in May 2024 at an asking price of $6,950,000. During the summer of 2024, while the Debtor was in the United Kingdom for approximately three months caring for his father, who was critically ill in intensive care, the Co-op's board did not permit a scheduled broker open house to proceed on the appointed date. The open house was allowed to take place the following evening, but most of the brokers and prospective purchasers who had registered did not attend, which created a negative impression of the Property in the brokerage community, and the Debtor withdrew the listing in July 2024. The Property was re-listed in February 2025 at an asking price of $6,400,000 and remained on the market through the Petition Date. Following the Petition Date, the Debtor's formal retention of the existing listing broker was approved by the Court on the Debtor's application filed September 3, 2025 [ECF Doc. No. 51], as described in Section 1.4. No offers were received. The Debtor initiated a loan modification process with HSBC Bank USA, N.A. in August 2023, but HSBC scheduled a public auction of the Debtor's shares and proprietary lease for May 21, 2025, to address an alleged debt of $2,981,548.85, plus interest and fees.

These pressures, combined with the Debtor's inability to generate income due to the non-compete clause and health issues, necessitated the filing to prevent the imminent loss of the Debtor's apartment and stabilize his financial situation.

**1.4 The Chapter 11 Case.**

On May 17, 2025 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. The case is assigned to the Honorable Michael E. Wiles and bears Case No. 25-11017 (MEW). The Debtor has remained in possession of his property and has continued to manage his affairs as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

The Property was already listed for sale with a real estate broker on the Petition Date. On September ~~10~~3, 2025, the Debtor ~~moved~~filed an application to formally retain ~~a real estate broker~~that broker under section 327 of the Bankruptcy Code [ECF Doc. No. 51], which the Court

approved, and on October 17, 2025, the Debtor filed proposed marketing and bidding procedures. The order approving the sale and bidding procedures were entered on November 4, 2025. Debtor's former counsel was replaced, and on December 30, 2025, Weinberg Zareh Malkin Price LLP was retained as counsel for the Debtor, with the Court's approval entered *nunc pro tunc* to that date. The Debtor subsequently retained Vernon Consulting, Inc. as financial advisor. On March 4, 2026, the Court entered an Amended Order Approving Bidding Procedures and Granting Related Relief (the "**Amended Bidding Procedures Order**") [ECF Doc. No. 88], which, among other things, approved amended bidding procedures, established a 90-day broker marketing period commencing February 19, 2026, scheduled a Sale Hearing for August 4, 2026, and required the Debtor to make certain payments to 301-52 Townhouse Corp. pending the closing of the sale, including monthly maintenance payments and two lump-sum payments of $66,500 each on March 6, 2026 and May 7, 2026, which payments were made timely. In addition, in September, the Debtor made a payment to 301-52 Townhouse Corp. in the amount of $29,216.26 to bring all maintenance payments current.

Following entry of the Amended Bidding Procedures Order, the Debtor pursued the sale process. However, the Property received no offers after extended marketing. In or about July 2026, HSBC Bank USA, N.A. offered the Debtor a loan modification with a 2% interest rate for the first 60 months, which the Debtor accepted. The Debtor made the trial period mortgage payments for July through September 2026, the mortgage payment for ~~July~~October 2026 and will continue making monthly mortgage payments going forward. Accordingly, the Debtor now proposes to retain the Property and fund the Plan through employment income, asset sales, ~~spousal contributions,~~ and other sources rather than through a sale of the Property.

**1.5 Summary of the Plan.**

The Plan provides for the Debtor to retain the Property pursuant to a loan modification with HSBC Bank USA, N.A., and to fund all distributions to creditors from the Debtor's employment income, an advance bonus payment, asset sales, ~~spousal contributions,~~ deferred compensation, and Social Security retirement ~~distributions, and settlement proceeds~~benefits, over a ~~35~~43-month period (~~July~~October 2026 through ~~May 2029~~April 2030; the Plan Budget extends through June 2030 to show two months of post-payment administration). The Debtor's primary asset is the Property, which was valued at approximately $5,999,999 on the Debtor's petition and schedules. ~~The estimated liquidation value is $4,100,000.~~The Property had been listed at $6,950,000 in May 2024 and at $6,400,000 from February 2025, as described in Section 1.3. The Property is carried at $4,500,000 in the Debtor's most recent Monthly Operating Report. The Property was marketed from May 2024 to July 2026 by two court-approved brokers, with the asking price reduced six times from $6,950,000 to $4,500,000, and no offer was received. The Plan assumes a forced-sale value of $4,100,000 for the reasons set out in Section 12.1. The Debtor believes that the combination of his employment income, bonuses, deferred compensation, Social Security retirement ~~distributions, spousal contributions~~benefits, and proceeds from the sale of personal property discussed herein~~, and a settlement being negotiated with BNY,~~ will generate sufficient

funds to satisfy all Allowed Administrative Claims, all Priority Tax Claims, all Allowed Secured Claims, and all Allowed General Unsecured Claims in full, with interest, over the life of the Plan. The Debtor continues to pursue a settlement with BNY and will utilize any proceeds to reduce Plan payments.

The principal means of funding the Plan are as follows: (a) the Debtor's net monthly employment income of approximately $18,~~309~~226 from Mizuho Americas; (b) an advance from Mizuho against the 2026 bonus in the amount of $200,000; (c) annual bonuses of approximately $~~215,500~~256,270 (net of taxes) and deferred bonuses (net of taxes) totaling approximately $~~94,500; (c) spousal contributions totaling approximately $325,000 over the Plan period~~237,965; (d) sale of HiFi equipment (estimated net proceeds of $~~113,430~~174,250); (e) sale of a Steinway piano ~~($30~~(estimated net proceeds of $36,000); (f) sale of artwork ($37,000); (g) sale of clothing ($~~10,000); (g) BNY settlement proceeds ($25~~18,000); (h) net Social Security income of $~~2,820~~1,918/month (net of taxes) commencing January ~~2027~~2028; and (i) ~~Fidelity~~BNY deferred compensation of approximately $~~68,045.~~ 62,150, together with dividend equivalents on the deferred shares of approximately $2,584 (net of taxes) payable in March 2027 and March 2028.

Total projected net income over the ~~35-month~~ Plan Budget period (October 2026 through June 2030) is approximately $2,~~035,085, and~~ 270,240. When the starting bank balance of $162,724 is added to this amount there is a total of $2,432,964 available to fund expenses and plan payments. Total projected expenses (including mortgage, Co-Op fees, utilities, and living expenses) are approximately $~~979,922, resulting in approximately $1,055,163 in remaining~~1,225,835. Remaining projected disposable income available ~~to fund~~for creditor distributions~~.~~, together with the starting bank balance is approximately $1,207,129, which is sufficient to fund all required distributions under the Plan (totaling approximately $1,134,041 in Administrative Claims, Priority Claims, and General Unsecured Claims combined).

## ARTICLE II — SUMMARY OF ASSETS AND LIABILITIES

**2.1 Assets of the Estate.**

As reflected in the Debtor's most recent ~~Amended Liquidation Analysis~~Monthly Operating Report filed with the Court, the Debtor's assets consist of the following:

Primary Residence (Co-op Shares and Proprietary Lease): $4,~~100~~500,000

Bank Accounts: $~~28,500~~162,724

~~Wine Collection: $365,790~~

Clothing: $41,400

Jewelry: $13,500

~~Household Goods and~~ Piano: $36,000

Artwork: $37,000

Electronics: $~~187,000~~174,250

~~Retirement & Profit Sharing: $187,596~~

Retirement & Profit Sharing (held at Fidelity): $180,087, comprising (i) BNY deferred compensation in the form of restricted stock units (approximately $123,533 before tax, distributed in February 2027 and February 2028 and included in the Plan Budget net of tax at $62,150), (ii) the deferred portion of the Debtor's 2026 Mizuho bonus ($35,000 before tax, vesting in April 2027, 2028 and 2029 and included in the Plan Budget net of tax at $18,305), and (iii) the Debtor's Mizuho 401(k) account and a brokerage account (approximately $21,539), which are not included in the Plan Budget

Sports Equipment: $450

Household Furnishings (nominal forced-sale value; not assigned a value): $0

Total Estimated Assets: $~~4,924,236~~5,145,411

**2.2 Liabilities of the Estate.**

The Debtor's liabilities, as reflected in the proofs of claim filed and the Debtor's schedules, consist of the following:

**Pre-Petition Secured Debt:**

301-52 Townhouse Corp. (Amended Proof of Claim No. ~~9): $89,824.27~~9): $89,824.27 (maintenance component paid in full as of September 16, 2026; approximately $73,065 of attorneys' fees remains outstanding)

HSBC Bank USA, N.A. (Proof of Claim No. 11): $3,325,415.13

WineCredit LLC (Proof of Claim No. ~~10): $303,602.13~~10): $303,602.13; Allowed Secured Claim fixed at $437,978.78 as of June 30, 2026 (including post-petition interest, fees and storage) by stipulation approved August 5, 2026 [ECF Doc. No. 133]

Total Pre-Petition Secured Debt: $3,718,841.53

**Priority Tax Claims:**

Internal Revenue Service (Proof of Claim No. 5): $484,183.07, of which $~~436,611~~438,612 is ~~asserted as~~ priority

New York State Dept. of Taxation & Finance (Proof of Claim No. 1): $35,206.65, of which $31,044 is asserted as priority

Total ~~Priority~~ Tax Claims as filed: $519,389.72, of which $469,656 is priority (the non-priority balance of $49,733.72 is included in General Unsecured Claims below)

**Other Priority Claims:**

Domestic Support Obligation (pre-petition arrears owed to the Debtor's former spouse): $33,831

**General Unsecured Claims:**

Consolidated Edison Company of New York Inc. (Claim No. 2): $6,983.52

American Express National Bank (Claim No. 4): $31,329.57

HSBC Bank USA NA (Claim No. 7): $26,085.57

Quantum3 Group LLC / Velocity Investments LLC (Claim No. 6): $88,852.58

Midland Credit Management, Inc. (Claim No. 8): $38,299.67

Non-priority portion of IRS and NYS tax claims: $~~51,734~~49,733.72

Total ~~Estimated~~Filed General Unsecured Claims: $~~243,285~~241,284.63

Potential WineCredit LLC deficiency claim (not yet asserted or substantiated; reserved in the Plan Budget, inclusive of attorneys' fees): up to $107,000

**Post-Petition Liabilities:**

As of January 2026, the Debtor had accrued post-petition liabilities totaling approximately $282,439, consisting of post-petition maintenance owed to the Co-op 301-52 Townhouse Corp. ($89,000), post-petition mortgage arrears owed to HSBC ($192,511), and post-petition amounts owed to WineCredit ($23,736). Pursuant to the Amended Bidding Procedures Order, the Debtor made certain payments to the Co-op, including current monthly maintenance and two lump-sum payments of $66,500 each (the first on March 6, 2026, and the second on May 7, 2026), totaling $133,000 in lump-sum payments. ~~These payments have reduced the amounts owed to the Co-op. All remaining post-petition liabilities will be addressed through the Debtor's projected income and the loan modification with HSBC~~An additional payment of $29,216.26 was made on September 16, 2026 which cleared the outstanding balance owed to the Co-op ($22,451) and met the September maintenance payment ($6,768.26, being the monthly maintenance of $6,533 together with late fees levied by the Co-op on the then-outstanding balance). The post-petition mortgage arrears, together with accrued interest, have been capitalized into the modified principal balance under the Loan Modification with HSBC, and the remaining post-petition amounts owed to WineCredit will be addressed as described in Section 6.3.

**2.3 Income and Expenses.**

The Debtor is currently employed at Mizuho Americas, earning net monthly base income from salary and wages of approximately $18,~~309~~226. The Debtor's 2025 total compensation was $985,000~~.~~ (which averages to $82,083 per month). Monthly living expenses are approximately $~~27,977~~26,776 (including mortgage payment of $15,~~043~~066, Co-Op fees of $6,533, average utilities of $1,~~750~~854, food of $2,~~250~~000, personal care of $~~650~~300, medical of $~~400~~200, transportation of $~~500~~150, entertainment of $~~500~~250, and property insurance of $~~351).~~423). Living expenses other than the HSBC mortgage payment (which is fixed under the Loan Modification), including Co-Op maintenance, are assumed to increase by 3% each year from October 2027. The Debtor also receives an annual bonus (net of approximately $~~215,500~~256,270, paid in April each year, with $200,000 of the 2026 bonus advanced), along with deferred bonuses from prior years totaling approximately $~~94,500. The Debtor's spouse will contribute $5,000/month from July through November 2026 and $10,000/month from December 2026 onwards (total spousal contributions of approximately $325,000 over the Plan period).~~237,965. Additionally, the Debtor will receive Social Security income of $~~2,820~~1,918/month commencing January ~~2027~~2028 and ~~Fidelity~~BNY deferred compensation distributions (from Fidelity) totaling approximately $~~68,045 ($53,000~~62,150 ($48,164 in February ~~2028~~2027 and $~~15,045~~13,986 in February ~~2029~~2028, together with dividend equivalents on the deferred shares of approximately $2,090 in March 2027 and $494 in March 2028, net of taxes).

## ARTICLE III — DEFINITIONS AND INTERPRETATION

Unless otherwise defined herein, capitalized terms used in this Plan shall have the meanings ascribed to them in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure.

**3.1** "Amended Bidding Procedures Order" means the Amended Order Approving Bidding Procedures and Granting Related Relief entered by the Bankruptcy Court on March 4, 2026 [ECF Doc. No. 88], as amended, modified, or supplemented from time to time.

**3.2** "Administrative Claim" means a Claim for costs and expenses of administration of the Chapter 11 Case entitled to priority under sections 503(b) and 507(a)(2) of the Bankruptcy Code, including, without limitation, any actual and necessary costs and expenses of preserving the estate, any actual and necessary costs and expenses of operating the Debtor's affairs, all compensation and reimbursement of expenses to the extent allowed by the Court under sections 327, 330, and 331 of the Bankruptcy Code, and any fees or charges assessed against the estate under section 1930 of title 28 of the United States Code.

**3.3** "Allowed Claim" means a Claim or any portion thereof (a) that has been allowed by a Final Order of the Court; (b) as to which no objection to its allowance has been timely interposed in accordance with the Plan; or (c) as to which any objection has been settled or withdrawn.

**3.4** "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended from time to time.

**3.5** "Bankruptcy Court" or "Court" means the United States Bankruptcy Court for the Southern District of New York or such other court having jurisdiction over the Chapter 11 Case.

**3.6** "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under 28 U.S.C. § 2075.

**3.7** "BNY Settlement" means the settlement being negotiated between the Debtor and Bank of New York to compensate the estate for expenses resulting from cessation of the Debtor's COBRA benefits between the approximate dates of September 5, 2025 and September 17, 2025 in the anticipated amount of $25,000. For the avoidance of doubt, the settlement is not yet finalized and not included in the Plan budget.

**3.8** "Business Day" means any day other than a Saturday, Sunday, or legal holiday as defined in Bankruptcy Rule 9006(a).

**3.9** "Chapter 11 Case" means the case under Chapter 11 of the Bankruptcy Code commenced by the Debtor on May 17, 2025, styled *In re Nicholas John Farley*, Case No. 25-11017 (MEW), pending before the Bankruptcy Court.

**3.10** "Claim" means a claim against the Debtor as defined in section 101(5) of the Bankruptcy Code.

**3.11** "Co-op" means 301-52 Townhouse Corp., the cooperative corporation in which the Debtor holds shares of common stock.

**3.12** "Confirmation Date" means the date on which the Confirmation Order is entered by the Bankruptcy Court.

**3.13** "Confirmation Order" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

**3.14** "Debtor" means Nicholas John Farley, an individual residing at 301 East 52nd Street, Unit 5C, New York, New York 10022.

**3.15** "Disputed Claim Reserve" means a reserve of funds from the Debtor's Plan funds established and maintained by the Debtor's counsel, in an escrow account to address any Disputed ~~Co-op~~ Claim, as more fully set forth in Section 7.8 of this Plan.

**3.16** "Disputed Co-op Claim" means any Claim or portion thereof asserted by the Co-op that is the subject of a pending objection, dispute, or contested matter as of the Effective Date, including, without limitation, any disputed pre-petition or post-petition maintenance charges, assessments, late fees, attorneys' fees, fines, or other charges asserted by the Co-op.

**3.17** "Domestic Support Obligations" means the $33,831 prepetition debt that the Debtor owes to his ex-wife that are entitled to treatment as a domestic support obligation under section 507(a)(1)(A) of the Bankruptcy Code.

**3.18** "Effective Date" means the first Business Day that is at least fourteen (14) days after the Confirmation Date on which all conditions to the effectiveness of this Plan have been satisfied or waived.

**3.19** "Estate" means the estate created in this Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

**3.20** "Estate Causes of Action" means any and all claims, causes of action, rights of action, suits, and proceedings, whether in law or in equity, whether known or unknown, that the Debtor or the Estate may hold against any entity, including, without limitation, claims and causes of action arising under sections 502, 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code, and any other avoidance actions, preference actions, fraudulent transfer or conveyance actions, and any other causes of action of the Debtor or the Estate arising under applicable federal or state law.

**3.21** "Final Order" means an order or judgment of the Bankruptcy Court, or any other court of competent jurisdiction, that has not been reversed, stayed, modified, or amended and as to which the time to appeal or seek certiorari, review, or rehearing has expired and no appeal or petition for certiorari, review, or rehearing is pending.

**3.22** "HSBC" means HSBC Bank USA, N.A., the holder of a secured claim against the Property.

**3.23** "Loan Modification" means the modification of the HSBC mortgage loan approved in or about July 2026, providing for an interest rate of 2% for the first 60 months, with monthly payments of ~~approximately~~$15,066 after three trial payments of $15,043~~ to $15,066.~~.

**3.24** "Petition Date" means May 17, 2025, the date on which the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

**3.25** "Plan" means this Fourth Amended Chapter 11 Plan of Reorganization, including all exhibits, supplements, appendices, and schedules hereto, as the same may be amended, modified, or supplemented from time to time in accordance with the terms hereof and the Bankruptcy Code.

**3.26** "Priority Tax Claim" means a Claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

**3.27** "Property" means all of the Debtor's right, title, and interest in and to 2,800 shares of common stock in 301-52 Townhouse Corp., allocated to Unit 5C at 301 East 52nd Street, New York, NY 10022, together with the associated proprietary lease.

**3.28** "U.S. Trustee" means the United States Trustee for Region 2.

# ARTICLE IV — CLASSIFICATION OF CLAIMS AND INTERESTS

Pursuant to section 1123(a)(1) of the Bankruptcy Code, the following designates the Classes of Claims against and Interests in the Debtor. A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date.

**Unclassified Claims**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified and are treated separately as set forth in Article V below.

**Classified Claims and Interests**

**Class 1 — Secured Claim of 301-52 Townhouse Corp. (Co-op Claim).**

Class 1 consists of the Allowed Secured Claim of the Co-op for pre-petition maintenance, assessments, late fees, attorneys' fees, and other charges. The Co-op has filed an Amended Proof of Claim No. 9 in the amount of $89,824.27. AfterFollowing the two payments of $66,500 inon March 6, 2026 and May 2026, this 7, 2026 and a further payment of $29,216.26 on September 16, 2026, all pre-petition and post-petition maintenance owed to the Co-op has been paid in full. The only remaining amount claimed by the Co-op is its attorneys' fees (Geller & Co.) of approximately $22,452. This73,065 per the most recent statement, which the proprietary lease entitles the Co-op to recover from the Debtor and which the Debtor will pay on the Effective Date as the cure required under section 365(b)(1) of the Bankruptcy Code in connection with the assumption of the proprietary lease pursuant to Section 8.1 of this Plan. Upon payment of the cure amount does not include post-petition accruals, and the , the Allowed Secured Claim amount of the Co-op shall be deemed satisfied in full, and the Co-op's lien on the Property shall remain in place with the same validity, force and effect. The Co-op's Claim has not yet been amended to reflect the payments made and, and any portion of the attorneys' fees that the Debtor disputes may be treated as a Disputed Co-op Claim if necessary.

**Class 2 — Secured Claim of HSBC Bank USA, N.A. (Mortgage Claim).**

Class 2 consists of the Allowed Secured Claim of HSBC Bank USA, N.A. arising under the secured cooperative share loan encumbering the Property. HSBC has filed Proof of Claim No. 11 in the amount of $3,325,415.13.

**Class 3 — Secured Claim of WineCredit LLC.**

Class 3 consists of the Allowed Secured Claim of WineCredit LLC, secured by the Debtor's wine collection. WineCredit LLC filed Proof of Claim No. 10 in the amount of $303,602.13, which amount has not been amended to include post-petition accruals10 in the

amount of $303,602.13. By stipulation approved by the Court on August 5, 2026 [ECF Doc. No. 133], WineCredit LLC's Allowed Secured Claim was fixed at $437,978.78 as of June 30, 2026, comprising the loan balance of $287,619.54, legal fees and costs of $56,156.76, interest of $79,586.46 and storage fees of $14,616.02, and the automatic stay was modified to permit WineCredit LLC to take possession of and liquidate the wine collection.

**Class 4 — Priority Unsecured Claims.**

Class 4 consists of all Allowed Priority Unsecured Claims against the Debtor other than Priority Tax Claims, including any Allowed Claims entitled to priority under section 507(a) of the Bankruptcy Code that are not otherwise classified herein.

**Class 5 — General Unsecured Claims.**

Class 5 consists of all Allowed General Unsecured Claims against the Debtor, including but not limited to the following filed claims:

- Consolidated Edison Company of New York Inc. — Claim No. 2: $6,983.52
- American Express National Bank — Claim No. 4: $31,329.57
- HSBC Bank USA NA — Claim No. 7: $26,085.57
- Quantum3 Group LLC as agent for Velocity Investments LLC — Claim No. 6: $88,852.58
- Midland Credit Management, Inc. — Claim No. 8: $38,299.67
- Any deficiency claims of secured creditors holding Allowed Secured Claims

**Class 6 — Interests of the Debtor.**

Class 6 consists of the Debtor's interest in property of the Estate. As the Debtor is an individual, the Debtor shall retain all property of the Estate that is not distributed under this Plan, subject to the provisions hereof.

## ARTICLE V — TREATMENT OF UNCLASSIFIED CLAIMS

**5.1 Administrative Claims.**

Each holder of an Allowed Administrative Claim shall be paid the full amount of such Allowed Administrative Claim in Cash on the later of (a) the Effective Date, (b) the date on which such Administrative Claim becomes an Allowed Administrative Claim, or (c) such other date as may be agreed upon by the Debtor and the holder of such Administrative Claim. Administrative Claims include, without limitation, fees and expenses of professionals retained by the Debtor pursuant to sections 327 and 328 of the Bankruptcy Code and approved by the Bankruptcy Court,

including Weinberg Zareh Malkin Price LLP as counsel, Vernon Consulting, Inc. as former financial advisor as well as quarterly fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6).

All administrative claims, including professional fee applications, must be filed with the Bankruptcy Court and served on the Debtor within thirty (30) days of the Effective Date.

Estimated Administrative Claims are as follows: Weinberg Zareh Malkin Price LLP: $~~60,000~~53,226; Vernon Consulting, Inc.: $~~12,500~~17,475; U.S. Trustee Fees: $~~7,821.~~9,402; post-confirmation professional fees: $24,000. Total estimated Administrative Claims: $~~80,321~~104,103.

**5.2 Priority Tax Claims.**

Each holder of an Allowed Priority Tax Claim shall be paid in full in Cash on the Effective Date, or, at the Debtor's election, in regular installment payments in Cash over a period not exceeding five (5) years from the Petition Date, with interest at ~~a~~the rate ~~determined~~required by section 511 of the Bankruptcy ~~Court,~~Code (7%, being the rate in effect in the month of confirmation), in accordance with section 1129(a)(9)(C) of the Bankruptcy Code. The Debtor elects to pay the Priority Tax Claims ~~include the following~~in installments as follows:

• Internal Revenue Service — Claim No. 5: $484,183.07, of which $~~436,611~~438,612 is ~~asserted as~~ priority ~~(to~~. Interest at 7% shall be paid ~~with 6% interest over~~monthly on the outstanding balance from month 2 of the Plan ~~period).~~(November 2026). Principal shall be paid in installments of 2% in February 2027, 5% in March 2027, 7% in April 2027, 24% in April 2028 and 28% in April 2029, with the remaining balance paid in full in April 2030 (month 43), which is within five years of the Petition Date.

• New York State Department of Taxation & Finance — Claim No. 1: $35,206.65, of which $31,044 is asserted as priority. Interest at 7% shall be paid monthly from month 2 of the Plan (November 2026), and the priority amount shall be paid in full in February 2027 (month 5 of the Plan).

## ARTICLE VI — TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

**6.1 Class 1 — Secured Claim of 301-52 Townhouse Corp. Class 1 is Unimpaired.**

Treatment: The ~~Allowed Secured Claim of the Co-op shall be satisfied in full from Plan funds, and specifically from the Debtor's projected disposable income during the Plan period.~~maintenance component of the Co-op's Claim has been paid in full prior to confirmation. The remaining component, the Co-op's attorneys' fees of approximately $73,065, shall be paid in full from Plan funds on the Effective Date (month 2 of the Plan, November 2026) as the cure required under section 365(b)(1) of the Bankruptcy Code upon the assumption of the proprietary lease pursuant to Section 8.1. Upon payment of the cure amount, the Allowed Secured Claim of the Co-op shall be deemed satisfied in full, and the Co-op's lien on the Property shall be unaffected. Additionally,

the Debtor shall continue to pay ongoing monthly Co-Op maintenance fees of $6,533 as they come due. All amounts paid to the Co-op prior to the Confirmation Date pursuant to the Amended Bidding Procedures Order shall be credited against the Allowed Secured Claim of the Co-op. The Debtor reserves all rights, objections, and defenses with respect to any Disputed Co-op Claim.

**6.2 Class 2 — Secured Claim of HSBC Bank USA, N.A. Class 2 is Unimpaired.**

**Treatment:** The Allowed Secured Claim of HSBC shall be treated pursuant to the Loan Modification. HSBC has agreed to modify the terms of its secured cooperative share loan, providing for an interest rate of 2% for the first 60 months. The Debtor shall make monthly mortgage payments of ~~approximately $15,043 to~~ $15,066 to HSBC. The Debtor made the trial period mortgage payments of $15,043 for July through September 2026, the first monthly payment of $15,066 for ~~July~~October 2026 and will continue making monthly mortgage payments going forward. HSBC's lien on the Property shall remain in place with the same validity, force, and effect, subject to the modified terms.

**6.3 Class 3 — Secured Claim of WineCredit LLC. Class 3 is Unimpaired.**

~~**Treatment:** The Allowed Secured Claim of WineCredit LLC shall be satisfied by the surrender to WineCredit LLC of the collateral securing its claim (i.e., the wine collection). To the extent that the Allowed Secured Claim of WineCredit LLC exceeds the value of its collateral, the deficiency shall be treated as a Class 5 General Unsecured Claim.~~

Treatment: The collateral securing the Allowed Secured Claim of WineCredit LLC (i.e., the wine collection) was surrendered to WineCredit LLC pursuant to the stipulation and order entered August 5, 2026 [ECF Doc. No. 133], under which WineCredit LLC is authorized to liquidate the collection in a commercially reasonable manner and apply the net proceeds to its Allowed Secured Claim, any net proceeds in excess of the Allowed Secured Claim are to be remitted to the Debtor, and any deficiency shall be treated as a Class 5 General Unsecured Claim. The Debtor and WineCredit LLC have each reserved their rights as to the balance due. WineCredit LLC has not yet sold the wine collection and has not asserted or substantiated any deficiency. Although the wine collection was previously scheduled at $365,790, it is in the possession of WineCredit LLC and is no longer carried as an asset of the Debtor; a sale may realize less than the scheduled value, and interest, fees and costs of sale continue to accrue on the claim. The Plan Budget therefore conservatively reserves $107,000 for a potential WineCredit deficiency claim, inclusive of attorneys' fees, which amount will be paid only to the extent such a claim is filed and Allowed.

**6.4 Class 4 — Priority Unsecured Claims. Class 4 is Unimpaired.**

Treatment: Domestic Support Obligations of $33,831 will be paid in month ~~10 of the plan. The IRS priority claim will be paid in months 10 through 22~~7 of the Plan ~~with 6% interest, and New York State priority claim will be paid in month 8 of the Plan,~~(April 2027), in accordance with ~~Section~~section 507(a)(1) of the Bankruptcy Code. Priority Tax Claims are unclassified and are treated in Section 5.2 above.

**6.5 Class 5 — General Unsecured Claims. Class 5 is Unimpaired.**

**Treatment:** Each holder of an Allowed General Unsecured Claim shall receive its *pro rata* share of the Debtor's net disposable income, after satisfaction in full of all Administrative Claims, Priority Tax Claims, Allowed Secured Claims (Classes 1 through 3), and Priority Unsecured Claims (Class 4). Total filed General Unsecured Claims are approximately $~~243,285~~241,284.63, which shall be paid with 4% interest over the Plan period. In addition, the Plan Budget reserves $107,000 for a potential, as yet unsubstantiated, deficiency claim of WineCredit LLC (inclusive of attorneys' fees), for a total modelled Class 5 pool of $348,285; to the extent no such deficiency claim is filed and Allowed, the reserved amount will revert to the Debtor. Allowed General Unsecured Claims shall receive *pro rata* distributions from available funds totaling 100% of their Allowed Claims.

**6.6 Class 6 — Interests of the Debtor. Class 6 is Unimpaired.**

**Treatment:** The Debtor shall retain all property of the Estate not otherwise distributed under this Plan. As an individual debtor, the Debtor's property shall re-vest in the Debtor upon the Effective Date, subject to the obligations and distributions required under this Plan.

## ARTICLE VII — MEANS FOR IMPLEMENTATION OF THE PLAN

**7.1 Source of Funds.**

The Debtor shall retain the Property pursuant to the Loan Modification with HSBC Bank USA, N.A. The Loan Modification provides for an interest rate of 2% for the first 60 months. The Debtor made the trial period mortgage ~~payment~~ payments of $15,043 for July through September 2026, the first monthly payment of $15,066 for October 2026 and shall continue making monthly mortgage payments of ~~approximately $15,043 to~~ $15,066, as well as ongoing Co-Op fees of $6,533 per month. The principal means of funding distributions under this Plan shall be: (a) the Debtor's employment income (net monthly wages of approximately $18,~~309~~226 from Mizuho Americas); (b) a bonus advance of $200,000; (c) the sale of personal property, including HiFi equipment (estimated net proceeds of $~~113,430~~174,250), a piano ($~~30~~36,000), artwork ($37,000) and clothing ($~~10,000); (c) spousal contributions ($5,000/month from July through November 2026 and $10,000/month from December 2026 onwards, totaling approximately $325~~18,000); (d) annual bonuses (net of approximately $~~215,500~~256,270) and deferred compensation (approximately $~~94,500~~237,965 total); and (e) ~~Fidelity~~BNY deferred compensation distributions (approximately $~~68,045);~~62,150) and ~~(f)~~dividend equivalents on the deferred shares (approximately $2,584, net of taxes, in March 2027 and March 2028). In the event the BNY settlement is finalized, all proceeds ~~($~~which are estimated to be $25,000~~).~~ will be used to paydown plan payment obligations. The Plan period runs from ~~July~~October 2026 through ~~May 2029 (35~~April 2030 (43 months).

The Debtor shall sell certain personal property to fund distributions under the Plan, as follows:

(a) HiFi Equipment. ~~The Debtor has obtained a proposal from The Music Room ("**TMR**") for the sale of the Debtor's high-fidelity audio equipment. TMR will make an initial cash payment of $15,430 for miscellaneous power supplies and cables (August 2026) and will accept the main equipment on consignment with target net proceeds of approximately $98,000 to $101,880 (net of TMR's 35% charges). TMR will arrange pickup and transportation. Over 50% of listings historically sell within 14 days and 90% within 45 days. The equipment is highly desirable (strong demand, single owner, mint condition, never moved). The Plan conservatively assumes $50,000 in September 2026 and $48,000 in October 2026.~~During 2026 the Debtor approached three categories of buyer for his high-fidelity audio equipment: The Music Room ("TMR"), a national consignment dealer; StereoBuyers, a New York purchaser of used equipment, which declined on June 12, 2026 following losses in a warehouse fire; and the dealers from whom the equipment was originally purchased. TMR proposed in July 2026 a cash purchase of cables and power supplies for $15,430 and consignment of the principal components at a 35% fee, but would not sign a written consignment contract, carried only limited insurance on consigned goods, and required the Debtor to palletize and transport the equipment at his own expense; TMR confirmed that it could not proceed on the terms that Court approval of a consignment of estate property would require. The Debtor will instead sell the equipment piece by piece through Audiogon, an online marketplace for used high-end audio equipment on which the owner sells directly to the buyer, no consignment or transfer of possession is involved, and the buyer pays before shipment. Listings will begin immediately upon confirmation of the Plan, starting with the components that can be packed and shipped by courier (cables, power supplies and smaller electronics) and ending with the two large loudspeakers (Bowers & Wilkins 800 D2), which will be sold to a buyer who collects. The net proceeds of $174,250 in the Plan Budget are 85% of the Audiogon Bluebook low valuation of approximately $205,000 for the 234 items, after Audiogon fees, payment processing, packing and freight, and negotiation; the equipment was purchased for approximately $659,854. The Plan Budget assumes sales commencing in December 2026 and completing by May 2027.

(b) Piano. The Debtor shall sell his piano with expected proceeds of $~~30~~36,000 (September ~~2026).~~2027). The Debtor has received a consignment valuation from Steinway of $39,300, less pickup and showroom-preparation charges, that should yield net proceeds of $36,000.

(c) Clothing. The Debtor's spouse shall sell luxury ready-to-wear clothing, principally Chanel pieces, through resale channels for such pieces, with expected net proceeds of $~~10~~18,000 ($4,000 in  November 2026, $4,000 in December 2026, $5,000 in ~~August 2026~~January 2027 and $5,000 in ~~September~~February 2027).

(d) Artwork.  The Debtor will sell the artwork listed in the Plan Budget with expected net proceeds of $37,000. The Debtor's Schedules valued the artwork at its purchase prices, totaling approximately $121,400, because the Schedules were prepared from the purchase invoices without a market test. During 2026~~).~~ the Debtor sought to sell the works through an art broker introduced by counsel (74tharts LLC), through Frith Street Gallery in London, from which the principal work (a Callum Innes painting purchased in 2008 for approximately $61,700) was acquired, and through

other dealers and galleries; none produced an offer, several citing the current resale market, and an art lender that had offered a $20,000 loan against a single painting withdrew. The $37,000 figure, approximately 30% of cost, is derived work by work from recent auction results for comparable pieces (for example, $18,000 for the Innes against recent auction results for large Innes canvases) and is net of commission and freight. The works will be consigned to auction houses and online art marketplaces at reserves consistent with those estimates, with sales assumed in the Plan Budget between January and April 2027.

(~~d~~e) BNY Settlement. The Debtor ~~expects~~continues to ~~receive $25,000 in September 2026 from~~negotiate the BNY settlement. The Plan does not include any proceeds as the settlement has not been finalized. In the event that the BNY Settlement is finalized, all proceeds will be used to pay down amounts due under the Plan.

The Debtor is employed at Mizuho Americas, earning net monthly wages of approximately $18,~~309~~226. The Debtor's 2025 total compensation was $985,000. ~~The Plan conservatively~~The Debtor has recently been appointed Head of the Equity & Futures Technology group, in addition to his current responsibilities, effectively doubling his role. The Debtor's 2025 total compensation was $985,000. The Debtor anticipates a raise in connection with his recent promotion. His current position at Mizuho closely matches the role he previously held at UBS where he earned between $1.2m and $1.6m. The Plan assumes total compensation ~~remains flat~~of $1.1m. The Debtor receives an annual bonus (net of approximately $~~215,500~~256,270, paid in April of each year) and deferred bonuses ~~from prior years~~ totaling approximately $~~94,500~~237,965 (payable in certain months as reflected in the Plan Budget). Any increases in base compensation and bonuses will be applied to reduce Plan payments. Additionally, the Debtor will begin receiving Social Security income of $~~2,820~~1,918 per month commencing January ~~2027~~2028 and ~~Fidelity~~BNY deferred compensation distributions of approximately $~~68,045~~62,150, plus dividend equivalents on the deferred shares of approximately $2,584 (net of taxes) in March 2027 and March 2028, during the Plan period.

Distributions under this Plan shall be funded from the Debtor's projected disposable income and shall be made in accordance with the Plan Budget (attached hereto). The priority of payments shall be as follows: (a) Allowed Administrative Claims (totaling approximately $~~72,500~~70,701, excluding fees due to the Office of the United States Trustee, payable in ~~months~~month 2~~, 3 and 4~~ of the Plan, plus $2,000 per month for post-confirmation professional fees payable in months 3 through 14 of the Plan); (b) the cure payment to the Co-op under section 365(b)(1) of the Bankruptcy Code in respect of the assumed proprietary lease, being the Co-op's attorneys' fees of approximately $73,065 (payable in month 2 of the Plan), which satisfies the Allowed Secured Claim of the Co-op (Class 1~~) (approximately $89,248, payable in months 3 and 4 of the Plan);~~); the Co-op maintenance arrears have already been paid in full; (c) ongoing HSBC mortgage payments pursuant to the Loan Modification (Class 2) ~~(approximately $15,043 to $~~($15,066/month); (d) Allowed Priority Tax Claims, including the IRS priority claim of $~~436,611~~438,612 (payable with ~~6~~7% interest from month 2 and principal instalments in months ~~2~~5 through ~~22~~43) and the NY State claim of $31,044 (payable in month ~~8~~5); (e) Domestic Support

Obligations of $33,831 (payable in month ~~10~~7); and (f) Allowed General Unsecured Claims of $~~243,285~~241,284.63, plus a reserve of $107,000 for any Allowed WineCredit deficiency claim (payable with 4% interest over the Plan period).

**7.2 Disputed Claim Reserve.**

Notwithstanding anything to the contrary in this Plan, the Debtor shall establish and fund the Disputed Claim Reserve from Plan funds in an amount equal to one hundred percent (100%) of the aggregate amount of all Disputed Co-op Claims as of the Effective Date. In the event that WineCredit has a deficiency claim and files such claim prior to the Effective Date, the Debtor will include such amount in the Disputed Claim Reserve. The Disputed Claim Reserve shall be held in an escrow account maintained by the Debtor's counsel, Weinberg Zareh Malkin Price LLP, for the benefit of the Estate pending the resolution of all Disputed ~~Co-op~~ Claims.

The Debtor shall have the right to object to any Disputed ~~Co-op~~ Claim, and any such objection shall be resolved by the Bankruptcy Court. Upon the entry of a Final Order resolving any Disputed ~~Co-op~~ Claim, the Debtor shall distribute from the Disputed Claim Reserve an amount equal to the Allowed portion of any such Disputed ~~Co-op Claim to the Co-op~~, together with any interest earned thereon, within fourteen (14) days of entry of such Final Order. Any funds remaining in the Disputed Claim Reserve attributable to the disallowed portion of any Disputed ~~Co-op~~ Claim shall be released to the Debtor.

The establishment of the Disputed Claim Reserve shall not constitute an admission by the Debtor of the validity, priority, or amount of any Disputed ~~Co-op~~ Claim, and the Debtor expressly reserves all rights, objections, and defenses with respect thereto. The ~~Co-op's~~ rights to payment from the Disputed Claim Reserve shall be limited to the Allowed amount of any Disputed ~~Co-op~~ Claim as determined by the Bankruptcy Court. Pending final resolution of all Disputed ~~Co-op~~ Claims, the funds in the Disputed Claim Reserve shall not be available for distribution to any other creditor or party in interest.

**7.3 Claims Objection Deadline.**

Unless otherwise ordered by the Bankruptcy Court, objections to Claims shall be filed and served ~~no~~on the later ~~than~~of ninety (90) days after the Effective Date or ninety (90) days after a claim is filed or amended (the "**Claims Objection Deadline**"). The Debtor may, for cause shown, seek one or more extensions of the Claims Objection Deadline by motion filed prior to its expiration. Any Claim as to which no objection has been timely filed and served on or before the Claims Objection Deadline (as may be extended) shall be deemed an Allowed Claim in the amount set forth in the applicable proof of claim or, if no proof of claim was filed, in the amount scheduled by the Debtor as undisputed and non-contingent. Nothing in this Section shall limit the Debtor's right to object to any Disputed Co-op Claim in accordance with Section 7.8 of this Plan, which objections may be filed at any time prior to the final resolution of the Disputed Claim Reserve.

# ARTICLE VIII — TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**8.1 Assumption and Rejection.**

On the Effective Date, the proprietary lease for Unit 5C at 301 East 52nd Street shall be assumed by the Debtor, who shall retain the Property. The cure amount payable to the Co-op under section 365(b)(1) of the Bankruptcy Code upon such assumption is the Co-op's attorneys' fees of approximately $73,065, as set forth in Section 6.1; all maintenance and other charges under the proprietary lease have been paid in full. To the extent the Debtor and the Co-op do not agree on the cure amount, the disputed portion shall be determined by the Bankruptcy Court at or following the Confirmation Hearing and shall be held in the Disputed Claim Reserve pending such determination, and the undisputed portion shall be paid on the Effective Date. All other executory contracts and unexpired leases not previously assumed or rejected shall be deemed rejected as of the Effective Date, unless otherwise provided by separate order of the Bankruptcy Court.

**8.2 Claims Arising from Rejection.**

Any Claim arising from the rejection of an executory contract or unexpired lease pursuant to this Plan must be filed with the Bankruptcy Court no later than thirty (30) days after the Effective Date or shall be forever barred.

# ARTICLE IX — CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVENESS

**9.1 Conditions Precedent to Confirmation.**

The following are conditions precedent to confirmation of the Plan: (a) the Confirmation Order shall be in form and substance reasonably acceptable to the Debtor; and (b) the Plan shall comply with the applicable provisions of the Bankruptcy Code.

**9.2 Conditions Precedent to the Effective Date.**

The following are conditions precedent to the occurrence of the Effective Date: (a) the Confirmation Order shall have been entered and shall have become a Final Order; and (b) all documents, instruments, and agreements necessary to implement the Plan shall have been executed and delivered.

**9.3 Waiver of Conditions.**

The Debtor may waive any of the conditions set forth in sections 9.1 and 9.2, other than conditions required by the Bankruptcy Code, without notice, leave, or order of the Bankruptcy Court and without any formal action.

## ARTICLE X — DISCHARGE, RELEASE, AND INJUNCTION

**10.1 Discharge.**

Pursuant to section 1141(d)(5) of the Bankruptcy Code, the Debtor shall receive a discharge upon the completion of all payments under the Plan, as provided by applicable law.

**10.2 Injunction.**

Except as otherwise provided in the Plan or the Confirmation Order, on and after the Confirmation Date, all entities that have held, hold, or may hold Claims against or Interests in the Debtor are permanently enjoined from commencing or continuing any action or proceeding against the Debtor or the Estate on account of any such Claim or Interest.

**10.3 Reservation of Rights to Pursue Estate Causes of Action.**

Notwithstanding any provision of this Plan to the contrary, the Debtor, on behalf of the Estate, hereby expressly reserves and retains all Estate Causes of Action, whether or not such Estate Causes of Action are specifically identified or described herein. Nothing in this Plan, the Confirmation Order, or any order of the Bankruptcy Court shall be deemed a waiver, release, or relinquishment of any Estate Cause of Action. The Debtor shall have the exclusive right, authority, and standing to commence, prosecute, settle, or abandon any Estate Cause of Action, as the representative of the Estate, after the Confirmation Date. The failure to specifically identify or describe any particular Estate Cause of Action in this Plan or the Disclosure Statement shall not constitute, and shall not be deemed to constitute, a waiver, release, or abandonment of any such Estate Cause of Action. All Estate Causes of Action are expressly preserved for the benefit of the Estate and its creditors.

Without limiting the generality of the foregoing, the Debtor specifically reserves the right to pursue causes of action against the Co-op, including claims arising from the Department of Buildings violation disputes, accounting errors, excessive fees, and other matters.

# ARTICLE XI — RETENTION OF JURISDICTION

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall retain exclusive jurisdiction over the following matters: (a) to hear and determine all motions, applications, adversary proceedings, and contested or litigated matters arising out of, under, or related to the Chapter 11 Case; (b) to ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of this Plan; (c) to hear and determine any objections to Claims or to the allowance, classification, or priority of any Claim; (d) to enter and implement such orders as may be necessary to execute, interpret, or enforce the provisions of this Plan or to maintain the integrity of this Plan; (e) to modify this Plan before or after the Confirmation Date; (f) to adjudicate any disputes concerning the Property or the Loan Modification; (g) to consider and approve fee applications of professionals retained in this Chapter 11 Case; (h) to determine all matters relating to compensation and reimbursement of expenses under sections 330 and 331 of the Bankruptcy Code; (i) to hear and determine matters concerning federal, state, and local taxes; (j) to hear and determine all Estate Causes of Action, including, without limitation, actions arising under sections 502, 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code, and any other avoidance actions, preference actions, fraudulent transfer or conveyance actions, and any other causes of action of the Debtor or the Estate, and to enter such orders as may be necessary to effectuate recovery on account of any Estate Cause of Action; (k) to enter a final decree closing this Chapter 11 Case; and (l) to hear any other matter not inconsistent with the Bankruptcy Code. For the avoidance of doubt, the Bankruptcy Court shall not retain exclusive jurisdiction over claims and causes of action against third parties that are not required to be brought before the Bankruptcy Court.

# ARTICLE XII — LIQUIDATION ANALYSIS AND FEASIBILITY

**12.1 Liquidation Analysis.**

Section 1129(a)(7) of the Bankruptcy Code requires that each holder of an Allowed Claim in an impaired Class that has not accepted the Plan will receive or retain under the Plan at least as much as such holder would receive if the Debtor's Estate were liquidated under Chapter 7 of the Bankruptcy Code. The Debtor believes the Plan satisfies this "best interests of creditors" test.

The Property is carried at $4,500,000 in the Debtor's most recent Monthly Operating Report. The marketing process described in Sections 1.3 and 1.4 did not yield any offers. Mandatory Local Law 11 façade work began on the building on May 5, 2025; when it reached the south elevation in late August 2025 the building was enclosed in scaffolding, cranes and equipment were placed on the Property's 1,400 square foot terrace with the terrace furniture stacked in its center, and the terrace has been unusable since. The managing agent has stated that it has no completion date. Both listing brokers reported the same three recurring comments from prospective purchasers: the condition of the building's lobby, hallways and staircases; the Local

Law 11 work with no completion date; and the cost of renovating the interior. Following a client viewing, Seth Levin of Keller Williams on April 22, 2026, reported via text "I just touched base with the agent again. She had been waiting for more feedback from her buyers. She just texted me that they really like your property but are unsure about the building". On November 25, 2025, Serhant recommended reducing the asking price to approximately $4,500,000, citing limited buyer interest driven by co-op rules, building conditions and renovation costs of $700 to $1,200 per square foot. On April 6, 2026, Keller Williams issued a broker price opinion putting the as-is value at approximately $4,800,000 with a baseline of approximately $4,500,000. The Property was listed at $4,500,000 from May 7, 2026 and was shown throughout, and no offer was received before the listing was withdrawn on July 15, 2026. The Plan Budget therefore uses $4,100,000 as the forced-sale value, approximately 9% below the last asking price at which no offer was received and 15% below the broker's as-is opinion, to reflect the discount a Chapter 7 trustee's sale would attract while the façade work continues.

In a hypothetical Chapter 7 liquidation, a trustee would be appointed and would be tasked with liquidating the Debtor's assets. The costs associated with a Chapter 7 liquidation — including trustee commissions (up to the statutory maximum under section 326 of the Bankruptcy Code), additional professional fees, wind-down costs, and the potential for fire-sale pricing — would substantially reduce the value available for distribution to creditors. ~~In a Chapter 7 liquidation, the Property would be sold and is estimated to yield approximately $4,000,000 in gross proceeds, which would be sufficient to pay the Co-op's claim (approximately $22,451) and HSBC's secured claim (approximately $3,484,972), with limited remaining funds for other creditors after trustee fees and costs of sale.~~In a Chapter 7 liquidation, the Property would be sold by a trustee while the Local Law 11 work described above continues. Based on the broker price opinion of approximately $4,800,000 as-is, the absence of any offer at the $4,500,000 asking price over ten weeks of showings, and the discount customarily attracted by a trustee's sale, the Plan assumes gross proceeds of approximately $4,100,000. After costs of sale of approximately 8% ($328,000), HSBC's secured claim (approximately $3,517,796, the projected balance under the Loan Modification as of April 2027), the Chapter 7 trustee's commission under section 326 of the Bankruptcy Code (approximately $146,250) and the Debtor's New York homestead exemption ($180,000), the sale of the Property would yield nothing for other creditors. The Debtor's remaining non-exempt personal property (HiFi equipment, artwork and piano) might realize approximately $148,000 at a trustee's auction, which is less than the approximately $576,552 of Priority Tax Claims, Domestic Support Obligations and the Co-op's cure claim that must be paid first. Even at a sale price of $4,500,000, the funds available after costs, HSBC, the trustee's commission and the homestead exemption (approximately $432,000 including personal property) would not cover the priority and cure claims. Accordingly, holders of General Unsecured Claims would receive no distribution in a Chapter 7 liquidation. Under this Plan, creditors receive payment in full (with interest) from the Debtor's employment income and other sources over time, which is ~~at least as favorable as, and likely~~substantially more favorable than~~,~~ what they would receive in a Chapter 7 liquidation. ~~The Debtor believes that distributions under the Plan will equal or exceed~~

~~the distributions that would be received in a Chapter 7 liquidation.~~ Additionally, the Debtor is contributing substantial post-confirmation income to the Plan which would not be available in a liquidation under Chapter 7.

**12.2 Feasibility.**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor, unless the Plan so provides.

The Plan is feasible because the Debtor has sufficient starting available funds of $162,724 along with projected income and assets to fund all required distributions over the ~~35-month~~ Plan period (~~July~~October 2026 through ~~May 2029).~~April 2030, with the Plan Budget extending through June 2030) while maintaining a minimum bank balance of $15,000 from February 2027 onwards. The Debtor's projected funding sources are as follows:

• Employment Income: Net monthly salary of $18,~~309~~226 from Mizuho Americas (totaling $~~640,830~~820,170 over the Plan period), with 2025 total compensation of $985,000 and the Plan ~~conservatively~~ assuming ~~flat~~ compensation of $1.1m going forward. In the event that the Debtor's income increases, monthly payments under the Plan will be increased commensurately, based on a percentage increase. By way of example, if the Debtor's income were to double, monthly payments under the Plan will likewise increase by 100% such that creditors would be repaid on an accelerated schedule;

• Annual Bonuses: Net annual bonus ~~of approximately $215,500,~~ payable ~~three~~four times during the Plan period (April 2027~~,~~ ($51,603 after repayment of bonus advance), April 2028~~,~~ ($256,270), April 2029 ($256,270) and April ~~2029),~~2030 ($256,270)), totaling $~~646,500~~820,413;

• Deferred Compensation: ~~Deferred~~Vesting of deferred bonuses ~~from 2026 ($17,500),~~payable in April 2027 ($~~51,333), and~~ 6,102), April 2028 ($~~25,667~~42,712), April 2029 ($79,322) and April 2030 ($109,830), totaling approximately $~~94,500~~237,965;

• ~~Fidelity~~BNY Deferred Compensation Distributions: Two (2) distributions totaling $~~68,045~~62,150 — consisting of $~~53,000~~48,164 in February 2027 and $13,986 in February 2028 ~~and $15,045 in February 2029;~~

~~• Spousal Contributions: Zulema Arroyo will contribute $5,000/month from July through November 2026~~ , plus dividend equivalents on the deferred shares of $2,090 in March 2027 and $~~10,000/month from December 2026 onwards, totaling approximately $325,000 over the Plan period~~494 in March 2028 (net of taxes), $2,584 in total;

• Personal Property Sales and Settlements: HiFi equipment ($~~113,430 net of consignment fees, via The Music Room~~174,250), piano ($~~30~~36,000), artwork ($37,000) and clothing ($~~10,000), and BNY settlement ($25~~18,000), totaling $~~178,430~~265,250;

• Social Security: $2,8201,918/month (net of taxes) commencing January 2027, 2028, totaling $57,528 over the Plan period;

• Reimbursements: refunds and reimbursements of medical, dental, vision and business expenses totaling $81,780 over the Plan period4,180 incurred in September 2026.

Of the $180,087 held at Fidelity, the BNY deferred compensation and the deferred portion of the 2026 Mizuho bonus (together approximately $80,455 net of tax) are included in the Plan Budget; the balance, the Debtor's 401(k) and brokerage accounts of approximately $21,539, is not included as a funding source and is available to the Debtor as a contingency should any projected income stream fall short. The 401(k) account receives contributions of 8% of the Debtor's base salary each year (a 4% employee deferral from gross salary, already reflected in the net salary used in the Plan Budget, matched by a 4% employer contribution from Mizuho), approximately $32,000 per year in total, so that, before any investment return, the account is expected to grow to approximately $133,000 by the end of the Plan period.

Total projected net income over the Plan period is approximately $2,035,085.270,240. When the starting bank balance of $162,724 is added to this amount there is a total of $2,432,964 available to fund expenses and plan payments. Total projected expenses (including mortgage, Co-Op fees, utilities, and living expenses, with all living expenses other than the fixed HSBC mortgage payment escalated by 3% annually from October 2027) are approximately $979,9221,225,835. Remaining projected disposable income available for creditor distributions, together with the starting bank balance is approximately $1,083,663207,129, which is sufficient to fund all required distributions under the Plan (totaling approximately $970,0291,134,041 in Administrative Claims, Priority Claims, and General Unsecured Claims combined).

## ARTICLE XIII — RISK FACTORS

Holders of Claims should consider the following risk factors in deciding whether to vote to accept or reject the Plan:

### 13.1 Loan Modification Compliance.

The Plan depends on the Debtor's continued compliance with the terms of the Loan Modification with HSBC. Failure to make timely monthly mortgage payments could result in HSBC declaring a default and exercising its remedies, including foreclosure on the Property, which could jeopardize the Plan.

### 13.2 Employment Continuity.

The Plan depends on the Debtor's continued employment at Mizuho Americas or comparable employment. While the Debtor was recently promoted and the Plan conservatively

assumes ~~flat~~a modest compensation increase over the compensation received in 2025, there can be no assurance that the Debtor will remain employed for the full duration of the Plan.

**13.3 Sufficient Income.**

While the Debtor believes that the combination of employment income, bonuses, deferred compensation, ~~spousal contributions,~~ asset sales, and Social Security retirement ~~distributions~~benefits will generate sufficient funds to satisfy all Allowed Claims, there can be no assurance that all projected income streams will materialize as anticipated. In the event that the Debtor's projected income is insufficient, holders of General Unsecured Claims may receive less than the full amount of their Allowed Claims. The Debtor's 401(k) account (approximately $21,524 at October 2026, and growing by employee and employer contributions of approximately $32,000 per year), which is not relied upon in the Plan Budget, would be available to mitigate any such shortfall.

**13.4 Claims Objections.**

The Debtor reserves the right to object to any Claim. The actual amount of Allowed Claims may differ from the amounts currently scheduled or reflected in filed proofs of claim. In particular, any deficiency claim of WineCredit LLC will depend on the proceeds realized from the sale of the wine collection, which has not yet occurred; the deficiency may exceed the $107,000 reserved in the Plan Budget, in which case the Allowed Class 5 Claims, and the distributions required under the Plan, would be correspondingly larger. This may affect the distributions under the Plan.

**13.5 Tax Consequences.**

The Plan may result in tax consequences for the Debtor and the Estate. Creditors are urged to consult their own tax advisors regarding any tax consequences of the Plan.

**13.6 BNY Settlement.**

The Debtor may not ultimately be successful in negotiating the anticipated BNY Settlement~~, which would leave the estate with a smaller pool of funds to pay claims in the short term~~.

## ARTICLE XIV — VOTING PROCEDURES AND CONFIRMATION

**14.1 Voting on the Plan.**

Pursuant to section 1126 of the Bankruptcy Code, no Class of Claims is Impaired under the Plan. Accordingly, no Class of Claims is entitled to vote to accept or reject the Plan as all Classes are conclusively presumed to have accepted the Plan.

**14.2 Acceptance of the Plan.**

Pursuant to section 1126(c) of the Bankruptcy Code, a Class of Claims has accepted the Plan if the Plan has been accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the Allowed Claims of such Class that have actually voted.

**14.3 Confirmation Standards.**

At the Confirmation Hearing, the Court will determine whether the requirements of section 1129 of the Bankruptcy Code have been satisfied, including, among others, that: (a) the Plan complies with the applicable provisions of the Bankruptcy Code; (b) the proponent of the Plan has complied with the applicable provisions of the Bankruptcy Code; (c) the Plan has been proposed in good faith; (d) the Plan satisfies the "best interests of creditors" test set forth in section 1129(a)(7); (e) the Plan is feasible pursuant to section 1129(a)(11); and (f) all amounts payable for services or costs and expenses in connection with the case have been approved by the Court.

**14.4 Federal Tax Consequences.**

The following is a summary of certain significant United States federal income tax consequences of the Plan to the Debtor and holders of Claims. This summary is based on the Internal Revenue Code of 1986, as amended, and is for informational purposes only. It does not address all aspects of federal income taxation that may be relevant to particular holders of Claims. Each holder of a Claim is urged to consult its own tax advisor regarding the federal, state, local, and foreign tax consequences of the Plan.

Generally, a creditor who receives cash in satisfaction of a Claim will recognize gain or loss equal to the difference between the amount of cash received and the creditor's adjusted tax basis in the Claim. The character of any gain or loss (as ordinary income or capital gain) will depend on the nature of the Claim and the circumstances of the holder.

## ARTICLE XV — MISCELLANEOUS PROVISIONS

**15.1 Payment of Statutory Fees.**

All fees payable pursuant to 28 U.S.C. § 1930 shall be paid on or before the Effective Date and shall continue to be paid until the Chapter 11 Case is closed, converted, or dismissed.

**15.2 Post-Confirmation Reporting.**

The Debtor shall file all post-confirmation reports required by the Bankruptcy Court, the U.S. Trustee, and applicable law until the Chapter 11 Case is closed.

**15.3 Breach of the Plan.**

In the event the Debtor breaches the Plan payment requirements, the Debtor shall promptly file a notice with the Bankruptcy Court and request a hearing to determine whether the case should be converted to Chapter 7 and/or a sale process for the Property commenced to pay remaining claims.

**15.4 Amendments and Modifications.**

The Debtor reserves the right, in accordance with the Bankruptcy Code, to amend or modify this Plan at any time before the Confirmation Date and, with the approval of the Bankruptcy Court, after the Confirmation Date and before substantial consummation of the Plan.

**15.45 Revocation or Withdrawal of the Plan.**

The Debtor reserves the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Plan is revoked or withdrawn, it shall be null and void, and nothing contained in the Plan shall constitute a waiver or release of any Claims by or against the Debtor.

**15.56 Governing Law.**

Except to the extent that the Bankruptcy Code or other federal law is applicable, the rights, duties, and obligations arising under this Plan shall be governed by the laws of the State of New York, without giving effect to conflict of laws principles.

**15.67 Notices.**

All notices and requests in connection with this Plan shall be in writing and shall be delivered to: Counsel for the Debtor: (i) Weinberg Zareh Malkin Price LLP, Attn: Adrienne Woods, Esq., 45 Rockefeller Plaza, 20th Floor, New York, New York 10111, Phone: (212) 899-5470, Email: awoods@wzmplaw.com.awoods@wzmplaw.com and (ii) Pillsbury Winthrop Shaw Pittman LLP, 31 West 52nd Street, New York, New York 10019, Phone: (212) 858-1170, Email: hugh.mcdonald@pillsburylaw.com.

**15.78 Exculpations.**

Notwithstanding anything herein to the contrary, to the fullest extent permitted by applicable law, no Exculpated Party (as defined below) shall have or incur, and each Exculpated Party shall be released and exculpated from, any claim, obligation, right, cause of action, remedy, or liability whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in connection with or arising out of the administration of the Chapter 11 Case; the negotiation and pursuit of the Disclosure Statement, any settlement or other acts approved by the Bankruptcy Court, and the Plan or confirmation of the Plan; the occurrence of the Effective Date; the administration and implementation of the Plan or the property to be sold or distributed under the Plan; or the transactions in furtherance of any of the foregoing; other than claims or liabilities arising out of or relating to any act or omission of an Exculpated Party that is determined by a Final Order of a court of competent jurisdiction to have constituted willful misconduct, intentional fraud, or gross negligence.

For purposes of this Section 15.8, the term "Exculpated Party" or "Exculpated Parties" shall mean the Debtor, the Debtor's attorneys at Weinberg Zareh Malkin Price LLP and Pillsbury Winthrop Shaw Pittman LLP, and the Debtor's financial advisor at Vernon Consulting, Inc, and each of their respective current and former members, partners, shareholders, officers, directors, associates, employees, agents, and representatives, in each case acting in their capacity as professionals retained by, or fiduciaries of, the Debtor's estate in the Chapter 11 Case.

No entity may commence or continue any action, employment of process, or act to collect, offset, or recover any claim or cause of action released or exculpated under this Section 15.8, and any such action or proceeding shall be enjoined. Any entity that violates this injunction shall be subject to sanctions, including contempt of court.

**15.9 Successors and Assigns.**

The rights, benefits, and obligations of any entity named or referred to in this Plan shall be binding on, and inure to the benefit of, any successor or assign of such entity.

**15.~~8~~10 Severability.**

If any term or provision of this Plan is held to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.

**15.~~9~~11 Final Decree.**

The Debtor shall file a motion requesting entry of a final decree closing this Chapter 11 Case after the Estate has been fully administered and all distributions required under this Plan have been made.

**15.~~10~~12 Recommendation.**

The Debtor believes that the Plan affords creditors the best opportunity to receive the maximum recovery on their Claims. The Debtor's retention of the Property pursuant to the Loan Modification, combined with the Debtor's employment income, bonuses, deferred compensation, ~~spousal contributions,~~ asset sales, and Social Security retirement ~~distributions~~benefits, will generate sufficient funds to pay all creditors in full with interest. The Debtor recommends that all creditors entitled to vote accept the Plan.

Respectfully submitted,

*/s/ Nicholas John Farley*

Nicholas John Farley

Dated: ~~August 4~~October 16, 2026
New York, New York

WEINBERG ZAREH MALKIN PRICE LLP

*/s/ Adrienne Woods*
Adrienne Woods, Esq.
Omid Zareh, Esq.
Terrence K. McLaughlin, Esq., of Counsel
Donna Fiorelli, Esq., of Counsel
45 Rockefeller Plaza, 20th Floor
New York, New York 10111
Phone: 212-899-5470
Email: awoods@wzmplaw.com
Email: ozareh@wzmplaw.com
Email: tmclaughlin@wzmplaw.com
Email: dfiorelli@wzmplaw.com

And

Hugh M. McDonald
PILLSBURY WINTHROP SHAW PITTMAN LLP
31 West 52nd Street
New York, New York 10019
Phone: 212-858-1170
Email: hugh.mcdonald@pillsburylaw.com

*Counsel to Debtor*